No. 22-2948

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| LISA ALCORN, as Independent Administrator of the Estate of TYLER LUMAR, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiff-Appellant | |
| v. | No. 17 C 5859 |
| THE CITY OF CHICAGO, *et al.*, | The Honorable Virginia M. Kendall District Judge |
| Defendants-Appellees. | |

**BRIEF AND CIRCUIT RULE 30 APPENDIX OF
PLAINTIFF-APPELLANT LISA ALCORN**

BRYAN J. O'CONNOR, SR.
O'CONNOR LAW GROUP, LLC
19 South LaSalle Street
Suite 3250
Chicago, IL 60603
(312) 236-1814
boc@oconnorlawgroup.com

DONALD J. PECHOUS
THE KHOWAJA LAW FIRM, LLC
8 South Michigan Avenue
Suite 2600
Chicago, IL 60603
(312) 388-1198
dpechous@khowajalaw.com

*Attorneys for Plaintiff-Appellant*

**ORAL ARGUMENT REQUESTED**

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>22-2948</u>

Short Caption: <u>Alcorn v. City of Chicago, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement stating the following information in compliance with <u>Circuit Rule 26.1</u> and <u>Fed. R. App. P. 26.1</u> .

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):

> **<u>Lisa Alcorn, as Independent Administrator of the Estate of Tyler Lumar</u>**

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

> **<u>The Khowaja Law Firm, LLC</u>**

> **<u>O'Connor Law Group, LLC</u>**

(3) If the party or amicus is a corporation: **N/A**

i) Identify all its parent corporations, if any; and

> **N/A**

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

**N/A**

Attorney's Signature: _/S/Donald J Pechous_     Date: _January 27, 2023_

Attorney's Printed Name: _Donald J Pechous_

Please indicate if you are _Counsel of Record_ for the above listed parties pursuant to Circuit Rule 3(d). Yes_ X _  No ___.

Address:      8 South Michigan Avenue
              Suite 2600
              Chicago, IL 60603

Phone Number: 312-388-1198      Fax Number: 312-386-0575

E-Mail Address: dpechous@khowajalaw.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>22-2948</u>

Short Caption: <u>Alcorn v. City of Chicago, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement stating the following information in compliance with <u>Circuit Rule 26.1</u> and <u>Fed. R. App. P. 26.1</u> .

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):

### Lisa Alcorn, as Independent Administrator of the Estate of Tyler Lumar

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

**The Khowaja Law Firm, LLC**

**O'Connor Law Group, LLC**

(3) If the party or amicus is a corporation: **N/A**

i) Identify all its parent corporations, if any; and
**N/A**
ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
**N/A**

Attorney's Signature: /S/*Bryan J O'Connor*  Date: January 27, 2023
Attorney's Printed Name: Bryan J O'Connor

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to
Circuit Rule 3(d). Yes___  No __X__.

Address:   221 N LaSalle Street, Suite 1750, Chicago, IL  60601


Phone Number: 312-236-1814     Fax Number: 312-580-5479

E-Mail Address: boc@oconnorlawgpr.com

# TABLE OF CONTENTS

Table of Authorities ...................................................................................... iii

Jurisdictional Statement ................................................................................ 1

Statement of the Issues Presented for Review ............................................ 3

Statement of the Case .................................................................................... 4

    Nature of the Case ...................................................................................... 4

    Course of Proceedings ................................................................................ 5

    Disposition Below ....................................................................................... 5

    Statement of Facts ..................................................................................... 6

Summary of the Argument ........................................................................... 18

Standard of Review ....................................................................................... 21

Argument ....................................................................................................... 22

    I.    The City of Chicago Enforced an Express Policy that Mandates
        Needless Detention Because It Requires an Arrestee, Detained on a
        Misdemeanor Warrant and Prepared to Post Bail, to Appear in
        Bond Court Even Though the Judicial Officer Who Issued the
        Warrant Predetermined the Bond Amount .......................................... 22

        A.    The Policy Violates State Law, Proving that Lumar's Detention
            in Anticipation of a Bond Hearing was Needless and Thus
            Unreasonable under the Fourth Amendment ............................. 24

        B.    The 48-hour *McLaughlin* Burden Shifting Approach Should
            Not Apply Since the Law Did Not Contemplate Any Hearing ..... 30

        C.    The General Administrative Order was Invalid, Void *Ab Initio*
            and Offers No Defense to the City's Unconstitutional Policy ....... 31

    II.    Wlodarski Never Had Probable Cause to Believe Tyler Lumar
        Possessed Drugs Because Wlodarski Saw the Contraband on the
        Floor of a Crowded Room Before Lumar Ever Touched It ................... 35

III.    Tyler Lumar's Suicide was Legally Foreseeable and Plaintiff
        Should be Allowed to Pursue Damages Under Both 42 U.S.C. §
        1983 and the Illinois Wrongful Death Act. ........................................ 42

Conclusion ............................................................................................................. 48

Certificate of Compliance with Rule 32(a) ........................................................ 49

Certificate of Service ........................................................................................... 50

Circuit Rule 30(d) Statement ............................................................................. 51

Circuit Rule 30(a) and 30(b) Appendix .......................................................... A1

# TABLE OF AUTHORITIES

## Cases

*Alexander v. United States*, 721 F.3d 418 (7th Cir. 2013) ........................................... 39

*Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630 (7th Cir. 2002) ............................... 27

*Arlotta v. Bradley Center*, 349 F.3d 517 (7th Cir. 2003) ............................................ 29

*Beard v. Mitchell*, 604 F.2d 485 (7th Cir. 1979) .......................................................... 44

*Belbachir v. Cnty. of McHenry*, 726 F.3d 975, 980 (7th Cir. 2013) .......................... 45

*Benedix v. Vill. of Hanover Park*, 677 F.3d 317 (7th Cir. 2012)) ............................... 34

*Bennett v. Council 31 of Am. Fed'n of State, Cnty. & Municipal Emps., AFL-CIO*, 991 F.3d 724, (7th Cir. 2021) ............................................................... 21

*Black Earth Meat Market, LLC v. Village of Black Earth*, 834 F.3d 841, (7th Cir. 2016) ..................................................................... 20

*Blair v. Mackoff*, 284 Ill. App. 3d 836 (Ill. App. Ct. 1996)) ........................................ 33

*Calhoun v. Ramsey,* 408 F.3d 375 (7th Cir. 2005) ...................................................... 23

*Carey* v. *Piphus,* 435 U.S. 247 (1978).......................................................................... 42

*Chortek v. City of Milwaukee*, 356 F.3d 740 (7th Cir. 2004) ............................... 23, 30

*Crumpton v. Walgreen Co.*, 375 Ill. App. 3d 73 (1st Dist. 2007) ............................... 45

*City of Okla. v. Tuttle*, 471 U.S. 808 (1985) ............................................................... 23

*County of Riverside v. McLaughlin,* 500 U.S. 44 (1991).............................................. 23

*Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539 (2017) ................................... 42

*Dezort v. Village of Hinsdale,* 35 Ill.App.3d 703 (Ill. App. Ct. 1976) ........................ 45

*Doe v. Sheriff of DuPage County*, 128 F.3d 586 (7th Cir. 1997)................................. 29

*Florence v. Bd. of Chosen Freeholders of County of Burlington*, 566 U.S. 318 (2012) .................................................................................................. 35

*Franks v. Delaware*, 438 U.S. 154 (1978)..................................................................... 36

*Gerstein v. Pugh*, 420 U.S. 103 (1975) .................................................................. 23, 36

*Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) ................................................. 42

*Gunville v. Walker*, 583 F.3d 979 (7ᵗʰ Cir. 2009) ........................................................ 12

*Henry v. Hulett*, 969 F.3d 769 (7ᵗʰ Cir. 2020) ........................................................... 20

*Hernandez v. Sheahan*, 455 F.3d 772 (7ᵗʰ Cir. 2006) .....................................25, 33-34

*In re Oliver*, 452 F.2d 111 (7ᵗʰ Cir. 1971).................................................................... 33

*Jones v. Clark*, 630 F.3d 677 (7ᵗʰ Cir. 2011) ............................................................... 36

*Jutzi-Johnson v. U.S.*, 263 F.3d 753 (7ᵗʰ Cir. 2001) ................................................... 43

*La Bombarbe v. Phillips Swager Associates Inc.*, 130 Ill. App. 3d 896 (Ill. App. Ct. 1985).......................................................................................................................... 43

*Lampe v. Ascher*, 59 Ill. App.3d 755, 376 N.E.2d 74 (Ill. App. Ct. 1978)..............26-27

*Latuszkin v. City of Chicago,* 250 F.3d 502 (7ᵗʰ Cir. 2001) ......................................... 23

*Lawson v. Veruchi*, 637 F.3d 699 (7ᵗʰ Cir. 2011).) ....................................................... 36

*Leavitt v. Farwell Tower Ltd. Partnership*, 625 N.E.2d 48, 52 (Ill. App. Ct. 1993)........................................................................................................................... 45

*Lester v. City of Chicago*, 830 F.2d 706 (7ᵗʰ Cir. 1987)................................................ 35

*Lewis v. City of Chi.*, 914 F.3d 472 (7ᵗʰ Cir. 2019)................................................ 37, 40

*Little v. Chicago Hoist Body Co.*, 32 Ill. 2d 156 (Ill. 1965) ......................................... 46

*Llaguno v. Mingey*, 763 F.2d 1560 (7ᵗʰ Cir. 1985) ...................................................... 35

*Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006) ............................................... 31

*Manuel v. City of Joliet*, 137 S. Ct. 911 (2017) ..................................................... 36, 40

*Manuel v. City of Joliet,* (Manuel II) 903 F.3d 667 (7th Cir. 2018) ............................ 40

iv

*Maxwell v. City of Indianapolis*, 998 F.2d 431 (7th Cir. 1993) ............................ 35, 36

*McLaughlin v. Sullivan*, 123 N.H. 335 (N.H. 1983) .................................................. 46

*McCormick v. City of Chicago*, 230 F.3d 319 (7th Cir. 2000) ...................................... 23

*Memphis Community School Dist. v. Stachura*, 477 U.S. 299 (1986)........................ 42

*Monell v. New York City Department of Social Services,* 436 U.S. 658,
    98 S. Ct. 2018 (1978) ............................................................................ 22

*Moore v. Kusper*, 465 F.2d 256 (7th Cir. 1972) ........................................................ 27

*Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336 (7th Cir. 1985) ............... 27, 35

*Neiman v. Keane*, 232 F.3d 577 (7th Cir. 2000)) ...................................................... 35

*Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020) .......................................... 37

*People ex Rel. Carey v. Power*, 59 Ill. 2d 569 (Ill. 1975)) ......................................... 32

*People v. Harbach*, 298 Ill. App. 3d 111 (Ill. App. Ct. 1998). .................................. 27

*People v. McAfee*, 853 N.E.2d 107 (Ill. App. Ct. 2006) .............................................. 33

*People v. Schroeder*, 102 Ill. App. 3d 133 (Ill. App. Ct. 1981) ................................. 33

*Portis v. City of Chicago*, 613 F.3d 702 (7th Cir. 2010) .................................. 23, 30, 34

*R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs.*, 335 F.3d
    643 (7th Cir. 2003)............................................................................ 21

*Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir. 2001) .............................................. 42

*Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605 (7th Cir. 2002)............................. 42

*Sterling Nat'l Bank v. Block,* 984 F.3d 1210, (7th Cir. 2021) .................................... 20

*Stone v. Wright*, 734 F. App'x 989 (7th Cir. 2018) .................................................... 40

*Surplus Store Exchange, Inc. v. City of Delphi*, 928 F.2d 788 (7th Cir. 1991) .......... 27

*Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006)....................................... 45

*United States v. Jacobsen*, 466 U.S. 109 (1984).........................................................24

*United States v. Williams*, 333 Fed. App'x 127 (7th Cir. 2009)..................................37

*Virginia v. Moore*, 553 U.S. 164 (2008) .....................................................................24

*Washington-Southern Nav. Co. v. Baltimore Phila. Steamboat Co.*,
    263 U.S. 629 (1924) .............................................................................................33

## Statutes, Rules and Constitutional Provisions

28 U.S.C. § 1291..........................................................................................................1

42 U.S.C. § 1983.....................................................................................................*passim*

Illinois Supreme Court Rule 21...................................................................................32

Federal Rule of Evidence 801(c) .................................................................................12

705 ILCS 35/28............................................................................................................32

705 ILCS 35/28............................................................................................................32

720 ILCS 570/402........................................................................................................36

725 ILCS 5/110-7(a), (b)..............................................................................................27

740 ILCS 180/1............................................................................................................45

U.S. Constitution Amendment IV...........................................................................passim

**JURISDICTIONAL STATEMENT**

The following statement is pursuant to Circuit Rule 28(a).  Jurisdiction for the United States District Court for the Northern District of Illinois, Eastern Division ("District Court") was based upon 28 U.S.C §§ 1331 and 1343.  Plaintiff-Appellant Lisa Alcorn ("Plaintiff"), as independent administrator of the estate of Tyler Lumar, filed a civil rights action under 42 U.S.C. § 1983 against Defendant-Appellees the City of Chicago, Sergeant Kevin Geyer, Officer Thomas Wlodarski, Sheriff Tom Dart, in his official capacity, and Cook County.  In this regard, Alcorn brought direct claims under the Fourth Amendment alleging that the City of Chicago enforced an unconstitutional, express policy, which resulted in the needless detention of Tyler Lumar. Plaintiff further brought claims against Officer Thomas Wlodarski under the Fourth Amendment for causing Lumar to suffer continued detention after a false claim of probable cause to believe that Lumar possessed drugs inside the Cook County Jail. Plaintiff also brought a claim of wrongful death under Illinois law against the City of Chicago and Cook County.

Jurisdiction over this action in the United States Court of Appeals for the Seventh Circuit is based upon 28 U.S.C. § 1291 from the District Court's final judgment, as to all claims against the City of Chicago, Sergeant Kevin Geyer, Officer Thomas Wlodarski, Sheriff Tom Dart, in his official capacity, and Cook County, entered on September 29, 2022.  (App. A1.)

On October 28, 2022, the Plaintiff filed a timely Notice of Appeal, appealing the District Court's final judgment, as to all claims against the City of Chicago,

Officer Thomas Wlodarski, Sheriff Tom Dart, in his official capacity, and Cook County.  (R. 411.) The Plaintiff is not appealing the District Court's final judgment as to the claims against Sergeant Kevin Geyer.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the District Court erred when it found that the Fourth Amendment was not violated where the City maintained and enforced an express policy of denying arrestees the right to post bail and mandated needless detention to attend an unnecessary bond hearing, as a judicial officer had already determined probable cause and bond amount.

2.     Whether the District Court erred when it found that Officer Wlodarski, the sole eyewitness, had probable cause to bring about the further detention of Tyler Lumar after Wlodarski fabricated evidence when he made false statements regarding the alleged recovery of suspected cocaine from Tyler Lumar.

3.     Whether the District Court erred when it granted summary judgment to the defendants on Plaintiff's claim of wrongful death under Illinois law where Plaintiff's Decedent, Tyler Lumar, attempted suicide at the very time he was experiencing mental torture due to the violations of his constitutional rights.

## STATEMENT OF THE CASE

<u>Nature of the Case</u>

On August 11, 2017, Alcorn brought a civil rights action pursuant to 42 U.S.C. § 1983 against the City of Chicago Defendants and the Cook County Defendants, alleging two distinct, yet inextricably intertwined, violations under the Fourth Amendment. (Dkt. 1.)

Plaintiff's complaints against the City Defendants stem from the arrest of Tyler Lumar on a valid arrest warrant and the subsequent enforcement of an express policy of the City that mandated a needless, excessive, and thus unreasonable detention in violation of the Fourth Amendment as a matter of law. (Dkt. 279).

Regarding Plaintiff's complaints against the Cook County Defendants, those claims arise from Officer Wlodarski's false statements that Tyler Lumar possessed drugs inside the Cook County Jail, while Lumar was suffering from the detention imposed by the City's challenged unconstitutional policy. Officer Wlodarski caused Lumar additional, illegal detention. (Dkt. 279). As a result of the illegal and unconstitutional acts of the Defendants, Lumar attempted suicide, which, in turn, led to his death. Lumar's suicide attempt was made while in custody at the very same he was suffering from severe mental distress that the illegal acts of the Defendants directly caused. (Dkt. 279).

The case was assigned to the Honorable Judge Virginia M. Kendall.

<u>Course of Proceedings</u>

On July 15, 2021, Plaintiff moved to voluntarily dismiss all claims against all defendants except for Sergeant Kevin Geyer, the City of Chicago, Thomas Wlodarski, Sheriff Tom Dart in his official capacity, and Cook County. (Dkt. 318.) The District Court granted Plaintiff's motion for voluntary dismissal on July 19, 2021. (Dkt. 322.)

On October 4, 2021, Plaintiff moved for Summary Judgment against Defendant Wlodarski on her Fourth Amendment claim of arrest without probable cause. (Dkt. 333). On October 4, 2021, Defendants Cook County, Sheriff Dart and Officer Wlodarski moved for Summary Judgment against Plaintiff. (Dkt. 329).

On October 15, 2021, Plaintiff moved for Summary Judgment against the City of Chicago and Sergeant Geyer on her Fourth Amendment claim of needless and excessive detention in violation of the Fourth Amendment. (R. 345). On October 15, 2021, Defendants City of Chicago and Sergeant Geyer moved for Summary Judgment against Plaintiff. (Dkt. 348).

<u>Disposition Below</u>

On September 27, 2022, the District Court entered a Memorandum Opinion and Order granting the City Defendants' Motion for Summary Judgment (Dkt. 348) in full and denying Plaintiff's Motion for Summary Judgment (Dkt. 345) in full. (Dkt.407).

On September 28, 2022, the District Court entered a Memorandum Opinion and Order granting the Sheriff's Office Defendants' Motion for Summary Judgment

(Dkt. 329) in full and denying Plaintiff's Motion for Summary Judgment (Dkt. 333) in full. (Dkt.408).

On September 29, 2022, the District Court entered judgment on behalf of all Defendants and against Plaintiff Lisa Alcorn. (Dkt. 409).

On October 28, 2022, Plaintiff-Appellant Lisa Alcorn filed her Notice of Appeal. This is a civil appeal as a matter of right pursuant to Federal Rule of Appellate Procedure 3(a) and Circuit Rule 3(a).

<u>Statement of Facts</u>

On August 18, 2016, Chicago Police Officers Daniel Warren and Carlos Vega were working patrol and received a call of an assault in progress and a disruptive patient at the Madison Health Clinic on Madison Street. (Dkt. 346 ¶¶ 2–3; Dkt. 368 ¶¶ 2–3; Dkt. 350 ¶ 4; Dkt. 365 ¶ 4.) Officers Warren and Vega were dispatched to the clinic at 3800 W. Madison Street where they observed Tyler Lumar inside the building. (Dkt. 346 ¶¶ 4–5; Dkt. 368 ¶¶ 4–5.) Officer Warren spoke with Lumar and the medical staff at the clinic. (Dkt. 346 ¶¶ 6–7; Dkt. 368 ¶¶ 6–7.) Lumar told Officer Warren he was unhappy with his medical services. (Dkt. 346 ¶ 6; Dkt. 368 ¶ 6). The doctor at the clinic wanted Lumar to leave the clinic and not return but also did not want to press charges. (Dkt. 346 ¶ 9; Dkt. 368 ¶ 9.) Lumar left the clinic after being told by Officer Warren that he was banned from the building. (Dkt. 346 ¶ 10; Dkt. 368 ¶ 10; Dkt. 350 ¶ 6; Dkt. 365 ¶ 6.)

After leaving the clinic, Officers Warren and Vega learned through their in-car personal terminal device ("PDT") of an outstanding warrant for Lumar's arrest

and attempted to locate him. (Dkt. 346 ¶¶ 11–12; Dkt. 368 ¶¶ 11–12; Dkt. 350 ¶ 8; Dkt. 365 ¶ 8.) The officers located Lumar, and Officer Warren placed him under arrest at approximately 3:58 p.m. on August 18, 2016. (Dkt. 346 ¶¶ 13–14; Dkt. 368 ¶¶ 13–14; Dkt. 350 ¶ 9; Dkt. 365 ¶ 9.) The arrest warrant was issued on June 7, 2016, by Lee County, IL for the offense of "Failing to Appear on Pay or Appear/Contempt Non-Pay." (Dkt. 346 ¶¶ 16, 23; Dkt. 368 ¶¶ 16, 23; Dkt. 364 ¶ 5; Dkt. 390 ¶ 5.) After the arrest, Lumar arrived at the 11th District police station ("11th District") around 4:26 p.m. (Dkt. 346 ¶¶ 17–18; Dkt. 368 ¶¶ 17–18.)

At approximately 4:26 p.m., Officer Vega contacted Corrine Esteban at Chicago Police Department's Law Enforcement Agencies Data System ("LEADS") desk to confirm the validity of the warrant. (Dkt. 350 ¶ 10; Dkt. 365 ¶ 10.) Esteban confirmed the warrant against Lumar was serviceable in the geographical limits of Cook County, printed the LEADS response, memorialized the descriptors demonstrating Officer Vega had the correct person in custody, and issued a clerical HOLD number. (Dkt. 350 ¶ 11; Dkt. 365 ¶ 11.) Esteban provided her attestation paper to the Extradition Department at the Chicago Police Department headquarters. (Dkt. 350 ¶ 16; Dkt. 365 ¶ 16.) At approximately 4:43 p.m., Detective Joseph Tripoli of Extradition contacted Lee County via computer to request a copy of the warrant and its information. (Dkt. 350 ¶ 17; Dkt. 365 ¶ 17.) He noted in his message, "Held at: Chicago Police Department," and that, "Subject will be transported to bond court and then to Cook County jail." (*Id*.).

Lee County Correctional Officer Kimberley Stewart verified the warrant was valid for failure to appear contempt non-pay on August 18, 2016, at approximately 4:48 p.m. (Dkt. 346 ¶ 21; Dkt. 368 ¶ 21; Dkt. 350 ¶ 18; Dkt. 365 ¶ 18; Dkt. 364 ¶ 3; Dkt. 390 ¶ 3.) Lee County also relayed details regarding the bond that was set on the warrant and indicated Lee County would extradite if Lumar was unable to pay the bond on the warrant. (Dkt. 350 ¶ 18; Dkt. 365 ¶ 18.) Officer Stewart testified that if Lumar was allowed to bond out, the 11th District did not need to hold him. (Dkt. 346 ¶ 27; Dkt. 368 ¶ 27; Dkt. 364 ¶ 9; Dkt. 390 ¶ 9.)

The amount of the bond on the warrant was $500, 10 percent, which amounted to $50. (Dkt. 346 ¶ 24; Dkt. 368 ¶ 24; Dkt. 364 ¶ 6; Dkt. 390 ¶ 6.) When arrested, Lumar had $130 in his possession. (Dkt. 346 ¶ 26; Dkt. 368 ¶ 26; Dkt. 350 ¶ 27; Dkt. 365 ¶ 27; Dkt. 364 ¶ 8; Dkt. 390 ¶ 8.) Lumar acknowledged the warrant but claimed he already made payments and had gone to court. (Dkt. 346 ¶ 25; Dkt. 368 ¶ 25; Dkt. 350 ¶ 14; Dkt. 365 ¶ 14; Dkt. 364 ¶ 7; Dkt. 390 ¶ 7.) Lumar asked Officer Vega about the process of bonding out. (Dkt. 346 ¶ 19; Dkt. 368 ¶ 19; Dkt. 365 ¶ 1; Dkt. 390 ¶ 1.) Officer Warren told Lumar that when a physical copy of the arrest warrant came across, if he was eligible, he might be able to receive a bond. (Dkt. 346 ¶ 20; Dkt. 368 ¶ 20; Dkt. 364 ¶ 2; Dkt. 390 ¶ 2.) Officers Warren and Vega compiled Lumar's paperwork, including the arrest and case report, in the processing room over approximately three hours and forty minutes, during which time Lumar remained in the processing room. (Dkt. 350 ¶¶ 28–29; Dkt. 365 ¶¶ 28–29.)

Lumar was "received in lockup" at 6:26 p.m. which means he entered the lockup after the lockup keeper completed asking any screening questions. (Dkt. 346 ¶¶ 42–43; Dkt. 368 ¶¶ 42–43.) Once an arrestee is received in lockup, he is searched, photographed, fingerprinted, and allowed to use the phone before being placed in a cell. (Dkt. 346 ¶ 44; Dkt. 368 ¶ 44.) In Lumar's case, he was searched and then fingerprinted at approximately 6:35 p.m. and photographed at approximately 6:40 p.m. (Dkt. 346 ¶¶ 45–48; Dkt. 368 ¶¶ 45–48; Dkt. 351 Ex. 2.)

On August 18, 2016, Sergeant Kevin Geyer, the assigned desk sergeant or station supervisor, dealt with bonding procedures. (Dkt. 346 ¶¶ 33–34; Dkt. 368 ¶¶ 33–34; Dkt. 350 ¶ 43; Dkt. 365 ¶ 43.) According to Chicago Police Department Special Order S06-01, active in August 2016, the station supervisor held the responsibility of determining, pursuant to orders, whether an arrestee may bond out, preparing the forms, and collecting the money. (Dkt. 350 ¶ 39; Dkt. 365 ¶ 39.) Issuing a bond receipt and taking bond is done pursuant to police department policy. (Dkt. 346 ¶ 37; Dkt. 368 ¶ 37.) If police department policy allows someone to bond out, they have the means to do so, and they are eligible to bond out, they will be bonded out. (Dkt. 346 ¶ 38; Dkt. 368 ¶ 38.) However, if department policies state an arrestee cannot bond out, the arrestee will be sent to bond court according to that policy. (Dkt. 346 ¶ 39; Dkt. 368 ¶ 39.) Per department policy, individuals arrested on out-of-county warrants are not eligible for bond regardless of whether a bond has been set. (Dkt. 350 ¶ 41; Dkt. 365 ¶ 41.) Sergeant Geyer reviewed the relevant paperwork, approved probable cause for Lumar's arrest, and made the

9

determination that Lumar was to be transported to the Cook County Department of Corrections ("CCDOC") for bond court the following morning pursuant to Chicago Police Department policy. (Dkt. 350 ¶ 43; Dkt. 365 ¶ 43.)

Chicago Police Department Bureau of Patrol Directive 15-0174 ("BOP Order"), issued July 29, 2015, mandated that anyone arrested based on a warrant issued in an Illinois county outside of Cook County could not post bond at the police station. (Dkt. 346 ¶ 28; Dkt. 368 ¶ 28; Dkt. 364 ¶ 11; Dkt. 390 ¶ 11.) Prior to July 29, 2015, detainees arrested on out-of-county warrants were allowed to bond out at the police station. (Dkt. 368 ¶ 31.) Instead of being bonded out, the BOP Order required anyone at the 11th District arrested on a warrant issued outside of Cook County to instead be sent to bond court at the CCDOC at 26th Street and California. (Dkt. 346 ¶¶ 29–30; Dkt. 368 ¶P 29–30; Dkt. 350 ¶¶ 37–38; Dkt. 365 ¶¶ 37–38.) As of August 18, 2016, Sergeant Geyer was aware of the BOP Order and its mandate requiring any person arrested on an out-of-county warrant to be sent to bond court at Cook County. (Dkt. 350 ¶ 44; Dkt. 365 ¶ 44.)

The BOP Order was created in response to Cook County General Administrative Order No. 2015-06-Procedures for Arrests on Illinois Intrastate Warrants Outside of Cook County ("GAO"), that Chief Judge of the Circuit Court of Cook County Timothy Evans entered on June 17, 2015. (Dkt. 350 ¶¶ 35–36; Dkt. 365 ¶¶ 35–36; Dkt. 351 Ex. 12.) The GAO states in part: "Defendants taken into custody by an arresting agency located within Cook County on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear

10

in bond court. . . A bail hearing shall be held, and the defendant shall be remanded by mittimus to the custody of the Cook County Sheriff." (Dkt. 350 ¶ 35; Dkt. 365 ¶ 35; Dkt. 351 Ex. 12.)

Approximately five and a half hours after being placed in the lockup, on August 19, 2016, Officers Delgado and Vega arrived the 11th District at approximately 12:08 a.m. to transport Lumar to the hospital because he complained of shortness of breath attributed to his asthma. (Dkt. 350 ¶ 46; Dkt. 365 ¶ 46.) A Chicago Fire Department ambulance transported Lumar to Mount Sinai Hospital at approximately 12:26 a.m. (Dkt. 346 ¶¶ 49, 51; Dkt. 368 ¶¶ 49, 51.) After treatment, he was cleared to be returned to the 11th District station. (Dkt. 350 ¶¶ 50–51; Dkt. 365 ¶¶ 50–51.) Lumar arrived back at the 11th District on August 19, 2016, at approximately 7:00 a.m. (Dkt. 346 ¶ 53; Dkt. 368 ¶ 53; Dkt. 350 ¶ 52; Dkt. 365 ¶ 52.)

Shortly after arriving back at the 11th District Station, at approximately 8:40 a.m. on August 19, 2016, two transport officers arrived to bring Lumar to the CCDOC to be held before his appearance in bond court scheduled for that same morning. (Dkt. 350 ¶ 53; Dkt. 365 ¶ 53.) Chicago Police Officers Vinson and Alexander brought Lumar from District 11 to Cook County Jail at 26th Street, in a van with over twenty other arrestees from various Chicago Police Districts to begin the process of being brought to bond court. (Dkt. 332 ¶ 25; Dkt. 361 ¶ 25; Dkt. 334 ¶ 12; Dkt. 360 at 3 ¶ 12.) Upon arrival at Cook County Jail, personnel, including Cook County Sheriff's Officer Wlodarski, first searched detainees for possession of

weapons or other contraband. (Dkt. 332 ¶¶ 26, 30; Dkt. 361 ¶¶ 26, 30.) This took place prior to Cook County Jail officially taking detainees into custody. (*Id.*)

Cook County Jail personnel then placed Lumar with other detainees into "Bullpen 23," a large cell that held multiple pretrial detainees, at Cook County Jail. (Dkt. 334 ¶ 13; Dkt. 360 ¶ 13.) Approximately 25 detainees, including Lumar, were placed in Bullpen 23. (Dkt. 360 ¶ 14.)

Officer Wlodarski reached down to the ground next to Lumar and recovered a baggie that contained twelve individually wrapped baggies of small white rocks, suspected at the time, and later determined through Illinois State Police testing, to be crack cocaine. (Dkt. 332 ¶¶ 33–34; Dkt. 361 ¶¶ 33–34; Dkt. 334 ¶ 34; Dkt. 360 ¶ 34; Dkt. 360 ¶¶ 5, 15; Dkt. 374 ¶¶ 5, 15.) Sheriff's Deputy Officer Wlodarski accused Lumar of possessing cocaine, a controlled substance. Officer Wlodarski told Chicago Police Officer Peter Vinson that he recovered the narcotics. (Dkt. 346 ¶¶ 55–56; Dkt. 368 ¶¶ 55–56; Dkt. 350 ¶ 61; Dkt. 365 ¶ 61.) Wlodarski told Deputy Leon that he found the suspected drugs on Lumar. Dkt. 360 ¶ 22.[1]

Wlodarski filled out an incident report and stated:

> "On the above date at 0905hrs, R/D Wlodarski, T #15733 was conducting a search of new prisoners in bullpen 23 when R/D noticed prisoner Lumar, Tyler IR#2025878 reaching behind the bullpen bench. R/D took detainees hand from the back of bench and

---

[1]  Wlodarski disputes this fact as hearsay. Under Federal Rule of Evidence 801(c), "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). This statement, however, is not hearsay as it is not offered for the truth of the matter asserted but rather is offered to show Wlodarski made false and misleading statements to fellow law enforcement officers.

> saw prisoner drop a plastic package. R/D recovered the package
> which contained 12 individually packaged small white rocks
> (suspect crack cocaine). Sgt. Latham, C #3170 notified, prisoner and
> contraband returned to CPD district 11 for charges." (Dkt. 362 ¶ 8;
> Dkt. 373 ¶ 8; Dkt. 334 ¶ 18; Dkt. 360 at 4 ¶ 18; Dkt. 332 Ex. 33.)

Sergeant Latham signed Wlodarski's incident report on August 19, 2016. (Dkt. 334 ¶ 21; Dkt. 360 at 5 ¶ 21; Dkt. 332 Ex. 33.) Lt. Lewis wrote an Administrative Assessment based on a conversation with Wlodarski and reviewing his Statement of Facts in the incident report. (Dkt. 360 ¶ 24.) Lt. Lewis wrote in her Administrative Assessment that she was "notified by Ofc. Wlodarski, T. #15733 that he had recovered some contraband off prisoner Lumar, Tyler…" (Dkt. 360 ¶ 25.)

Wlodarski reviewed video of Bullpen 23 on the day of his deposition during preparation with his attorney. (Dkt. 360 ¶ 26; Dkt. 336; Dkt. 339.) Prior to July 18, 2019, the day of his sworn deposition testimony in this case, Wlodarski had not seen any video of Bullpen 23, or the general area. (Dkt. 360 ¶ 27; Dkt. 336; Dkt. 339.) Wlodarski later testified at his deposition that his incident report is inaccurate. (Dkt. 360 ¶ 30.)

Wlodarski was asked the following questions and gave the following answers at his deposition:

Q. So the first thing that alerted you was his actions, correct?

A. Yes, ma'am.

Q. And were you looking at him when he actually picked something up?

A. Yes, ma'am.

Q. You saw him pick something up?

13

A. Yes, ma'am.

Q. Which hand did he pick it up with?

A. The left.

Q. How long was it from the time you saw him pick something up with his left hand up until the point that you, yourself, picked up the contraband?

A. Seconds. I can't even estimate it. Less than half a minute of seeing his actions.

Q. So if understand your testimony, you remember seeing him pick something up from the ground, correct?

A. Yes, ma'am.

(Dkt. 334, Exhibit 6, Wlodarski Deposition, p. 39, ll. 2-21.)

Wlodarski testified he approached Lumar and took hold of his hand, but Lumar had nothing in his hand. (Dkt. 362 ¶ 21; Dkt. 373 ¶ 21; Dkt. 334 ¶ 33; Dkt. 360 at 9 ¶ 33; Dkt. 360 at 16 ¶ 13 Dkt. 374 ¶ 13.) Wlodarski testified that he recovered the suspected cocaine from the ground next to Tyler Lumar and not Tyler Lumar's hand. (Dkt. 360 ¶ 34.) Wlodarski testified only "seconds," or "less than half a minute" passed from the time he saw Lumar pick something up to the time he himself picked up the contraband. (Dkt. 362 ¶ 22; Dkt. 373 ¶ 22; Dkt. 334 ¶ 35; Dkt. 360 at 9 ¶ 35.) Lumar was separated from the other detainees and handcuffed. He became agitated at this time while Wlodarski completed the necessary paperwork. (Dkt. 332 ¶ 35; Dkt. 361 ¶ 35.)

Due to the confiscation of contraband prior to the court hearing, Cook County Jail personnel rejected Lumar for admission and sent him back to District 11 with

Officers Vinson and Alexander along with the confiscated contraband. (Dkt. 332 ¶ 36; Dkt. 361 ¶ 36.) Officers Vinson and Alexander departed Cook County Jail with Lumar at approximately 10:33 a.m. and arrived at District 11 with Lumar around 11:00 a.m. on August 19, 2016. (Dkt. 332 ¶ 39; Dkt. 361 ¶ 39.) Officer Alexander told Lumar he would be returned to the Cook County Jail for bond court the following day. (Dkt. 362 ¶ 29; Dkt. 373 ¶ 29; Dkt. 334 ¶ 44; Dkt. 360 at 11 ¶ 44.) While in the van, Lumar acted upset. (Dkt. 362 ¶ 30; Dkt. 373 ¶ 30; Dkt. 334 ¶ 45; Dkt. 360 at 11 ¶ 45.)

Due to the new charges, Cook County correctional officers released Lumar back into the custody of the Chicago Police Department in order to be processed for possession of a controlled substance. (Dkt. 350 ¶ 62; Dkt. 365 ¶ 62.) Lumar insisted that the narcotics were not his and was angry at this turn of events. (Dkt. 346 ¶ 57; Dkt. 368 ¶ 57; Dkt. 364 ¶ 13; Dkt. 390 ¶ 13.) Officer Vinson escorted Lumar out of the "bullpen" at Cook County Jail and back onto the truck where he was transported back to the 11th District, which took approximately fifteen to twenty minutes. (Dkt. 346 ¶¶ 58–60; Dkt. 368 ¶¶ 58–60; Dkt. 350 ¶ 63; Dkt. 365 ¶ 63; Dkt. 364 ¶¶ 14–15; Dkt. 390 ¶¶ 14–15.) Lumar was acting upset while he was in the van. (Dkt. 346 ¶ 62; Dkt. 368 ¶ 62; Dkt. 364 ¶ 17; Dkt. 390 ¶ 17.) Chicago Police Officer Alexander told Lumar he would be returned to Cook County Jail for bond court the following day. (Dkt. 346 ¶ 61; Dkt. 368 ¶ 61; Dkt. 364 ¶ 16; Dkt. 390 ¶ 16.) At this point, Lumar had been in custody approximately seventeen hours.

Upon Lumar's arrival at District 11, Detention Aid Errum testified he was "ranting and raving" and repeatedly saying, "this is bullshit." (Dkt. 362 ¶ 31; Dkt. 373 ¶ 31; Dkt. 334 ¶ 46; Dkt. 360 at 11 ¶ 46.) Detention Aid Errum testified he told Lumar to "calm down" and escorted him to a cell. (Dkt. 362 ¶ 31; Dkt. 373 ¶ 31; Dkt. 334 ¶ 47; Dkt. 360 at 11 ¶ 47.) Detention Aide Errum then secured him in a cell at around 11:00 a.m. (Dkt. 350 ¶ 66; Dkt. 365 ¶ 66.) During their brief interaction, Detention Aide Errum did not perform a complete visual check or arrestee questionnaire of Lumar, (Dkt. 350 ¶ 71; Dkt. 365 ¶ 71.)

On August 19, 2016, at approximately 11:15 a.m., while conducting a routine check, Detention Aide Barry found Lumar hanging by his t-shirt in his cell. (Dkt. 346 ¶¶ 65–66; Dkt. 368 ¶¶ 65–66; Dkt. 350 ¶ 73; Dkt. 365 ¶ 73.) Lumar had taken off his shirt, tied it to the bars, and tied it around his neck. (Dkt. 346 ¶ 67; Dkt. 368 ¶ 67.) Chicago Police Department personnel responded to Detention Aide Barry's calls for assistance, cut down Lumar, and began CPR. (Dkt. 346 ¶ 66; Dkt. 368 ¶ 66; Dkt. 350 ¶¶ 74–75; Dkt. 365 ¶¶ 74–75.) Sergeant McCall called 911, and paramedics transported Lumar to Mount Sinai Hospital. (Dkt. 350 ¶ 75; Dkt. 365 ¶ 75.) Twenty months later, on April 18, 2018, Lumar was pronounced dead; the cause of death was "complications of hanging," and the manner of death was "suicide." (Dkt. 346 ¶¶ 68–69; Dkt. 368 ¶¶ 68–69; Dkt. 350 ¶ 76; Dkt. 365 ¶ 76; Dkt. 364 ¶ 20; Dkt. 390 ¶ 20.)

Dr. John M. Fabian, Psy.D., is a Board Certified Forensic and Clinical Psychologist and a Fellowship Trained Clinical Neuropsychologist. (Dkt. 362,

Exhibit 12; Dkt. 373 ¶ 36.) It is Dr. Fabian's opinion, within a reasonable degree of psychological certainty, that Tyler Lumar started his day on August 18, 2016, with psychiatric diagnoses of other specified depressive disorder, other specified personality disorder with antisocial and borderline features, as well as cannabis use disorder and alcohol use disorder. (Dkt. 362, Exhibit 12; Dkt. 373 ¶ 37.) It is Dr. Fabian's opinion, withing a reasonable degree of psychological certainty, that Tyler Lumar's suicide attempt was based on his psychological functioning, coupled with the immediate and acute psychosocial stressors that he was dealt, namely:

- being arrested and then locked up for an unpaid fine that he thought was paid;

- being told that it was likely he could bond out but then being denied bail and spending the night in the police lockup;

- then suffering an asthma attack, sitting in a hospital waiting room for up to 5 hours after midnight without sleep;

- then being taken to Cook County Jail where he is accused of a felony, namely narcotics possession that he did not commit;

- protesting his innocence to no avail; and

- on the return trip from Cook County Jail, one of the officers telling him that he is going to be returned to the same jail where he was just wrongfully accused of a felony.

Already suffering from depression, he now becomes despondent and feeling hopeless having never been detained for any length of time before. As a result, Mr. Lumar attempts suicide. (Dkt. 362, Exhibit 12; Dkt. 373 ¶ 38.)

17

**SUMMARY OF THE ARGUMENT**

Tyler Lumar was arrested in Chicago, Cook County, Illinois, pursuant to a warrant that a judge in Lee County, Illinois had previously issued. The Lee County warrant required Lumar to post $50 to gain his release on a misdemeanor. After his arrest in Chicago, Lumar was willing and able to post that money at the police station. Despite the desire and ability to post bond after administrative processing at the police station was completed, and as a direct result of the enforcement of an express policy of the Chicago Police Department, Lumar was barred from posting bond and detained.

All administrative processing was completed at the police station within three hours after Lumar's arrest on the warrant. Instead of allowing Lumar to post the $50 bond at the conclusion of processing, Lumar was held overnight and then transported to Cook County Bond Court for a hearing that was without purpose. Any court hearing for Lumar was purposeless because the judge in Lee County had previously determined both the bond amount and the existence of probable cause, and Lumar was not contesting that he was the same individual named in the warrant.

Illinois law mandated that Tyler Lumar should have been allowed to post the predetermined bail at the police station. The law contemplated Lumar's release from custody at the police station, and as such, the District Court misapplied the *McLaughlin* 48-hour burden shifting approach. The District Court incorrectly authorized needless detention, to attend a purposeless hearing, because the

purposeless hearing was held to be held within 48 hours of arrest. This was error.

During Tyler Lumar's wrongful detention that Chicago's policy occasioned, and while waiting to be presented to a Cook County judge for the gratuitous bond hearing, Cook County Officer Wlodarski falsely claimed that he recovered cocaine from Tyler Lumar during a search in a jail bullpen. The record, however, shows that this was a fabrication made by the sole eyewitness, Wlodarski. On the day of his deposition in this case, Officer Wlodarski watched video, for the first time, of his encounter with Tyler Lumar. Wlodarski then changed his original story during the deposition and admitted that his incident report, wherein he claimed he took Lumar's hand and saw him drop a baggie, was inaccurate.

Wlodarski materially changed his version of events when he testified, *not* that he took Lumar's hand and saw him drop a baggie as he originally claimed, rather, that he saw the baggie of cocaine on the floor of the bullpen before Lumar ever touched it. Wlodarski admitted that he then merely saw Lumar pick up, and quickly drop, the baggie from the floor of the bullpen crowded with approximately twenty-five detainees. The District Court erroneously minimized the consequences of Wlodarski's damaging deposition testimony finding that Wlodarski only admitted that the "order of events" was inaccurate. However, Wlodarski's admission that the order of events he originally claimed was untrue. and that he saw the baggie on the floor before Lumar ever touched it, demolishes probable cause.

Absent the illegal conduct of Wlodarski, Lumar would have would have been presented to a judge and admitted to bail. Instead, Wlodarski caused the continued

wrongful detention of Lumar. As such, there were two proximate causes of Lumar's injuries: Wlodarski's misconduct and Chicago's unconstitutional policy. While Wlodarski engaged in his illegal conduct, the unconstitutional policy of the City of Chicago continued to violate Lumar's Fourth Amendment rights.

Within two hours after Lumar was wrongfully accused of possessing cocaine, he was returned to the police station "ranting and raving." Lumar was then placed alone in a cell without having a suicide screening. Within fifteen minutes of his return, Lumar attempted suicide by hanging himself from the cell bars using his shirt that he tied around his neck. Lumar was suffering mental torture as a direct result of the illegal conduct of the Defendants, at the very time of his suicide attempt.

Plaintiff submits that sufficient evidence exists in the record to allow a jury to determine whether the Defendants' unconstitutional acts were the proximate cause of the suicide attempt -- conduct that occurred while Lumar was undergoing mental torture -- and to award any damages that flowed from it under both 42 U.S.C. § 1983 and Illinois' wrongful death statute.

**Standard of Review**

This Court "reviews a district court's summary judgment ruling *de novo* and consider[s] the facts and draw all inferences in the light most favorable to the nonmoving party." *Sterling Nat'l Bank v. Block*, 984 F.3d 1210, 1217 (7th Cir. 2021), *citing Henry v. Hulett*, 969 F.3d 769, 776 (7th Cir. 2020) (*en banc*).

Where, as here, the parties submitted cross-motions for summary judgment, this Court considers "the motions one at a time," *Black Earth Meat Market, LLC v. Village of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016), and construes all reasonable inferences in favor of the party against whom the motion was granted. *Bennett v. Council 31 of Am. Fed'n of State, Cnty. & Municipal Emps., AFL-CIO*, 991 F.3d 724, 729 (7th Cir. 2021), *citing Gill v. Scholz*, 962 F.3d 360, 363 (7th Cir. 2020). The existence of cross-motions for summary judgment does not imply that no genuine issues of material fact exist. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003).

# ARGUMENT

I.  **The City of Chicago Enforced an Express Policy that Mandates Needless Detention Because It Requires an Arrestee, Detained on a Misdemeanor Warrant and Prepared to Post Bail, to Appear in Bond Court Even Though the Judicial Officer Who Issued the Warrant Predetermined the Bond.**

The City of Chicago maintained and enforced an express, unconstitutional policy identified as BOP 15-0174. The policy requires Chicago police officers to refuse to accept bail from individuals arrested on warrants that Illinois counties, other than Cook County, issue and hold the arrestee to attend a bond hearing before a Cook County judge. The policy mandates detention even though a judicial officer has already set the bond amount, where the arrestee is willing and able to post the predetermined bond, and where the arrestee does not contest that he or she is the same individual named in the arrest warrant.

The policy ignores the fact that a judicial officer in another county had already determined probable cause and the amount of required bail. Detention here was objectively needless and legally unjustified. The policy was enforced against Tyler Lumar and caused a legally unreasonable, excessive detention in violation of the Fourth Amendment.

A municipality may be found liable under § 1983 when it violates constitutional rights via an official policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). To establish an official policy or custom, a plaintiff must show that his constitutional injury was caused "by (1) the enforcement of an express policy of the City, (2) a widespread practice that is so permanent and well settled as

to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001), *citing McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).

"The express policy theory applies, as the name suggests, where a policy explicitly violates a constitutional right when enforced." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). "Under this type of claim, one application of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability." *Id*. at 379-380, *citing City of Okla. v. Tuttle*, 471 U.S. 808, 822, (1985).

"An excessive length of detention may be sufficient to violate the reasonableness requirement of the Fourth Amendment." *Chortek v. City of Milwaukee*, 356 F.3d 740, 746 (7th Cir. 2004). The Constitution only allows "a brief period of detention to take the administrative steps incident to arrest." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). "Needless delay, or delay for delay's sake — or, worse, delay deliberately created so that the process becomes the punishment — violates the Fourth Amendment." *Portis v. City of Chicago*, 613 F.3d 702, 705 (7th Cir. 2010), *citing County of Riverside v. McLaughlin*, 500 U.S. 44, at 56, 59. Detentions as brief as four hours can be excessive and must be justified. *Portis*, 613 F.3d at 705.

The challenged policy, BOP 15-0174, provides as follows:

> "[E]very person arrested by the Chicago Police Department on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court.

> *After local processing*, all persons arrested on a warrant
> issued by an Illinois state court outside of Cook County will be
> transported to the appropriate holding facility as determined by
> Special Order S06-12-02 'Non-Traffic Arrest Warrant
> Procedures." No law enforcement agency will be permitted to
> obtain custody of an arrestee for a warrant issued by their
> jurisdiction prior to that arrestee being taken into custody by
> the Cook County Sheriff following a bond hearing." BOP 15-
> 0174, eff. 7/29/15 (emphasis added). Dkt. 346, Exhibit 18, Dkt.
> 368 ¶ 28.

The challenged policy mandates gratuitous, extended detention even after police conclude all administrative processing of the arrestee, regardless of whether, as here, a judicial officer has already determined probable cause and the amount of the bond. The policy turned a perfectly legal arrest into an unconstitutional detention. *See, United States v. Jacobsen*, 466 U.S. 109, 124 (1984) ("It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.")

A.    The Policy Violates State Law, Proving That Lumar's Detention
      in Anticipation of a Bond Hearing Was Needless And Thus
      Unreasonable Under the Fourth Amendment.

Chicago's policy is plainly contrary to Illinois law. Unquestionably, "[I]t is not the province of the Fourth Amendment to enforce state law." *Virginia v. Moore*, 553 U.S. 164, 178 (2008). Plaintiff, however, does not seek enforcement of state law. The violation of Illinois law is nonetheless significant, and its discussion compulsory, because it demonstrates Tyler Lumar's detention was needless, and thus unreasonable under the Fourth Amendment.

Illinois statutory and case law unambiguously provide for the procedures to

be followed when a person, such as Tyler Lumar, is arrested pursuant to a warrant in a county other than the county in which the warrant for his arrest was issued. In that regard, Illinois law provides as follows:

> "Person arrested in another county.
>
> (a) Any person arrested in a county other than the one in which a warrant for his arrest was issued shall be taken without unnecessary delay before the nearest and most accessible judge in the county where the arrest was made or, if no additional delay is created, before the nearest and most accessible judge in the county from which the warrant was issued. He shall be admitted to bail in the amount specified in the warrant or, for offenses other than felonies, in an amount as set by the judge, and such bail shall be conditioned on his appearing in the court issuing the warrant on a certain date. The judge may hold a hearing to determine if the defendant is the same person as named in the warrant.
>
> (b) Notwithstanding the provisions of subsection (a), *any person arrested in a county other than the one in which a warrant for his arrest was issued, may waive the right to be taken before a judge in the county where the arrest was made. If a person so arrested waives such right, the arresting agency shall surrender such person to a law enforcement agency of the county that issued the warrant without unnecessary delay.* The provisions of Section 109-1 shall then apply to the person so arrested." 725 ILCS 5/109-2 (emphasis added).

The policy of the City of Chicago mandates needless detention. The policy does not provide for the ability to waive the right to be taken before a Cook County judge as required in subsection (b) of the statute and does not require police to surrender custody to a law enforcement agency of the county that issued the warrant without unnecessary delay.

Here, it was unnecessary for Lumar to be taken before a judge to protest that he was not the individual named in the warrant. *See*, *e.g.*, *Hernandez v. Sheahan*,

455 F.3d 772 (7th Cir. 2006) (holding that where a detainee claims that he was detained based upon misidentification, the Due Process Clause is satisfied where the jailer brings the detainee before a judge). It is uncontroverted that Lumar never contested that he was the individual named in the warrant. Importantly, Lumar only argued to the arresting officers that he had paid the outstanding fine that was the basis for the issuance of the warrant. As such, Lumar should have been surrendered to the Lee County Sheriff's Department. It is, however, undisputed in the record that Lee County advised Chicago police that if Lumar posted the $50 bond called for in the warrant, the Chicago Police no longer needed to hold Lumar.

It is well-settled in Illinois that a police department has no discretion to refuse tendered bail in a misdemeanor case after bond has been set. *Lampe v. Ascher*, 59 Ill. App.3d 755 (Ill. App. Ct. 1978). "We find that the statutes and supreme court rules applicable to bail for misdemeanor offenses reveal a scheme mandating prompt, efficient pretrial release from custody. …the purpose sought is '*to avoid undue delay in freeing certain persons accused of an offense.*'" *Id.* at 760 (emphasis in original). "The public's interest in the smooth operation of the misdemeanor bail system far outweighs the police department's interest in an accused's continued detention once booking procedures are completed, bail has been set by a judge or supreme court rule, and bail money is tendered." *Id.* "Further, we hold that the proper definition of 'may' in section 110-9 is 'shall'; there is a *mandatory* duty on a police department to accept tendered bail (set either by a judge or a supreme court rule) from misdemeanor defendants." *Id.* (emphasis in

26

original). "In this regard, the police department acts on behalf and in place of the circuit clerk." *Id.* at 761.²

Moreover, "[a] person for whom bail has been set has a right to be released from custody, subject to the conditions of the bail bond, when the appropriate amount of bail has been properly deposited. 725 ILCS 5/110-7(a), (b)." *People v. Harbach*, 298 Ill. App. 3d 111, 117 (Ill. App. Ct. 1998). It is undisputed that Tyler Lumar asked the Chicago Police officers about the process of posting bond and had more than enough money in his pocket to satisfy the bond that the Lee County court previously set. But for the challenged policy, Sgt. Geyer would have allowed Tyler Lumar to post the $50 bond at the 11th District Police Station and go home.

Although mere enforcement of a state statute is not a sufficient basis for imposing § 1983 municipal liability, *Surplus Store Exchange, Inc. v. City of Delphi*, 928 F.2d 788, 791-92 (7th Cir. 1991), the City was not following state statute, but was, in fact, violating it. As previously stated, Plaintiff does not claim that a mere violation of state law is actionable under the Fourth Amendment. However, violation of a state statute gives rise to a corresponding § 1983 violation, if the right encompassed in the state statute is guaranteed under the United States Constitution. *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1349 (7th Cir. 1985), *citing Moore v. Kusper*, 465 F.2d 256, 258 (7th Cir. 1972). In this case, the

---

2    "[I]n the absence of prevailing authority from the state's highest court, federal courts ought to give great weight to the holdings of the state's intermediate appellate courts and ought to deviate from those holdings only where there are persuasive indications that the state's highest court [would disagree]". *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). After forty-five years, the Illinois Supreme Court has given no indication that it disagrees with *Lampe*.

statute that was violated undoubtedly protects rights that the Fourth Amendment guarantees.

The Illinois statute, 725 ILCS 5/109-2, guarantees Fourth Amendment rights because it directs that the arrestee be brought before a judge in the county of arrest without needless delay and guarantees that the arrestee can contest probable cause to detain them, *i.e.*, that they are the same individual whose arrest the warrant commanded. Under the statute, the arrestee can also waive the right to an identity hearing, but the statute nonetheless directs that the arrestee must be surrendered to a law enforcement agency of the county that issued the warrant *without unnecessary delay*. Thus, the statute guards against the violation of the Fourth Amendment from both detention on a warrant without probable cause to believe that the correct individual was arrested, and excessive, unreasonable detention because it directs the arresting agency, in this case the Chicago Police, to relinquish custody of the arrestee without unnecessary delay. Here, the express policy of the Chicago Police plainly violates Illinois law causing a purposeless and unreasonable detention that violated the Fourth Amendment.

Assuming, *arguendo,* that the rights encompassed in Illinois statute 725 ILCS 5/109-2 are not guaranteed under the United States Constitution, the violations of state law nonetheless demonstrate that once administrative processing was completed, holding Tyler Lumar in custody had no legal justification, as he was willing and able to post the bond that had already been set. In this regard, Plaintiff does not challenge Lumar's detention during administrative processing. "[T]he

'booking' of an arrestee, which for one thing confirms the person's identity, does not violate the Fourth Amendment[,] . . . even when the arrest is for a minor matter, and even if the arrestee is ready and able to post bail immediately." *Arlotta v. Bradley Center*, 349 F.3d 517, 523 (7th Cir. 2003), *quoting Doe v. Sheriff of DuPage County*, 128 F.3d 586, 588 (7th Cir. 1997). But once the last steps of administrative processing concluded at 6:40 pm, after fingerprinting and photographing Lumar, his continued detention became needless.

If the challenged policy obeyed -- and not violated -- state law, Lumar would have been asked whether he wished to waive the right to be taken before a Cook County judge for an identity hearing to contest that he was in fact the individual named in the warrant. Because Lumar never protested that he was not the same Tyler Lumar named in the warrant and wanted to post the $50 bond, Lumar would have then waived appearance before a Cook County judge. At that point, the Chicago Police would have no lawful reason to hold Lumar and would have surrendered him to the Lee County Sheriff. Here though, Lee County had already notified Chicago Police that Lumar had only to post $50 in cash to be admitted to bail and leave the police station. Lumar, who had $130 in his pocket, would have then posted the $50 bond. This is not speculation because it is undisputed that: (a) Lumar never argued that the arrest warrant was issued for a different person, (b) Lumar asked the police officers about the ability to bond out, (c) Lumar had sufficient cash in his possession to satisfy the bond amount and (d) Lee County had advised Chicago Police that Lumar did not need to be held if he posted the $50.

B.      The 48-hour *McLaughlin* Burden Shifting Approach Should Not Apply Since the Law Did Not Contemplate Any Hearing.

The District Court did not address the fact that any bond hearing or other court hearing for Lumar in Cook County was needless since probable cause and the bond amount were already determined. Instead, the District Court incorrectly applied the 48-hour burden shifting approach of *McLaughlin* because the police intended to detain and transport Lumar for a hearing. Appendix at A-18-19. *McLaughlin*, to be sure, "established a 48-hour line between arrest and presentation to a magistrate for a probable-cause hearing." *Portis*, 613 F.3d at 704. And the District Court relied on *McLaughlin* when it dismissed Plaintiff's Fourth Amendment claims. This was error, however, as *McLaughlin* is inapposite to the instant case. Appendix at A-10, A-18-19. As *Portis* recognized, *McLaughlin* established a time period for presenting an arrestee before a judge to determine probable cause. But the 48-hour burden-shifting approach does not apply when a probable cause hearing before a magistrate is not contemplated. *Chortek*, 356 F.3d at 746-47. Accordingly, the presumption of reasonableness that the District Court afforded the City was improper. Appendix at A-18.

Here, probable cause had already been decided by a judge and a bond amount had been set. In these circumstances, *McLaughlin* offers no justification or legal basis for a City policy that required holding an arrestee, willing and able to post a bond, to appear at a bond hearing where the bond amount was already determined. As previously discussed, Illinois law did not contemplate a needless bond or probable cause hearing for Lumar. It was, in fact, only the City's policy that

contemplated such a hearing, even though it was wholly pointless here.

In sum, a second bail hearing or probable cause hearing was unnecessary because the Lee County judge had already determined bail and probable cause. *See, e.g., Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006) ("The judicial determination of probable cause may be made before the arrest (in the form of an arrest warrant) or promptly after the arrest, at a probable cause hearing (sometimes called a *Gerstein* hearing.")

At the conclusion of administrative processing, Lumar's detention became purposeless. The record demonstrates that no proper purpose existed to detain Tyler Lumar overnight to appear before a Cook County judge. The challenged policy is a policy of deliberate delay applied only when the warrant was issued outside of Cook County. If a Cook County judge had issued the warrant, Lumar could have simply posted the $50 and gone home. Here, Lumar was asked screening questions, was fingerprinted, then photographed, with the entire process completed at 6:40 pm on August 18, 2016. Lumar should have been allowed to post the $50 at the police station when processing was completed, instead, his constitutional rights were violated.

C.    The General Administrative Order was Invalid, Void *Ab Initio*
        and Offers No Defense to the City's Unconstitutional Policy.

The City places blame for the unconstitutional BOP Order squarely on General Administrative Order No. 2015-06, which Cook County Chief Judge Evans ("the GAO") entered. The City has offered no other reason for the refusal to accept bail and extend the detention of Lumar. However, the GAO improperly modifies

Illinois law, was therefore void *ab initio,* and offers no defense to the City.

"The [state circuit courts] may, from time to time, make all such rules for the orderly disposition of business before them as may be deemed expedient, *consistent with law.*" 705 ILCS 35/28. (emphasis added). Illinois Supreme Court Rule 21 further empowers circuit courts to adopt rules which are consistent with the Illinois Supreme Court rules and the statutes of Illinois. Rule 21 provides:

> (a) Circuit Court Rules. A majority of the circuit judges in each circuit may adopt rules governing civil and criminal cases, including remote appearances, which are consistent with these rules and the statutes of the State, and which, so far as practicable, shall be uniform throughout the State. All rules of court shall be filed with the Administrative Director within 10 days after they are adopted.

> (b) Administrative Authority. Subject to the overall authority of the Supreme Court, the chief circuit judge shall have the authority, among other things, to determine the hours of court and of the judges in the circuit, the available leave time to which a judge is entitled, and, when the judge's conduct negatively affects the operations of the court or public confidence in the court, to direct how that judge must conduct himself or herself. In the exercise of this general administrative authority, the chief judge shall take or initiate appropriate measures to address the persistent failure of any judge to perform his or her judicial duties or to comply with a directive from the chief judge. Ill. S. Ct. R. 21(a)(b) (eff. Oct. 1, 1983).

The GAO was not a Circuit Court rule adopted by a majority of the Cook County circuit judges. Even if it was, it would still be invalid because it modifies substantive law. Instead, the GAO was issued pursuant to the administrative authority of the chief circuit court judge, and that authority, as shown above, is quite limited. The GAO impermissibly goes far beyond a chief judge's power to determine court hours, judges' hours or judges' leave time.

The Illinois Supreme Court and the Illinois Court of Appeals have

consistently found that any rule that Illinois circuit courts promulgate may not abrogate, limit, or modify existing law. *See, People ex Rel. Carey v. Power*, 59 Ill. 2d 569, 574 (Ill. 1975) (Circuit court rule invalid insofar as it attempts to limit matters which an extended grand jury may consider); *People v. Schroeder*, 102 Ill. App. 3d 133, 137 (Ill. App. Ct. 1981) ("The administrative order relied upon by the trial court insofar as it purports to grant authority to dismiss a criminal case [based on undue delay in filing an information] modifies existing law and is invalid."); *People v. McAfee*, 853 N.E.2d 107, 110 (Ill. App. Ct. 2006) (Administrative order imposing $10 DNA collection fee that improperly modified existing law was void *ab initio*.); *Compare, Blair v. Mackoff*, 284 Ill. App. 3d 836 (Ill. App. Ct. 1996) (Administrative order, that dealt with the transfer of refiled cases within the Domestic Relations Division, did not conflict with the General Assembly's mandates in the Code of Civil Procedure or act as an improper exercise of its legislative powers by the judiciary.).

The GAO modified existing substantive law, was void, and offers no defense to the City. "[N]o rule of court can enlarge or restrict jurisdiction. *Nor can a rule abrogate or modify the substantive law.*" *In re Oliver*, 452 F.2d 111, 114 (7th Cir. 1971) (emphasis in original), *quoting Washington-Southern Nav. Co. v. Baltimore Phila. Steamboat Co.*, 263 U.S. 629, 635 (1924). "[A] rule of court which violates the Constitution or otherwise modifies substantive rights may not stand" *Id.* at 114.

To avert liability, this Court would need to grant the City immunity for blindly following the void GAO. However, "units of government are not entitled to immunity in suits under § 1983." *Hernandez v. Sheahan*, 455 F.3d at 776. In

*Hernandez*, the Cook County Sheriff, sued on a *Monell* claim in his official capacity, asserted immunity claiming that the Sheriff's Office was merely following a judge's order when detaining the Hernandez plaintiff. *Id*. This Court firmly rejected that argument. "Official immunities (judicial, legislative, absolute, qualified, quasi, and so on) are personal defenses designed to protect the finances of public officials whose salaries do not compensate them for the risks of liability under vague and hard-to-foresee constitutional doctrines. That justification does not apply to suits against units of state or local government, which can tap the public fisc." *Id*. Simply put, "Municipalities do not enjoy any kind of immunity from suits for damages under § 1983." *Benedix v. Vill. of Hanover Park*, 677 F.3d 317, 318-19 (7th Cir. 2012). To allow the City to avoid liability for its unconstitutional policy because of the demonstrably void GAO would be tantamount to granting the City immunity, but the law does not allow that.

The sole reason for the refusal to accept bond from Tyler Lumar, was BOP 15-0174, a policy that mandated continued detention for a legally superfluous court hearing. This is precisely the "needless delay" this Court acknowledged would violate the Fourth Amendment. *Portis*, 613 F.3d at 705. Here, the record establishes that two hours and forty-two minutes after Tyler Lumar's arrest, the administrative tasks were completed. The reasonableness inquiry necessarily ends at 6:40 pm when Tyler Lumar's detention became gratuitous. As a matter of law, a detention that is needless and without purpose cannot be reasonable and entitles Plaintiff to summary judgment as to liability against the City.

II.    Wlodarski Never Had Probable Cause to Believe Tyler Lumar Possessed Drugs Because Wlodarski Saw the Contraband on the Floor of a Crowded Room Before Lumar Ever Touched It.

Probable cause to believe Tyler Lumar knowingly possessed a controlled substance was decidedly absent because Wlodarski testified that he saw the drugs on the floor of the bullpen, crowded with twenty-five detainees, before Lumar ever touched it. Wlodarski fabricated evidence to create the illusion of probable cause. Wlodarski's deposition testimony materially contradicts both the incident report he authored on August 19, 2016, and what he reported to his fellow officers on that day. Wlodarski authored an incident report that facially, but falsely, proclaimed probable cause to believe that Tyler Lumar unlawfully possessed a controlled substance.

Generally, whether probable cause exists is a jury question. *Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000). "[I]f the question of probable cause arises in a damages suit, it is a proper issue for the jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them. *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993) *citing Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir. 1985) (en banc) (plurality opinion); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1346-47 (7th Cir. 1985); *Lester v. City of Chicago*, 830 F.2d 706, 715 (7th Cir. 1987) (whether police had probable cause to arrest for disorderly conduct is a jury question). Here however, judgment in favor of Plaintiff, rather than Wlodarski, is appropriate because the alleged probable cause was based entirely on false evidence.

An illegal arrest occurs if the officer lacks probable cause to arrest. *Lawson v. Veruchi*, 637 F.3d 699, 703 (7th Cir. 2011). The existence of probable cause is determined objectively based on the facts and circumstances known to the officer at the time. Those facts and circumstances must be "sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *Id*. Probable cause is a practical, common-sense determination. *Maxwell v. City of Indianapolis*, 998 F.2d at 434. "[T]he obvious assumption is that there will be a *truthful* showing" of probable cause. *Franks v. Delaware*, 438 U.S. 154, 164-65 (1978) (emphasis in original).

Probable cause justifying an arrest exists "when a reasonable officer with all the knowledge of the officers on the scene would have believed that the suspect committed an offense defined by state law." *Jones v. Clark*, 630 F.3d 677, 684 (7th Cir. 2011). Under Illinois law, "[I]t is unlawful for any person knowingly to possess a controlled or counterfeit substance or controlled substance analog." 720 ILCS 570/402.

"The Fourth Amendment… establishes 'the standards and procedures' not just for arrest but also for ensuing 'detention'." *Manuel v. City of Joliet*, 137 S. Ct. 911, 917, (2017), *citing Gerstein at* 111. The Fourth Amendment protects not only against "an initial arrest without probable cause, but also any "continued detention in its absence." *Hurt v. Wise*, 880 F.3d 831, 843 (7th Cir. 2018) (*citing Manuel*, 137 S. Ct. at 918-19), overruled on other grounds by *Lewis v. City of Chi.*, 914 F.3d 472, 475 (7th Cir. 2019). "A claim for false arrest or pretrial detention based on fabricated

evidence sounds in the Fourth Amendment right to be free from seizure without probable cause. *Patrick v. City of Chicago*, 974 F.3d 824, 834 (7th Cir. 2020) *citing Lewis*, 914 F.3d at 476–78.

In his incident report, Wlodarski wrote that he saw Lumar reaching behind the bench, took Lumar's hand and saw Lumar drop a plastic package. On that same report, in the Incident Categories Box, Wlodarski noted, "Contraband Confiscated (From Detainee)." Sgt. Latham signed off on Wlodarski's false incident report. Lt. Lewis, another supervisor, wrote an administrative Assessment based on a conversation with Wlodarski and a review of Wlodarski's incident report. Lt. Lewis concluded that Wlodarski "recovered some contraband off prisoner Lumar." Wlodarski told Deputy Leon that he found the suspected drugs on Lumar. The report and the statements to fellow law enforcement officers were false. Wlodarski failed to tell anyone that he saw the baggie on the floor before Lumar picked it up and he further failed to tell anyone that Lumar dropped the bag within seconds.

If what Wlodarski originally proclaimed that day was true, it would be near impossible to argue that probable cause did not exist. *See, e.g., United States v. Williams*, 333 Fed. App'x 127, 128 (7th Cir. 2009) ("once the officers saw the gun thrown, they had probable cause to make an arrest."). Wlodarski's material omission of the fact that he saw the baggie on the floor of the bullpen before Lumar touched it, coupled with his false assertion that he only saw Lumar drop the baggie, without more, illegitimately "bullet proofed" Wlodarski's claimed, yet non-existent, probable cause.

Here, Wlodarski's sworn testimony demonstrates that he never had probable cause. Lumar was one of approximately 25 detainees in a full bullpen. Wlodarski unequivocally testified that he was looking at Lumar when he first saw Lumar pick something up from the floor of a crowded area-- *before Lumar even touched the baggie*. This critical, yet omitted, fact dooms probable cause, exposes the prior untruths of Wlodarski and makes summary judgment in favor of Plaintiff, rather than Wlodarski, appropriate.

Contrary to his original narrative wherein he claimed that he took Lumar's hand and Lumar then dropped the baggie, Wlodarski testified that he saw Lumar pick something up, he grabbed Lumar's hand, but Lumar had nothing in his hand. From the time Wlodarski saw Lumar pick something up, to the time Wlodarski picked up the baggie containing the suspect cocaine, was "seconds," "less than half a minute." In sum, Wlodarski testified that he saw Lumar pick up and quickly, within seconds, drop and abandon a baggie found on the floor of a room crowded with detainees. Looked at objectively, and in the light most favorable to Plaintiff, summary judgment should never have been granted to Wlodarski.

Considering Wlodarski's sworn testimony, Wlodarski's incident report and the version of events he related to other officers on August 19, 2016, are troubling. Wlodarski never reported, whether in writing or verbally, that he saw the baggie on the floor before seeing Lumar pick it up and quickly abandon it. Wlodarski related a different story in his report and to fellow law enforcement officers--a significantly and materially different story.

38

Wlodarski's incident report, and statements to fellow law enforcement officers that day, altered or omitted critical, material details and was thus misleading and false. The sole eyewitness, Officer Wlodarski, fabricated evidence. False statements and fabricated evidence cannot serve as the basis for probable cause. *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013). Wlodarski now admits that the incident report is inaccurate. Since the report was inaccurate, then Wlodarski's statements to fellow officers were likewise inaccurate and thus false. Wlodarski's fabrications on August 19, 2016, provided facially inarguable, yet illusory, probable cause to further detain Lumar. Wlodarski's sworn testimony, however, exposes the fabrications and destroys probable cause. Recall that the deposition testimony was given shortly after Wlodarski reviewed the video of the events of that day for the very first time. The video compelled Wlodarski to change his story.

The District Court erroneously minimized the consequences of Wlodarski's critically damaging deposition testimony. "Officer Wlodarski did not admit to fabrications or a false report but rather the order of the events in the report was inaccurate." Appendix at A-36.  However, the order of events is essential to the analysis of whether probable cause existed. Indeed, the District Court ignored Wlodarski's material misstatements and disregarded the fact that Wlodarski admitted to seeing the bag on the floor of a crowded cell before Lumar ever touched it. While Plaintiff submits that she is entitled to summary judgment on the issue of probable cause, Wlodarski never should have been granted summary judgment as it

is, at the bare minimum, a jury question. [3]

We now know that Wlodarski's misleading and false story, as he reported on August 19, 2016, never happened as he then described. As this Court has explained, a detention not supported by probable cause and based only on "police fabrications" is unreasonable and in violation of the Fourth Amendment. *Lewis*, 914 F.3d at 477, *citing Manuel*, 137 S. Ct. at 919. Wlodarski deprived Tyler Lumar's liberty. If Wlodarski, the sole eyewitness, had not submitted a false report and mislead fellow law enforcement officers, Lumar would have gone to bond court and gained his freedom after posting the $50 bond using the money he had in his pocket.

"Wrongful arrest or detention creates a wrongful-seizure claim, plain and simple, and the constitutional objection is to wrongful custody rather than to a criminal prosecution." *Stone v. Wright*, 734 F. App'x 989 (7th Cir. 2018), *citing Manuel v. Joliet*, 137 S. Ct. 911, 917-20 (2017). In other words, "the wrong is the detention rather than the existence of criminal charges." *Manuel v. City of Joliet*, (*Manuel II*) 903 F.3d 667, 670 (7th Cir. 2018).

Wlodarski never had probable cause to believe that Tyler Lumar knowingly possessed a controlled substance. Wlodarski fabricated a set of facts creating an illusion of probable cause. Wlodarski was untruthful in both his written report and

---

[3]   The District Court cited *Florence v. Bd. of Chosen Freeholders of County of Burlington*, 566 U.S. 318 (2012) for the proposition that jailors have a legitimate interest in securing correctional facilities. (Appendix at A-34.) Plaintiff agrees with this general proposition but notes that *Florence* offers absolutely no support for what happened here: Wlodarski's fabrication of evidence. Penological security surely does not and cannot justify such falsification.  At an absolute minimum, a question of fact exists for the jury to determine whether Wlodarski had probable cause to arrest or cause Lumar's continued detention.

in his statements to fellow law enforcement officers.  If Wlodarski had been truthful, he would have stated in his report, and orally, that he saw the baggie on the floor before Lumar even touched it.

Wlodarski mislead everyone into believing that what he saw was Lumar attempting to rid himself of drugs before a search. If real, it is a scenario where the *mens rea* for "knowing possession" is readily inferred. The true story however, viewing the record in the light most favorable to Plaintiff, was that Lumar, in a room crowded with other detainees, picked up a baggie from the floor and immediately abandoned it. "Knowing possession" never occurred. Indeed, it is plausible to infer that Lumar had no idea what that baggie contained before he picked it up and dropped it within seconds. When looked at objectively, no probable cause ever existed here.

Wlodarski's fabrications caused Lumar to be returned to the Chicago Police instead of continuing to bond court to appear at the gratuitous bond hearing. Wlodarski violated Tyler Lumar's constitutional rights under the Fourth Amendment and wrongfully caused his detention to be illegally extended further than it should have been. Wlodarski caused Lumar to be returned to the same police station he just came from, to spend more time in jail instead of being allowed to post $50 and go home. It is undisputed that Wlodarski was the sole eyewitness, his statements were false and Lumar's return to the Chicago Police and continued detention was based exclusively on those false statements. No reasonable jury could find otherwise.

III.    Tyler Lumar's Suicide was Legally Foreseeable and Plaintiff Should Be Allowed to Pursue Damages Under Both § 1983 and the Illinois Wrongful Death Act.

Plaintiff seeks to recover damages related to Tyler Lumar's suicide attempt and subsequent death under both § 1983 and Illinois' wrongful death statute. To be clear, Plaintiff is *not* claiming that Defendants are liable for their deliberate indifference and subsequent failure to prevent Lumar's suicide. *See*, *e.g.*, *Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001) ("To be liable under the Eighth Amendment for an inmate's suicide, a prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing this act.") Rather, Plaintiff claims that Tyler Lumar's suicide was the direct and foreseeable result of mental torture attendant to the unconstitutional acts that Defendants committed upon Tyler Lumar that were occurring at the very same time when Lumar hung himself.

A § 1983 plaintiff may recover damages that any constitutional violation proximately causes. *See, Cty. of Los Angeles*, *Calif. v. Mendez*, 137 S. Ct. 1539, 1548 (2017). "[G]enerally the issue of proximate cause is a jury question." *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 615 (7th Cir. 2002). "Compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation . . ., personal humiliation, and mental anguish and suffering.'" *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307 (1986) *citing Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 350 (1974);

*Carey* v. *Piphus,* 435 U.S. 247, 264 (1978) (mental and emotional distress constitute compensable injury in § 1983 cases).

Suicide in a detention setting is a well-known and readily foreseeable risk that demands a jailer employ extensive programs, safeguards, and staff training. *See, Sheriff's Office Motion for Summary Judgment*, Dkt. 330 at pp. 27-30. "It is reasonably foreseeable that an inmate may attempt suicide ." *La Bombarbe v. Phillips Swager Associates Inc.*, 130 Ill. App. 3d 896, 898 (Ill. App. Ct. 1985). "It is true that jail inmates are much more likely to commit suicide than free persons are -- in fact, nine times as likely." *Jutzi-Johnson v. U.S.*, 263 F.3d 753, 757 (7th Cir. 2001), *citing* Lindsay M. Hayes Joseph R. Rowan, *National Study of Jail Suicides: Seven Years Later* 54 (National Center on Institutions and Alternatives, Feb. 1988).

In addition to the facts discussed, Plaintiff has placed into the record the opinion of Dr. John Fabian, Psy.D., a Board Certified Forensic and Clinical Psychologist and a Fellowship Trained Clinical Neuropsychologist. It is Dr. Fabian's opinion, withing a reasonable degree of psychological certainty, that Tyler Lumar's suicide attempt was based on his psychological functioning, coupled with the immediate and acute psychosocial stressors that he was dealt, namely:

- being arrested and then locked up for an unpaid fine that he thought was paid;

- being told that it was likely he could bond out but then being denied bail and spending the night in the police lockup;

- then suffering an asthma attack, sitting in a hospital waiting room for up to 5 hours after midnight without sleep;

43

- then being taken to Cook County Jail where he is accused of a felony, namely narcotics possession that he did not commit;

- protesting his innocence to no avail; and

- on the return trip from Cook County Jail, one of the officers telling him that he is going to be returned to the same jail where he was just wrongfully accused of a felony.

Already suffering from depression, Lumar became despondent and felt hopeless, having never been detained for any length of time previously. As a result, Mr. Lumar attempted suicide. (Dkt. 362, Exhibit 12; Dkt. 373 ¶ 38.)

"[P]rolonged detention based on incorrect or unfounded suspicion may unjustly 'imperil [a] suspect's job, interrupt his source of income, and impair his family relationships.'" *McLaughlin*, 500 U.S. at 52. Here, it led Tyler Lumar to suicide. Tyler Lumar, already suffering under an unconstitutional detention that the City of Chicago inflicted upon him, was subjected to further illegal and unconstitutional detention at the hands of Wlodarski.[4] At 9:05 am, Wlodarski falsely claimed that he recovered cocaine from Tyler Lumar during a search, causing Lumar to be returned to the 11th District Police Station to be locked in a cell. An angry Tyler Lumar, ranting and raving, continuously denied that the cocaine was his. A little over two hours later, at 11:15 am, fifteen minutes after arriving back at the 11th District and in the absence of a suicide screening, Lumar was found unconscious, hanging in a cell with his shirt tied around his neck. Tyler Lumar was detained in violation of his Fourth Amendment rights. The record

---

4   This Court has recognized that in Section 1983 actions, different conduct from multiple defendants could constitute more than one proximate cause of a plaintiff's injury. *Beard v. Mitchell*, 604 F.2d 485, 497 (7th Cir. 1979).

contains substantial, if not overwhelming evidence in the record that those rights violations caused Lumar to suffer mental anguish leading to his hanging.

The Illinois wrongful death statute permits a decedent's estate to sue a party whose alleged "wrongful act, neglect or default" caused the individual's death. 740 ILCS 180/1. Plaintiff must establish "(1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of duty proximately caused decedent's death; and pecuniary damages arising therefrom to persons designated under the Act." *Thompson v. City of Chicago*, 472 F.3d 444, 457 (7th Cir. 2006), *quoting Leavitt v. Farwell Tower Ltd. Partnership*, 625 N.E.2d 48, 52 (Ill. App. Ct. 1993).

In Illinois, a jailer owes a "general duty of care to his prisoner." *Dezort v. Village of Hinsdale,* 35 Ill.App.3d 703, 708-709 (Ill. App. Ct. 1976). The duty includes protecting prisoners from "self-injury or self-destruction" by requiring police officers to use "ordinary and reasonable care for the preservation of their prisoner's health and life under the circumstances of the particular case." *Id.* at 710; *Accord, Belbachir v. Cnty. of McHenry*, 726 F.3d 975, 980 (7th Cir. 2013) (Jail personnel are obligated by ordinary tort principles to provide prisoner with reasonable care.)

The general rule under Illinois law is that a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent intervening event that the tortfeasor cannot be expected to foresee. *Crumpton v. Walgreen Co.*, 375 Ill. App. 3d 73, 78 (1st Dist. 2007). This rule carries an exception that deems suicide foreseeable when the defendant's conduct caused an injury, most

often to the head, that made the decedent so "'bereft of reason'" as to cause him to attempt suicide. Id. at 80. Here, the injury creating the exception was not a physical blow. Rather, it was devastating psychic harm that Defendants' intentional constitutional violations caused.

"The universal rule followed by most jurisdictions is that the victim's act of suicide is a  new and independent agency breaking the chain of causation from the negligent act and is not reasonably foreseeable…this is summed up as follows: '* * *the better view [is] that when his insanity prevents him from realizing the nature of his act or controlling his conduct, his suicide is to be regarded either as *a direct result and no intervening force at all*, or as a normal incident of the risk, for which the defendant will be liable. * * * But if the suicide is during a lucid interval when he is in full command of his faculties but his life has become unendurable to him, it is agreed that his voluntary choice is an abnormal thing, which supersedes the defendant's liability.'" *Little v. Chicago Hoist Body Co.*, 32 Ill. 2d 156, 158-159 (1965), *quoting Prosser, Law of Torts, 2d ed.*, pp. 273-274 (emphasis added).

The Illinois Supreme Court, in *Little,* observed a "great lapse in time" (five years) between the accident and the attempted suicide. *Little* at 159. Plaintiff proceeds here under the "direct result" theory as no lapse in time occurred, no attenuation, and thus no intervening force at all. Lumar was enduring mental injury from the Defendants' intentional acts at the exact time of his suicide attempt. *See also, McLaughlin v. Sullivan*, 123 N.H. 335, 337-38 (N.H. 1983) (Exception to general rule that an action will not lie where damages are sought for the suicide of

another "typically involve the infliction of severe physical injury, or, in rare cases, the intentional infliction of severe mental or emotional injury through wrongful accusation, false arrest or torture.")

The record demonstrates that Tyler Lumar attempted suicide at the very time he was suffering from his wrongful detention, two hours after Wlodarski falsely accused him of the felony offense of possessing cocaine. The record has more than sufficient evidence here to allow a jury to determine proximate cause.

Lumar was continuously in custody for over seventeen hours after he was entitled to be released at the completion of administrative processing, after Wlodarski falsely accused him of possessing cocaine and after Officer Alexander told him that he would be returned the next day to the very same place where he was falsely accused of a felony. Lumar was then placed into a cell alone, without a suicide screening. Lumar -- angry, upset, ranting and raving and repeatedly saying "this is bullshit," -- was then found hanging by his shirt from the cell bars within 15 minutes after being placed in the cell. Those facts coupled with the expert opinion of Dr. Fabian provide more than sufficient evidence to allow a jury to determine proximate cause and find that the suicide attempt was the direct result of the Defendants' wrongful actions rather than an intervening cause that occurred during a lucid interval.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that this Court should reverse the decision of the District Court granting Defendants' motions for summary judgment, enter summary judgment in favor of Plaintiff on her motions for summary judgment, and remand this case for further proceedings for a jury to ascertain damages.

Respectfully submitted,

/S/*Donald J. Pechous*
Donald J. Pechous

Attorneys for Plaintiff-Appellant:

Donald J. Pechous *Counsel of Record*
The Khowaja Law Firm, LLC
8 S. Michigan Ave., Suite 2600
Chicago, IL 60603
312-388-1198
Email: dpechous@khowajalaw.com

Bryan J. O'Connor, Sr.
O'Connor Law Group, LLC
19 S. LaSalle St., Suite 1200
Chicago, IL 60603
312-236-1814
Email: boc@oconnorlawgroup.com

**CERTIFICATE OF COMPLIANCE WITH**
<u>**FEDERAL RULE OF APPELLATE PROCEDURE 32(a)**</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,845 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12 point Century font and footnotes in 12 point Century font.

<u>*/s/ Donald J Pechous*</u>
Donald J. Pechous


*Attorney for Plaintiff-Appellant*

Dated:    January 27, 2023

## CERTIFICATE OF SERVICE

I, the undersigned, counsel for the Plaintiff-Appellant, hereby certify that on January 27, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ *Donald J Pechous*
Donald J. Pechous
THE KHOWAJA LAW FIRM, LLC
8 South Michigan Avenue
Suite 2600
Chicago, Illinois 60603
(312) 388-1198
dpechous@khowajalaw.com

Dated: January 27, 2023

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), I, the undersigned, counsel for the Defendant-Appellees, hereby certify that all materials required by Circuit Rule 30(a) and (b) are included in the Appendix.

/s/ *Donald J Pechous*
Donald J. Pechous
THE KHOWAJA LAW FIRM, LLC
8 South Michigan Avenue
Suite 2600
Chicago, Illinois 60603
(312) 388-1198
dpechous@khowajalaw.com

Dated: January 27, 2023

# CIRCUIT RULE 30(a) and 30(b) APPENDIX

## TABLE OF CONTENTS OF CIRCUIT RULE 30(a) and 30(b) APPENDIX

Memorandum Opinion and Order (Docket #407) in *Lisa Alcorn as Independent Administrator of the Estate of Tyler Lumar v. City of Chicago, et. al.*, 17 C 5859 dated September 27, 2022 ......................................................A-1

Memorandum Opinion and Order (Docket #408) in *Lisa Alcorn as Independent Administrator of the Estate of Tyler Lumar v. City of Chicago, et. al.*, 17 C 5859 dated September 28, 2022 ......................................................A-24

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LISA C. ALCORN, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| | ) | No. 17 C 5859 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lisa Alcorn, as the Independent Administrator of the Estate of Tyler Lumar filed this suit against a set of Defendants, including Sergeant Kevin Geyer and the City of Chicago ("City Defendants"), for claims surrounding the suicide of Tyler Lumar while he was detained by the Chicago Police Department ("CPD"). Before the Court is Plaintiff's motion for summary judgment on Counts I and II of her Third Amended Complaint ("TAC") (Dkt. 345) and the City Defendants' motion for summary judgment on Counts I, II, and IX. (Dkt. 348). For the following reasons, Defendant's motion [348] is granted in full, and Plaintiff's motion [345] is denied in full.

## BACKGROUND

On August 18, 2016, Chicago Police Officers Daniel Warren and Carlos Vega were working patrol and received a call of an assault in progress and a disruptive patient at the Madison Health Clinic on Madison Street. (Dkt. 346 ¶¶ 2–3; Dkt. 368 ¶¶ 2–3; Dkt. 350 ¶ 4; Dkt. 365 ¶ 4). Officers Warren and Vega were dispatched to the clinic at 3800 W. Madison Street where they observed Tyler Lumar inside the building. (Dkt. 346 ¶¶ 4–5; Dkt. 368 ¶¶ 4–5). Officer Warren spoke with Lumar and the medical staff at the clinic. (Dkt. 346 ¶¶ 6–7; Dkt. 368 ¶¶ 6–7). Lumar

1

**A-1**

told Officer Warren he was unhappy with his medical services.  (Dkt. 346 ¶ 6; Dkt. 368 ¶ 6).  The officers learned Lumar came to the clinic for treatment related to his asthma and became enraged when the doctor refused to provide him with codeine.  (Dkt. 350 ¶ 5; Dkt. 365 ¶ 5).  The officers learned Lumar allegedly made threats to the clinic staff and knocked over papers.  (Dkt. 346 ¶ 8; Dkt. 368 ¶ 8; Dkt. 350 ¶ 5; Dkt. 365 ¶ 5).  The doctor at the clinic wanted Lumar to leave the clinic and not return but also did not want to press charges.  (Dkt. 346 ¶ 9; Dkt. 368 ¶ 9).  Lumar left the clinic after being told by Officer Warren that he was banned from the building.  (Dkt. 346 ¶ 10; Dkt. 368 ¶ 10; Dkt. 350 ¶ 6; Dkt. 365 ¶ 6).

After leaving the clinic, Officers Warren and Vega learned through their in-car personal terminal device ("PDT") of an outstanding warrant for Lumar's arrest and attempted to locate him.  (Dkt. 346 ¶¶ 11–12; Dkt. 368 ¶¶ 11–12; Dkt. 350 ¶ 8; Dkt. 365 ¶ 8).  The officers located Lumar, and Officer Warren placed him under arrest at approximately 3:58 p.m. on August 18, 2016.  (Dkt. 346 ¶¶ 13–14; Dkt. 368 ¶¶ 13–14; Dkt. 350 ¶ 9; Dkt. 365 ¶ 9).  The arrest warrant was issued on June 7, 2016, by Lee County, IL for the offense of "Failing to Appear on Pay or Appear/Contempt Non-Pay."  (Dkt. 346 ¶¶ 16, 23; Dkt. 368 ¶¶ 16, 23; Dkt. 364 ¶ 5; Dkt. 390 ¶ 5).  After the arrest, Lumar arrived at the 11th District police station ("11th District") around 4:26 p.m.  (Dkt. 346 ¶¶ 17–18; Dkt. 368 ¶¶ 17–18).

At approximately 4:26 p.m., Officer Vega contacted Corrine Esteban at Chicago Police Department's Law Enforcement Agencies Data System ("LEADS") desk to confirm the validity of the warrant.  (Dkt. 350 ¶ 10; Dkt. 365 ¶ 10).  Esteban confirmed the warrant against Lumar was serviceable in the geographical limits of Cook County, printed the LEADS response, memorialized the descriptors demonstrating Officer Vega had the correct person in custody, and issued a clerical HOLD number.  (Dkt. 350 ¶ 11; Dkt. 365 ¶ 11).  Esteban provided her attestation paper to the

Extradition Department at the Chicago Police Department headquarters.  (Dkt. 350 ¶ 16; Dkt. 365 ¶ 16).  At approximately 4:43 p.m., Detective Joseph Tripoli of Extradition contacted Lee County via computer to request a copy of the warrant and its information.  (Dkt. 350 ¶ 17; Dkt. 365 ¶ 17).  He noted in his message, "Held at: Chicago Police Department," and that, "Subject will be transported to bond court and then to Cook County jail."  (*Id*.).  Lee County Correctional Officer Kimberley Stewart verified the warrant was valid for failure to appear contempt non-pay on August 18, 2016, at approximately 4:48 p.m.  (Dkt. 346 ¶ 21; Dkt. 368 ¶ 21; Dkt. 350 ¶ 18; Dkt. 365 ¶ 18; Dkt. 364 ¶ 3; Dkt. 390 ¶ 3).  Lee County also relayed details regarding the bond that was set on the warrant and indicated Lee County would extradite if Lumar was unable to pay the bond on the warrant.  (Dkt. 350 ¶ 18; Dkt. 365 ¶ 18).  Officer Stewart testified that if Lumar was allowed to bond out, the 11th District did not need to hold him.  (Dkt. 346 ¶ 27; Dkt. 368 ¶ 27; Dkt. 364 ¶ 9; Dkt. 390 ¶ 9).

The amount of the bond on the warrant was $500, 10 percent, which amounted to $50.  (Dkt. 346 ¶ 24; Dkt. 368 ¶ 24; Dkt. 364 ¶ 6; Dkt. 390 ¶ 6).  When arrested, Lumar had $130 in his possession.  (Dkt. 346 ¶ 26; Dkt. 368 ¶ 26; Dkt. 350 ¶ 27; Dkt. 365 ¶ 27; Dkt. 364 ¶ 8; Dkt. 390 ¶ 8).  Lumar acknowledged the warrant but claimed he already made payments and had gone to court.  (Dkt. 346 ¶ 25; Dkt. 368 ¶ 25; Dkt. 350 ¶ 14; Dkt. 365 ¶ 14; Dkt. 364 ¶ 7; Dkt. 390 ¶ 7).  Lumar asked Officer Vega about the process of bonding out.  (Dkt. 346 ¶ 19; Dkt. 368 ¶ 19; Dkt. 365 ¶ 1; Dkt. 390 ¶ 1).  Officer Warren told Lumar that when a physical copy of the arrest warrant came across, if he was eligible, he might be able to receive a bond.  (Dkt. 346 ¶ 20; Dkt. 368 ¶ 20; Dkt. 364 ¶ 2; Dkt. 390 ¶ 2).  The charged offense entered on the arrest report, "725 ILCS 5.0/110-3 ISSUANCE OF WARRANT Class Z - ," was selected from a drop-down menu in the CLEAR computer system which generates the arrest reports; this option was the only applicable selection

3

**A-3**

from the program's drop-down options. (Dkt. 350 ¶¶ 30, 32; Dkt. 365 ¶¶ 30, 32). The charge of "Issuance of Warrant/Class Z" is the drop-down selection for Illinois warrants regardless of whether the warrant was issued from within Cook County or from an out-of-county warrant. (Dkt. 350 ¶ 31; Dkt. 365 ¶ 31). Details for the section "Bond Info" on the arrest report are entered when an arrestee posts bond and details of the posted bond are available. (Dkt. 350 ¶ 33; Dkt. 365 ¶ 33). The section on the arrest report for Lumar indicates, "Bond Information Not Available." (Dkt. 351 Ex. 2).

While at the 11th District police station, Lumar did not appear agitated, and he cooperated throughout the processing procedure. (Dkt. 350 ¶¶ 23, 26; Dkt. 365 ¶¶ 23, 26). During that processing, Lumar was screened for medical and mental health concerns. (Dkt. 350 ¶ 24; Dkt. 365 ¶ 24). He denied having any mental health issues or medical concerns and also denied previously attempting suicide. (*Id*.). He informed the officers that he was taking prescription medication for asthma only. (Dkt. 350 ¶ 24; Dkt. 365 ¶ 24). Officers Warren and Vega compiled Lumar's paperwork, including the arrest and case report, in the processing room over approximately three hours and forty minutes, during which time Lumar remained in the processing room. (Dkt. 350 ¶¶ 28–29; Dkt. 365 ¶¶ 28–29).

Lumar was "received in lockup" at 6:26 p.m. which means he entered the lockup after the lockup keeper completed asking any screening questions. (Dkt. 346 ¶¶ 42–43; Dkt. 368 ¶¶ 42–43). Once an arrestee is received in lockup, he is searched, photographed, fingerprinted, and allowed to use the phone before being placed in a cell. (Dkt. 346 ¶ 44; Dkt. 368 ¶ 44). In Lumar's case, he was searched and then fingerprinted at approximately 6:35 p.m. and photographed at approximately 6:40 p.m. (Dkt. 346 ¶¶ 45–48; Dkt. 368 ¶¶ 45–48; Dkt. 351 Ex. 2). In lockup, his property was inventoried. (Dkt. 350 ¶ 25; Dkt. 365; ¶ 25). Lumar was also allowed to make

telephone calls during processing with his personal cell phone before arriving in lockup.  (Dkt. 350 ¶ 21; Dkt. 365 ¶ 21).  Once in lockup, he was also allowed to make additional phone calls. (Dkt. 350 ¶ 25; Dkt. 365 ¶ 25).

On August 18, 2016, Sergeant Kevin Geyer, the assigned desk sergeant or station supervisor, dealt with bonding procedures.  (Dkt. 346 ¶¶ 33–34; Dkt. 368 ¶¶ 33–34; Dkt. 350 ¶ 43; Dkt. 365 ¶ 43).  According to Chicago Police Department Special Order S06-01, active in August 2016, the station supervisor held the responsibility of determining, pursuant to orders, whether an arrestee may bond out, preparing the forms, and collecting the money.  (Dkt. 350 ¶ 39; Dkt. 365 ¶ 39).  Issuing a bond receipt and taking bond is done pursuant to police department policy.  (Dkt. 346 ¶ 37; Dkt. 368 ¶ 37).  If police department policy allows someone to bond out, they have the means to do so, and they are eligible to bond out, they will be bonded out.  (Dkt. 346 ¶ 38; Dkt. 368 ¶ 38).  However, if department policies state an arrestee cannot bond out, the arrestee will be sent to bond court according to that policy.  (Dkt. 346 ¶ 39; Dkt. 368 ¶ 39).  Relevant here, per department policy, individuals arrested on out-of-county warrants are not eligible for bond regardless of whether a bond has been set.  (Dkt. 350 ¶ 41; Dkt. 365 ¶ 41).  Sergeant Geyer reviewed the relevant paperwork, approved probable cause for Lumar's arrest, and made the determination that Lumar was to be transported to the Cook County Department of Corrections ("CCDOC") for bond court the following morning pursuant to Chicago Police Department policy. (Dkt. 350 ¶ 43; Dkt. 365 ¶ 43).

Chicago Police Department Bureau of Patrol Directive 15-0174 ("BOP Order"), issued July 29, 2015, mandated that anyone arrested based on a warrant issued in an Illinois county outside of Cook County could not post bond at the police station.  (Dkt. 346 ¶ 28; Dkt. 368 ¶ 28; Dkt. 364 ¶ 11; Dkt. 390 ¶ 11).  Instead of being bonded out, the nondiscretionary BOP Order

required anyone at the 11th District arrested on a warrant issued outside of Cook County to instead be sent to bond court at the CCDOC at 26th Street and California.  (Dkt. 346 ¶¶ 29–30; Dkt. 368 ¶P 29–30; Dkt. 350 ¶¶ 37–38; Dkt. 365 ¶¶ 37–38).  All officers were expected to follow the BOP Order or face being disciplined.  (Dkt. 350 ¶ 37; Dkt. 365 ¶ 37).  As of August 18, 2016, Sergeant Geyer was aware of the BOP Order and its mandate requiring any person arrested on an out-of-county warrant to be sent to bond court at Cook County.  (Dkt. 350 ¶ 44; Dkt. 365 ¶ 44).

The BOP Order was created in response to Cook County General Administrative Order No. 2015-06-Procedures for Arrests on Illinois Intrastate Warrants Outside of Cook County ("GAO"), entered by Chief Judge of the Circuit Court of Cook County Timothy Evans on June 17, 2015.  (Dkt. 350 ¶¶ 35–36; Dkt. 365 ¶¶ 35–36; Dkt. 351 Ex. 12).  The GAO states in part: "Defendants taken into custody by an arresting agency located within Cook County on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court. . . A bail hearing shall be held, and the defendant shall be remanded by mittimus to the custody of the Cook County Sheriff."  (Dkt. 350 ¶ 35; Dkt. 365 ¶ 35; Dkt. 351 Ex. 12).

Approximately five and a half hours after being placed in the lockup, on August 19, 2016, Officers Delgado and Vega arrived the 11th District at approximately 12:08 a.m. to transport Lumar to the hospital because he complained of shortness of breath attributed to his asthma.  (Dkt. 350 ¶ 46; Dkt. 365 ¶ 46).  Lumar was uncooperative with the transport officers and Emergency Medical Services personnel who arrived to take him to Mount Sinai Hospital.  (Dkt. 350 ¶ 47; Dkt. 365 ¶ 47).  A Chicago Fire Department ambulance transported Lumar to Mount Sinai Hospital at approximately 12:26 a.m.  (Dkt. 346 ¶¶ 49, 51; Dkt. 368 ¶¶ 49, 51).  While in the waiting room at the hospital, Lumar told the transporting officers he wanted to go home and see his daughter; but he did not exhibit any signs of suicidal ideation to the officer waiting with him in the waiting room.

That officer was a Crisis Intervention Team-trained officer. (Dkt. 346 ¶ 52; Dkt. 368 ¶ 52; Dkt. 350 ¶¶ 48–49; Dkt. 365 ¶¶ 48–49; Dkt. 364 ¶ 12; Dkt. 390 ¶ 12). Lumar was seen by doctors at Mount Sinai and the emergency department physician, Dr. Ferguson, did not believe Lumar exhibited any signs of suicidal ideation. After treatment, he was cleared to be returned to the 11th District station. (Dkt. 350 ¶¶ 50–51; Dkt. 365 ¶¶ 50–51). Lumar arrived back at the 11th District on August 19, 2016, at approximately 7:00 a.m. (Dkt. 346 ¶ 53; Dkt. 368 ¶ 53; Dkt. 350 ¶ 52; Dkt. 365 ¶ 52).

Shortly after arriving back at the 11th District Station, at approximately 8:40 a.m. on August 19, 2016, two transport officers arrived to bring Lumar to the CCDOC to be held before his appearance in bond court scheduled for that same morning. (Dkt. 350 ¶ 53; Dkt. 365 ¶ 53). While awaiting bond court, and while detained in a group cell ("bullpen") at CCDOC, Lumar was accused of possessing cocaine, a controlled substance, by Sheriff's Deputy Officer Wlodarski who told Chicago Police Officer Peter Vinson that he recovered the narcotics. (Dkt. 346 ¶¶ 55–56; Dkt. 368 ¶¶ 55–56; Dkt. 350 ¶ 61; Dkt. 365 ¶ 61). Due to the new charges, Cook County correctional officers released Lumar back into the custody of the Chicago Police Department in order to be processed for possession of a controlled substance. (Dkt. 350 ¶ 62; Dkt. 365 ¶ 62). Lumar insisted that the narcotics were not his and was angry at this turn of events. (Dkt. 346 ¶ 57; Dkt. 368 ¶ 57; Dkt. 364 ¶ 13; Dkt. 390 ¶ 13). Officer Vinson escorted Lumar out of the "bullpen" at Cook County Jail and back onto the truck where he was transported back to the 11th District, which took approximately fifteen to twenty minutes. (Dkt. 346 ¶¶ 58–60; Dkt. 368 ¶¶ 58–60; Dkt. 350 ¶ 63; Dkt. 365 ¶ 63; Dkt. 364 ¶¶ 14–15; Dkt. 390 ¶¶ 14–15). Lumar was acting upset while he was in the van. (Dkt. 346 ¶ 62; Dkt. 368 ¶ 62; Dkt. 364 ¶ 17; Dkt. 390 ¶ 17). Chicago Police Officer Alexander told Lumar he would be returned to Cook County Jail for bond court the following day.

(Dkt. 346 ¶ 61; Dkt. 368 ¶ 61; Dkt. 364 ¶ 16; Dkt. 390 ¶ 16).  At this point, Lumar had been in custody approximately seventeen hours.

Upon arriving at the 11th District, Lumar repeatedly said, "this is bullshit" and appeared to be agitated and upset.  (Dkt. 346 ¶ 63; Dkt. 368 ¶ 63; Dkt. 350 ¶ 67; Dkt. 365 ¶ 67; Dkt. 364 ¶ 18; Dkt. 390 ¶ 18).  Lumar was told to calm down by Detention Aide Jonathan Errum and asked if he wanted a phone call, which he refused.  (Dkt. 346 ¶ 64; Dkt. 368 ¶ 64; Dkt. 350 ¶ 69; Dkt. 365 ¶ 69; Dkt. 364 ¶ 19; Dkt. 390 ¶ 19).  Detention Aide Errum then secured him in a cell at around 11:00 a.m.  (Dkt. 350 ¶ 66; Dkt. 365 ¶ 66).  There is no evidence in the record that Lumar ever told Detention Aide Errum that he was suicidal.  (Dkt. 350 ¶ 70; Dkt. 365 ¶ 70).  During their brief interaction, Detention Aide Errum did not perform a complete visual check or arrestee questionnaire of Lumar but also did not perceive him to be under the influence of drugs or alcohol, exhibiting signs of drug or alcohol withdrawal, despondent, or irrational.  (Dkt. 350 ¶ 71; Dkt. 365 ¶ 71).  Lumar did not report any serious mental problems, and Detention Aide Errum did not perceive any signs that Lumar had any mental health issues or that he may attempt suicide.  (Dkt. 350 ¶ 72; Dkt. 365 ¶ 72).

On August 19, 2016, at approximately 11:15 a.m., while conducting a routine check, Detention Aide Barry found Lumar hanging by his t-shirt in his cell.  (Dkt. 346 ¶¶ 65–66; Dkt. 368 ¶¶ 65–66; Dkt. 350 ¶ 73; Dkt. 365 ¶ 73).  Lumar had taken off his shirt, tied it to the bars, and tied it around his neck.  (Dkt. 346 ¶ 67; Dkt. 368 ¶ 67).  Chicago Police Department personnel responded to Detention Aide Barry's calls for assistance, cut down Lumar, and began CPR.  (Dkt. 346 ¶ 66; Dkt. 368 ¶ 66; Dkt. 350 ¶¶ 74–75; Dkt. 365 ¶¶ 74–75).  Sergeant McCall called 911, and paramedics transported Lumar to Mount Sinai Hospital.  (Dkt. 350 ¶ 75; Dkt. 365 ¶ 75).  On April 18, 2018, Lumar was pronounced dead; the cause of death was "complications of hanging," and

the manner of death was "suicide."  (Dkt. 346 ¶¶ 68–69; Dkt. 368 ¶¶ 68–69; Dkt. 350 ¶ 76; Dkt. 365 ¶ 76; Dkt. 364 ¶ 20; Dkt. 390 ¶ 20).

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).

## DISCUSSION

### A. Count I: Unlawful Detention in Violation of the Fourth Amendment Against Sgt. Geyer

In Count I of the TAC, Plaintiff alleges Sgt. Geyer unlawfully seized and detained Tyler Lumar in violation of the Fourth Amendment by prohibiting him from posting bond at the police station pursuant to the BOP Order.  (Dkt. 279).  This Court held Lumar's initial arrest by the CPD and transport to the 11th District was proper under the Fourth Amendment.  (Dkt. 116 at 11–12). Despite the lawful initial arrest, "[a]n excessive length of detention may be sufficient to violate the reasonableness requirement of the Fourth Amendment." *Chortek v. City of Milwaukee*, 356 F.3d 740, 746 (7th Cir. 2004).

Lumar was detained from his first arrest to his death for approximately nineteen hours. During this time, Lumar was processed for the first charge (the Lee County warrant), brought to

the hospital for care, and brought to the Cook County Jail for bond court. A "delay of 48 hours or less is presumed reasonable, and the arrested person bears the burden of establishing that the length of his custody is nonetheless unreasonable." *Portis v. City of Chicago, Ill.*, 613 F.3d 702, 704 (7th Cir. 2010). The 48-hour burden-shifting approach does not come into play when police "don't plan to present the suspect to a magistrate for a probable-cause hearing." *Id.*; *see also Chortek*, 356 F.3d at 746–47. Nevertheless, detention less than 48 hours may still be unreasonably long especially in light of the reason for delay. *Portis*, 613 F.3d at 705 ("Needless delay, or delay for delay's sake – or, worse, delay deliberately created so that the process becomes the punishment – violates the fourth amendment.") (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 59 (1991)). Alcorn bears the burdens of proof and persuasion for the claim that detention was excessive, and the court "must examine not only the length of a given detention but also the reasons why release was deferred." *Portis*, 613 F.3d at 705. A detention period may be extended for the time reasonably necessary to complete administrative steps incident to the arrest. *Arlotta v. Bradley Center*, 349 F.3d 517, 523 (7th Cir. 2003).

Lumar's detention extended for a total of seventeen hours from his first arrest to his transfer to bond court. Much of this period was overnight during which he was taken to the hospital and treated for his complaint of difficulty breathing. He spent approximately seven of the seventeen hours at the hospital where he was brought after complaining of shortness of breath. The remaining ten hours comprised processing, sleep, phone calls, and transport to bond court in the morning at approximately 8:40 a.m. (Dkt. 350 ¶ 53; Dkt. 365 ¶ 53).

The administrative step of transferring Lumar to bond court was mandatory for Sgt. Geyer as instituted by the BOP Order pursuant to the GAO. (Dkt. 350 ¶ 37; Dkt. 365 ¶ 37). Although Alcorn claims Sgt. Geyer concealed Lumar's eligibility to post bond directly at the 11th District;

the record does not reflect this. Rather, Sgt. Geyer did not permit Lumar's bonding out at the police station due to the nondiscretionary BOP Order. Nothing in the record supports the notion that Lumar's offense was eligible for bond at the station and that Sgt. Geyer concealed that from Lumar to force him to attend bond court the next morning. There was no "delay for delay's sake" for example; or deliberate delay.

Plaintiff also argues Sgt. Geyer falsely reported on Lumar's arrest report that the bond information was not available despite the fact that bond was set at $500, 10%, which is $50. Plaintiff bases this claim on the section of the arrest report for "Bond Info" which stated "No Bond Information Available." Yet, Plaintiff fails to dispute that this section of the form is not completed until the accused posts bond and then the details of that bond are placed on the form. (Dkt. 350 ¶ 33; Dkt. 365 ¶ 33). The section correctly stated "No Bond Information Available" because Lumar had not yet appeared on his out-of-county warrant and had not yet posted. (*Id*.). All aspects of administrative processing indicated Lumar was to be sent to bond court solely due to the nondiscretionary BOP Order, including communication from the Extradition Department to Lee County that "Subject will be transported to bond court and then to Cook County jail." (Dkt. 350 ¶ 17; Dkt. 365 ¶ 17).

Because Sgt. Geyer was acting well within his role as a law enforcement officer when he was following the general order, he is also protected by qualified immunity which "shields federal and state officials from money damages." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The protection "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (citation omitted). To overcome qualified immunity, a plaintiff must establish a violation of a constitutional right, and the court must determine if the right at issue was

**A-11**

"clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "Determining whether a defendant state officer is entitled to qualified immunity involves two inquiries: '(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation.' If either inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (internal citation omitted).

Plaintiff has failed to demonstrate how having to appear in bond court before posting bond violated a "clearly established" constitutional right. A right is "clearly established" if "every 'reasonable official would [have understood] that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Reichle v. Howards*, 566 U.S. 658, 664–65 (2012) ("This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can "'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" (citation omitted)). To demonstrate a right is "clearly established," a plaintiff must point to closely analogous cases or prove the right is "so clear . . . that no one thought it worthwhile to litigate the issue." *Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 650 (7th Cir. 2003) (quoting *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000)).

There does not need to be a case exactly on point for a right to be "clearly established," but "existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018) (quoting *al-Kidd*, 563 U.S. at 741). The circumstances of the violation must be "clearly established" in a particularized manner, and the inquiry should be "undertaken in light of the specific context of the case, not as a broad general

proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the legal doctrine . . . will apply to the factual situation the officer confronts.'") (citation omitted); *see also White v. Pauly*, 580 U.S. 73, (2017) ("[T]he clearly established law must be 'particularized' to the facts of the case . . . Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.") (quoting *Anderson*, 483 U.S. at 639–40). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

There was no reason for Sgt. Geyer to believe administering procedures pursuant to a BOP Order in place for over a year violated Lumar's "clearly established" constitutional rights. The GAO was a valid, nondiscretionary promulgation of instructions for court procedures of arrests on out-of-county warrants. *Davidson v. Davidson*, 612 N.E.2d 71, 72 (Ill. App. Ct. 1993) ("[T]he judicial branch of government possesses the constitutional authority to promulgate procedural rules to facilitate the discharge of its constitutional duties."). It was not clearly established that Lumar's right to bond out directly from the police station without delay would outweigh the court's right to establish procedures. Sgt. Geyer's role in not permitting Lumar to post bond at the police station was merely clerical in nature and did not violate a clearly established constitutional right.

Expecting Sgt. Geyer to assess and determine whether a legally valid court order violated an arrestee's constitutional rights would "disrupt the balance . . . . between the interest in vindication of citizens' constitutional rights and in public officials' effective performance of their

13

**A-13**

duties." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1867 (2017) (citation omitted). Officers could be subject to internal discipline if they failed to follow the BOP Order and discarded the requirement that arrestees on out-of-county warrants go before bond court prior to posting bond. (Dkt. 350 ¶ 37; Dkt. 365 ¶ 37). It is unreasonable to find that following the BOP Order violated a clearly established constitutional right. Therefore, this Court finds qualified immunity attaches and protects Sgt. Geyer from any liability for his role in prohibiting Lumar from posting bond at the 11th District station pursuant to the BOP Order. Defendants' motion for summary judgment on Count I is granted, and Plaintiff's motion for summary judgment on Count I is denied.

**B. Count II: *Monell* Claim for Express Policy Constitutional Violation Against the City of Chicago**

Plaintiff brings a claim in Count II of the TAC against the City of Chicago pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (Dkt. 279). Specifically, Plaintiff alleges the CPD issued an unauthorized hold for Lumar to restrain him against his will, without due process, in accordance with the express policy of the BOP Order. Plaintiff originally also alleged that the CPD engaged in a widespread practice of arbitrarily and capriciously allowing some individuals arrested on out-of-county warrants to post bond at the police station. In Plaintiff's response and motion for summary judgement, the widespread practice theory of liability is abandoned, leaving only the question of the express policy. (Dkt. 345; Dkt. 366).

To prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct "properly attributable to the municipality itself." *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). To do so, Plaintiff must prove he or she suffered a violation of a constitutional right. *Id*. The alleged constitutional violation must have been caused by one of three types of actions: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-

settled that it constituted a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (citation omitted).  Plaintiff must also show the policy or custom demonstrates municipal fault, which is easily established when a municipality takes action or directs an employee to take action that facially violates a federal right. *First Midwest Bank Guardian of Estate of LaPorta*, 988 F.3d at 986 (citing *Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404–05 (1997)).  Finally, a *Monell* plaintiff must prove the municipality's action was the "moving force" behind the violation. *First Midwest Bank Guardian of Estate of LaPorta*, 988 F.3d at 987.

There are two varieties of "express policy" claims under *Monell*.  The first applies, "as the name suggests, where a policy explicitly violates a constitutional right when enforced." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (citing *Monell*, 436 U.S. at 658).  To prevail on this first variation, Plaintiff must identify specific language in the policy that explicitly violates a person's constitutional rights. *Id.* at 381.  "Under this type of claim, one application of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability." *Id.* at 379–80 (citing *City of Okl. v. Tuttle*, 471 U.S. 808, 822 (1985)).  The second variation of an "express policy" claim applies where the plaintiff "object[s] to omissions in the policy," *i.e.*, that the policy fails to address certain issues. *Id.* at 380.  Such claims require "more evidence than a single incident to establish liability." *Id*.  The BOP Order is the express policy for which Plaintiff brings a *Monell* claim.  Plaintiff's claim falls under the first category as evidence of only one occurrence, Lumar's detention, is presented.  Under this claim, Plaintiff is required to point to specific language that explicitly violates an individual's constitutional rights.  Plaintiff

points only to the requirement in the BOP Order that an individual on an out-of-county warrant be taken to bond court prior to being eligible to post bond.

The first question is whether Lumar suffered a constitutional injury. *Baker v. McCollan*, 443 U.S. 137, 140 (1979) ("The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'"). Absent a showing that the overnight detention of Lumar in anticipation of appearing in bond court was unconstitutional, Plaintiff's *Monell* claim fails. *See Petty v. City of Chicago*, 754 F.3d 416, 424–25 (7th Cir. 2014). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Riley v. California*, 573 U.S. 134 (2014)). A reasonable detention period may include time necessary to complete the administrative steps incident to an arrest, "delay of 48 hours or less is presumed reasonable, and the arrested person bears the burden of establishing that the length of his custody is nonetheless unreasonable." *Portis*, 613 F.3d at 704; *see also McLaughlin*, 500 U.S. at 56 ("[A] jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement."). Examples of unreasonable delay include "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility." *McLaughlin*, 500 U.S. at 56.

CPD detained Lumar for approximately seventeen hours prior to his transportation to CCDOC for his appearance in bond court. His continuing detention arose for the purpose of filing new charges on the alleged possession of narcotics and is not directly at issue in the *Monell* claim. The presumption therefore is that the seventeen-hour detention pending a probable cause

16

**A-16**

determination was reasonable.  Still, it is possible that such a length of time could amount to an

unreasonable delay depending on the purposes of the delay.

Plaintiff focuses heavily on the discrepancy between state law and the GAO and BOP

Order.  In relevant part, Illinois state statute provides:

> When bail has been set by a judicial officer for a particular offense or offender any sheriff or other peace officer may take bail in accordance with the provisions of Section 110-7 or 110-8 of this Code and release the offender to appear in accordance with the conditions of the bail bond, the Notice to Appear or the Summons. The officer shall give a receipt to the offender for the bail so taken and within a reasonable time deposit such bail with the clerk of the court having jurisdiction of the offense. A sheriff or other peace officer taking bail in accordance with the provisions of Section 110-7 or 110-8 of this Code shall accept payments made in the form of currency, and may accept other forms of payment as the sheriff shall by rule authorize.

725 ILCS 5/110-9.  Illinois law further provides:

> Person arrested in another county.
>
> (a) Any person arrested in a county other than the one in which a warrant for his arrest was issued shall be taken without unnecessary delay before the nearest and most accessible judge in the county where the arrest was made or, if no additional delay is created, before the nearest and most accessible judge in the county from which the warrant was issued. He shall be admitted to bail in the amount specified in the warrant or, for offenses other than felonies, in an amount as set by the judge, and such bail shall be conditioned on his appearing in the court issuing the warrant on a certain date. The judge may hold a hearing to determine if the defendant is the same person as named in the warrant.
>
> (b) Notwithstanding the provisions of subsection (a), any person arrested in a county other than the one in which a warrant for his arrest was issued, may waive the right to be taken before a judge in the county where the arrest was made. If a person so arrested waives such right, the arresting agency shall surrender such person to a law enforcement agency of the county that issued the warrant without unnecessary delay. The provisions of Section 109-1 shall then apply to the person so arrested.

725 ILCS 5/109-2.  Unlike Illinois state law, the BOP Order and GAO do not permit an arrestee

to waive the right to be taken before a judge in the county where the arrest was made.  Illinois

appellate courts reinforced state law, holding "The public's interest in the smooth operation of the

misdemeanor bail system far outweighs the police department's interest in an accused's continued

**A-17**

detention once booking procedures are completed, bail has been set by a judge or supreme court rule, and bail money is tendered." *Lampe v. Ascher*, 376 N.E.2d 74, 77 (Ill. App. Ct. 1978).

In contrast, the GAO issued by Chief Judge Evans of the Circuit Court of Cook County on June 17, 2015, stated, "Defendants taken into custody by an arresting agency located within Cook County on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court . . . A bail hearing shall be held, and the defendant shall be remanded by mittimus to the custody of the Cook County Sheriff." (Dkt. 350 ¶¶ 35–36; Dkt. 365 ¶¶ 35–36). "Subject to the rules of the Supreme Court, the circuit and Appellate Courts may make rules regulating their dockets, calendars, and business." 735 ILCS 5/1-104(b). In response, the CPD issued the BOP Order on July 29, 2015, stating in relevant part, "In June 2015, Chief Judge Timothy C. Evans issued an order stating that every person arrested by the Chicago Police Department on an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court." (Dkt. 346 ¶ 28; Dkt. 368 ¶ 28). Despite the fact that Plaintiff raises genuine concerns with the legality of the BOP Order and GAO under Illinois state law, the Court's analysis is unchanged. "[I]t is not the province of the Fourth Amendment to enforce state law." *Virginia v. Moore*, 553 U.S. 164, 178 (2008).

Typically, determining the reasonableness of the length of a detention is "a question best left open for juries to answer based on the facts presented in each case." *Chortek*, 356 F.3d at 747 (quoting *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988). Yet here, Plaintiff provides no evidence to present a genuine issue of material fact to overcome the presumption that Lumar's detention of less than 48 hours was unreasonable. *Id*. at 748 ("[I]n the absence of any evidence of improper purpose for the delay, we believe the government has provided a sufficient explanation."). Courts are required to "allow a substantial degree of flexibility" in determining

18

**A-18**

whether a delay is unreasonable. *McLaughlin*, 500 U.S. at 56. Here, Plaintiff cannot point to any evidence in the record that the delay was "motivated by ill will" or "for delay's sake." *Id*. Rather, Plaintiff recognizes the delay was for the purpose of appearing in bond court on an out-of-county warrant, pursuant to a BOP Order issued at the direction of the GAO. ((Dkt. 346 ¶ 28; Dkt. 368 ¶ 28). "While '[e]veryone agrees that the police should make every attempt to minimize the time a presumptively innocent individual spends in jail,' . . . or in police custody, neither the individual defendants nor the City is required to adopt procedures to process arrestees in the fastest conceivable way." *Palermo v. City of Chicago*, 980 F.2d 733 (Table), *2 (7th Cir. 1992) (quoting *McLaughlin*, 500 U.S. at 58). The Court does not find a genuine issue of material fact exists such that the question of whether the delay was unreasonable remains for the jury. Therefore, the Court grants City Defendant's motion for summary judgment on Count II (Dkt. 348) and denies Plaintiff's motion for summary judgment on Count II (Dkt. 345).

### C. Count IX: State Law Claim for Wrongful Death Against City of Chicago

Finally, Plaintiff brings a claim against the City of Chicago under the Illinois Wrongful Death Act. (Dkt. 279). Plaintiff must provide evidence of causation to survive summary judgment under the Illinois wrongful death statute, 740 ILCS 180/1, *et seq*. The Illinois wrongful death statute permits a decedent's estate to sue a party whose alleged "wrongful act, neglect or default" caused the individual's death. 740 ILCS 180/1. Plaintiff must establish "(1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of duty proximately caused decedent's death; and pecuniary damages arising therefrom to persons designated under the Act." *Thompson v. City of Chicago*, 472 F.3d 444, 457 (7th Cir. 2006) (quoting *Leavitt v. Farwell Tower Ltd. Partnership*, 625 N.E.2d 48, 52 (Ill. App. Ct. 1993)). The proximate cause element includes both cause in fact and legal cause. *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015).

Legal cause is only established when an injury is "reasonably foreseeable." *Id*. Proximate cause

is a question of fact for the jury unless there is no material issue regarding the matter or only one

conclusion is clearly evident. *Williams v. Univ. of Chicago Hospitals*, 688 N.E.2d 130, 134 (Ill.

1997).

"In wrongful death cases involving suicide, the general rule is that the injured party's

voluntary act of suicide is an independent intervening act, which is unforeseeable as a matter of

law and breaks the causal link between any alleged negligent conduct and the injury. . . .

Nevertheless, our courts have held that, where a plaintiff can show the suicide was a reasonably

foreseeable result of the defendant's conduct, liability will attach." *Stanphill v. Ortberg*, 129

N.E.3d 1167, 1177 (Ill. 2018) (citing *Turcios*, 32 N.E.3d); *see also Johnson v. Wal-Mart Stores,

Inc.*, 588 F.3d 439, 442 (7th Cir. 2009). The question of reasonable foreseeability is an objective

one, and "the question is what a reasonable person would see the likely result to be." *Id*.

Plaintiff points to an exception to this general rule when "as the proximate result of an

injury upon his head caused by the negligence of another; the person injured becomes insane and

bereft of reason, and while in this condition and as a result thereof he takes his own life. His act

in this case is not a voluntary one, and therefore does not break the causal connection between the

suicide and the act which caused the injury." *Crumpton v. Walgreen Co.*, 871 N.E.2d 905, 911

(Ill. App. Ct. 2007) (quoting *Stasiof v. Chicago Hoist & Body Co.*, 200 N.E.2d 88 (Ill. App. Ct.

1964)). Plaintiff argues this Court should find Lumar's suicide took place as a direct result of his

prolonged detention with no intervening force.

Plaintiff relies on a district court case for the premise that although it is rare that suicide

would not break the chain of causation, it is not impossible. *Hankins v. Alpha Kappa Alpha

Sorority, Inc.*, 447 F. Supp. 3d 672, 682 (N.D. Ill. 2020). The court in *Hankins* found, "[T]he

Illinois Supreme Court did not hold that suicide is always unforeseeable as a matter of law. Rather, *Turcios* only set forth a general presumption – albeit a strong one – that can still be overcome if a plaintiff is able to 'plead facts demonstrating that the suicide was foreseeable.'" *Id*. at 681–82. The court's finding at the motion to dismiss stage in *Hankins* bears no impact on the decision here. In *Hankins*, the court found Plaintiff sufficiently plead foreseeability since, "there does not appear to be any Illinois precedent foreclosing liability based on allegations that a victim explicitly told defendants that (1) their misconduct was triggering symptoms of the victim's mental-health issues; and (2) the victim had a plan to commit suicide. It is of course possible that discovery will eventually reveal facts that undermine the causal link." *Id*. at 683. Even if the holding in *Hankins* were precedential, which it is not, it would not persuade the Court of foreseeability in this case. Combing the record, there are no facts that inherently show conduct that would trigger any potential mental health issues – and remember, Lumar denied any mental health history and even went to the hospital hours prior to his death where a medical professional also did not see anything amiss in his mental status. He sat at the hospital with a trained officer who also did not see conduct that would initiate his training in this area. Lumar never mentioned the thought of taking his own life to anyone; but more importantly, he never exhibited symptoms of someone who might be in the throes of a mental health crisis.

In Lumar's case, there was no basis for Defendants to be aware of a risk of suicide. Plaintiff fails to point to any evidence in the record of an individual who interacted with Lumar suspecting he was at risk of committing suicide; or even to an individual who observed behavior that a reasonable person would deem to be so abnormal that one would be concerned that he might take his own life. Even if any individuals perceived some risk in his behavior, it would not be sufficient to find reasonable foreseeability and therefore liability. *Estate of Novack ex rel. Turbin v. County*

**A-21**

*of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) ("[S]trange behavior alone, without indications that the behavior has a substantial likelihood of taking a suicidal turn, is not sufficient to impute subjective knowledge of a high suicide risk to jail personnel.").

Plaintiff argues Lumar's suicide was legally foreseeable by virtue of his position as a detainee. *La Bombarbe v. Phillips Swager Associates Inc.*, 474 N.E.2d 942, 944 (Ill. App. Ct. 1985) ("[I]t is reasonably foreseeable that an inmate may attempt suicide."); *see also Jutzi-Johnson v. United States*, 263 F.3d 753, 757 (7th Cir. 2001) ("It is true that jail inmates are much more likely to commit suicide than free persons are – in fact, nine times as likely."). The fact that the risk exists does not make it such that prison officials will be held liable for wrongful death if a suicide occurs when no additional risk factors are present. Plaintiff cites to Doctor Fabian's report to establish an existing risk that Lumar would have attempted suicide based on his circumstances. However, Plaintiff placed no factual assertions related to the findings by the doctor in the Rule 56.1 Statement. *Raymond v. Ameritech, Corp.*, 442 F.3d 600, 604 (7th Cir. 2006) ("[D]istrict courts are entitled to expect strict compliance with Local Rule 56.1."). Regardless, Plaintiff's report does not alter the factual circumstances where Defendants had no reason to be aware of a heightened risk of suicide for Lumar while he was in custody. Plaintiff fails to cite to any legal or evidentiary support for a finding of foreseeability, much less one that would overcome the general rule that suicide "is an independent intervening event that the tortfeasor cannot be expected to foresee." *Johnson*, 588 F.3d at 442. Therefore, City Defendants' motion for summary judgment on Count IX is granted. (Dkt. 348).

## <u>CONCLUSION</u>

For the foregoing reasons, City Defendants' motion for summary judgment [348] is granted in full. Plaintiff's motion for summary judgment [345] is denied in full.

Virginia M. Kendall
United States District Judge

Date: September 27, 2022

**A-23**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| LISA C. ALCORN, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 17 C 5859 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Judge Virginia M. Kendall |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Lisa Alcorn, as the Independent Administrator of the Estate of Tyler Lumar filed this suit against a set of Defendants, including Sheriff's Officer Thomas Wlodarski, Sheriff Thomas Dart, and Cook County ("Sheriff's Office Defendants"), for claims surrounding the death of Tyler Lumar that took place while he was detained by the Chicago Police Department ("CPD"). Before the Court is Plaintiff's motion for summary judgment on Count III of her Third Amended Complaint ("TAC"). (Dkt. 333). Before the Court is also Sheriff's Office Defendants' motion for summary judgment on Counts III and X. (Dkt. 329). For the following reasons, Defendant's motion [329] is granted in full, and Plaintiff's motion [333] is denied in full.

**BACKGROUND**

On the afternoon of August 18, 2016, medical personnel at the Madison Family Health Center retreated into a locked office and called the police after Tyler Lumar, who had been refused codeine as treatment for asthma, knocked over papers, balled up his fists, and threatened "to shoot up the place." (Dkt. 332 ¶¶ 2–3; Dkt. 361 ¶¶ 2–3; Dkt. 332 Ex. 29 at 45–47). By the time Officers Warren and Vega arrived on the scene, a security guard at the Health Center already calmed Lumar

1

**A-24**

down and escorted him out to the vestibule area. (Dkt. 332 ¶ 4; Dkt. 361 ¶ 4). Medical personnel told Officers Warren and Vega they would not press charges so long as Lumar left the facility and was told to never return. (Dkt. 332 ¶ 5; Dkt. 361 ¶ 5). The officers relayed this to Lumar and he departed the facility. (Dkt. 332 ¶ 6; Dkt. 361 ¶ 6).

Back in the squad car, Officers Warren and Vega entered Lumar's name into their on-board computer and discovered an outstanding warrant from Lee County, IL for his arrest. (Dkt. 332 ¶¶ 7, 12; Dkt. 361 ¶¶ 7, 12). The arrest warrant was issued on June 7, 2016, for the offense of "Failing to Appear on Pay or Appear/Contempt Non-Pay." (Dkt. 334 ¶¶ 4–5; Dkt. 360 at 2 ¶¶ 4–5). Officers Warren and Vega located Lumar, and Officer Warren placed him under arrest at 3:58 p.m. on the basis of the outstanding warrant. (Dkt. 332 ¶ 9; Dkt. 361 ¶ 9; Dkt. 334 ¶¶ 2–3; Dkt. 360 at 1 ¶¶ 2–3). Officers Warren and Vega brought Lumar to Chicago Police Department District 11 ("District 11"), and Lumar was processed and placed in a holding cell. (Dkt. 332 ¶ 10; Dkt. 361 ¶ 10). During processing in District 11, Lumar was asked a series of questions and searched. (Dkt. 332 ¶¶ 13, 16; Dkt. 361 ¶¶ 13, 16).

Lumar asked Officer Vega about the process of bonding out. (Dkt. 362 ¶ 4; Dkt. 373 ¶ 4; Dkt. 334 ¶ 8; Dkt. 360 ¶ 8). When arrested on August 18, 2016, Lumar had $130 in his possession. (Dkt. 362 ¶ 5; Dkt. 373 ¶ 5; Dkt. 334 ¶ 10; Dkt. 360 at 2 ¶ 10). The amount of bond on Lumar's outstanding warrant was $500, 10%, amounting to $50. (Dkt. 362 ¶ 2; Dkt. 373 ¶ 2; Dkt. 334 ¶¶ 5–6; Dkt. 360 at 2 ¶¶ 5–6). Pursuant to Chicago Police Department policy, derived from an order issued by Chief Judge Timothy Evans of the Circuit Court of Cook County, anyone arrested on an out-of-county warrant was required to appear in bond court and unable to bond themselves out at the police station. (Dkt. 332 ¶ 12; Dkt. 361 ¶ 12).

**A-25**

Shortly after midnight on August 19, 2016, an ambulance transported Lumar from the holding cell at District 11 to Mount Sinai Hospital due to an asthma attack. (Dkt. 332 ¶ 18; Dkt. 361 ¶ 18). Lumar remained at Mount Sinai Hospital until he was returned to District 11 around 7:00 a.m. on August 19, 2016. (Dkt. 332 ¶ 19; Dkt. 361 ¶ 19). CPD personnel did not re-search Lumar before placing him back in lockup upon his return from the hospital. (Dkt. 332 ¶ 22; Dkt. 361 ¶ 22).

Later in the morning of August 19, 2016, Chicago Police Officers Vinson and Alexander brought Lumar from District 11 to Cook County Jail at 26th Street, in a van with over twenty other arrestees from various Chicago Police Districts to begin the process of being brought to bond court. (Dkt. 332 ¶ 25; Dkt. 361 ¶ 25; Dkt. 334 ¶ 12; Dkt. 360 at 3 ¶ 12). Upon arrival at Cook County Jail, personnel, including Cook County Sheriff's Officer Wlodarski, first searched detainees for possession of weapons or other contraband. (Dkt. 332 ¶¶ 26, 30; Dkt. 361 ¶¶ 26, 30). This took place prior to Cook County Jail officially taking detainees into custody. (*Id.*). Detainees did not go through a metal detector or body scanner at Cook County Jail prior to being searched. (Dkt. 332 ¶ 29; Dkt. 361 ¶ 29).

Cook County Jail personnel then placed Lumar with other detainees into "Bullpen 23," a large cell that held multiple pretrial detainees, at Cook County Jail. (Dkt. 334 ¶ 13; Dkt. 360 at 3 ¶ 13). Officer Wlodarski testified he saw Lumar pick something up from the ground with his left hand and drop it behind the bench he was sitting on. (Dkt. 362 ¶¶ 19–20; Dkt. 373 ¶¶ 19–20; Dkt. 334 ¶ 32; Dkt. 360 at 8 ¶ 32; Dkt. 360 at 14 ¶¶ 3–4; Dkt. 374 ¶¶ 3–4). Officer Wlodarski testified he approached Lumar and took hold of his hand, but Lumar had nothing in his hand. (Dkt. 362 ¶ 21; Dkt. 373 ¶ 21; Dkt. 334 ¶ 33; Dkt. 360 at 9 ¶ 33; Dkt. 360 at 16 ¶ 13 Dkt. 374 ¶ 13).

**A-26**

Officer Wlodarski reached down to the ground next to Lumar and recovered a baggie that contained twelve individually wrapped baggies of small white rocks, suspected at the time, and later determined through testing by the Illinois State Police, to be crack cocaine. (Dkt. 332 ¶¶ 33–34; Dkt. 361 ¶¶ 33–34; Dkt. 334 ¶ 34; Dkt. 360 at 9 ¶ 34; Dkt. 360 at 15–17 ¶¶ 5, 15; Dkt. 374 ¶¶ 5, 15). Officer Wlodarski worked at the Sheriff's Office for over ten years at this point and was familiar with how crack cocaine appeared. (Dkt. 332 ¶ 30; Dkt. 361 ¶ 30). Officer Wlodarski testified only "seconds," or "less than half a minute" passed from the time he saw Lumar pick something up to the time he himself picked up the contraband. (Dkt. 362 ¶ 22; Dkt. 373 ¶ 22; Dkt. 334 ¶ 35; Dkt. 360 at 9 ¶ 35). Lumar was separated from the other detainees and handcuffed. He became agitated at this time while Officer Wlodarski completed the necessary paperwork. (Dkt. 332 ¶ 35; Dkt. 361 ¶ 35). Discovery of contraband on a detainee requires the completion of an incident report by the person who discovered or recovered the contraband. (Dkt. 334 ¶ 17; Dkt. 360 at 4 ¶ 17). Officer Wlodarski filled out the report and stated:

> On the above date at 0905hrs, R/D Wlodarski, T #15733 was conducting a search of new prisoners in bullpen 23 when R/D noticed prisoner Lumar, Tyler IR#2025878 reaching behind the bullpen bench. R/D took detainees hand from the back of bench and saw prisoner drop a plastic package. R/D recovered the package which contained 12 individually packaged small white rocks (suspect crack cocaine). Sgt. Latham, C #3170 notified, prisoner and contraband returned to CPD district 11 for charges.

(Dkt. 362 ¶ 8; Dkt. 373 ¶ 8; Dkt. 334 ¶ 18; Dkt. 360 at 4 ¶ 18; Dkt. 332 Ex. 33). Sergeant Latham signed Wlodarski's incident report on August 19, 2016. (Dkt. 334 ¶ 21; Dkt. 360 at 5 ¶ 21; Dkt. 332 Ex. 33). At several points, Lumar was in unsecure locations or left unsupervised during his detainment. (Dkt. 332 ¶ 49; Dkt. 361 ¶ 49).

Due to the confiscation of contraband prior to the court hearing, Cook County Jail personnel rejected Lumar for admission and sent him back to District 11 with Officers Vinson and

Alexander along with the confiscated contraband. (Dkt. 332 ¶ 36; Dkt. 361 ¶ 36). Officers Vinson and Alexander departed Cook County Jail with Lumar at approximately 10:33 a.m. and arrived at District 11 with Lumar around 11:00 a.m. on August 19, 2016. (Dkt. 332 ¶ 39; Dkt. 361 ¶ 39). Officer Alexander told Lumar he would be returned to the Cook County Jail for bond court the following day. (Dkt. 362 ¶ 29; Dkt. 373 ¶ 29; Dkt. 334 ¶ 44; Dkt. 360 at 11 ¶ 44). While in the van, Lumar acted upset. (Dkt. 362 ¶ 30; Dkt. 373 ¶ 30; Dkt. 334 ¶ 45; Dkt. 360 at 11 ¶ 45). Upon Lumar's arrival at District 11, Detention Aid Errum testified he was "ranting and raving" and repeatedly saying, "this is bullshit." (Dkt. 362 ¶ 31; Dkt. 373 ¶ 31; Dkt. 334 ¶ 46; Dkt. 360 at 11 ¶ 46). Detention Aid Errum testified he told Lumar to "calm down" and escorted him to a cell. (Dkt. 362 ¶ 31; Dkt. 373 ¶ 31; Dkt. 334 ¶ 47; Dkt. 360 at 11 ¶ 47). The officers turned over the contraband to Chicago Police Department Sergeant Gartner for further processing and storage. (Dkt. 332 ¶ 40; Dkt. 361 ¶ 40).

Shortly after being placed in lockup at District 11 on August 19, 2016, Lumar hung himself after taking off his shirt and tying it to the bars and around his neck. (Dkt. 332 ¶ 43; Dkt. 361 ¶ 43; Dkt. 362 ¶ 34; Dkt. 373 ¶ 34; Dkt. 334 ¶ 50; Dkt. 360 at 13 ¶ 50). At approximately 11:15 a.m., Detention Aid Barry found Lumar unconscious in his cell. (Dkt. 362 ¶ 32; Dkt. 373 ¶ 32; Dkt. 334 ¶ 48; Dkt. 360 ¶ 48). Detention Aid Errum used a personal pocketknife to release Lumar and initiated CPR. (Dkt. 332 ¶ 44; Dkt. 361 ¶ 44; Dkt. 362 ¶ 33; Dkt. 373 ¶ 33; Dkt. 334 ¶ 49; Dkt. 360 at 12 ¶ 49). Paramedics transported Lumar to Mount Sinai Hospital where he was found to have no discernible brain activity. (Dkt. 332 ¶ 45; Dkt. 361 ¶ 45). Tyler Lumar ultimately passed away from complications of hanging on April 18, 2018, and the manner of death was suicide. (Dkt. 332 ¶ 45; Dkt. 361 ¶ 45; Dkt. 362 ¶ 35; Dkt. 373 ¶ 35; Dkt. 334 ¶¶ 52–53; Dkt. 360 at 13 ¶¶ 52–53; Dkt. 334 Ex. 16 at 185).

None of the officers or lockup keepers that interacted with Lumar on August 18, 2016, including Officers Warren and Vega, thought he was likely to harm himself or commit suicide. (Dkt. 332 ¶¶ 11, 17; Dkt. 361 ¶¶ 11, 17). The officer that took Lumar to Mount Sinai Hospital on the evening of August 18, 2016, thought Lumar was angry but not suicidal or likely to harm himself. (Dkt. 332 ¶ 20; Dkt. 361 ¶ 20). The doctor who treated Lumar at Mount Sinai noted he was yelling at his police officer escorts as inconsistent with respiratory distress but did not state in the record that she was concerned about his mental health. (Dkt. 332 ¶ 21; Dkt. 361 ¶ 21). CPD personnel did not re-screen Lumar for suicide upon his return from the hospital. (Dkt. 332 ¶ 22; Dkt. 361 ¶ 22). The doctor who treated Lumar at Mount Sinai did not note any mental health disturbances or suicidal ideation. (Dkt. 332 ¶ 23; Dkt. 361 ¶ 23). None of the CPD Officers or Detention Aids who saw or interacted with Lumar on August 19, 2016, including Officers Vinson and Alexander, who brought Lumar from Cook County Jail to District 11, thought he was likely to commit suicide or harm himself. (Dkt. 332 ¶¶ 41, 46; Dkt. 361 ¶¶ 41, 46). CPD personnel did not re-screen Lumar for suicide upon his return on August 19, 2016, to District 11. (Dkt. 332 ¶ 42; Dkt. 361 ¶ 42).

Although Lumar's family knew he had been previously arrested, they were not aware of any current mental health issues in 2016 and did not report any concerns about his mental health to the Chicago Police Department or anyone at the Cook County Sheriff's Office. (Dkt. 332 ¶ 47; Dkt. 361 ¶ 47).[1]

---

[1] On November 18, 2021, in Reply in support of Plaintiff's motion for summary judgment against Officer Wlodarski, Plaintiff filed both a response to the additional facts in Sheriff's Office Defendants' Response to Plaintiff's motion for summary judgment, as well as a set of fifteen newly offered "facts." (Dkt. 374; Dkt. 375). Local Rule 56.1(c) permits a party moving for summary judgment to file two documents in reply: a "reply memorandum of law," and a "response to the LR 56.1(b)(3) statement of additional material facts." Rule 56.1(c) does not authorize an additional statement of material facts by the moving party in the Reply. Sheriff's Office Defendants move to strike the additional facts raised in the Reply. (Dkt. 382). Defendants' motion [382] is granted, and the content of Plaintiff's additional facts in Dkt. 375 are stricken as waived since such facts were not raised until Plaintiff's Reply brief, leaving the defendants no opportunity to respond. *Kelso v. Bayer Corp.*, 398 F.3d 640, 643 (7th Cir. 2005).

**A-29**

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).

## DISCUSSION

### A. Count III: Unlawful Arrest and Detention in Violation of the Fourth Amendment Against Officer Wlodarski

Plaintiff brings a claim against Officer Wlodarski under § 1983 for unlawful detention and arrest in violation of the Fourth Amendment. (Dkt. 279). Both parties move for summary judgment on Count III. (Dkt. 333; Dkt. 329). The core issue is whether Officer Wlodarski had probable cause to refuse Tyler Lumar for admittance to Cook County Jail due to alleged possession of narcotics. Relatedly, the Court must determine whether Officer Wlodarski is entitled to qualified immunity, in which case the standard would be "arguable probable cause." *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998).

A plaintiff may prevail on a Fourth Amendment claim for continued wrongful pretrial detention. *Lewis v. City of Chicago*, 914 F.3d 472, 476–77 (7th Cir. 2019) ("[T]he constitutional injury arising from a wrongful pretrial detention rests on the fundamental Fourth Amendment principle that a pretrial detention is a 'seizure' – both before formal legal process and after – and

is justified only on probable cause."). While Officer Wlodarski did not arrest Lumar a second time and instead only rejected him for admission to Cook County Jail, the question of probable cause remains pertinent as it contributed to his continued detention.

In order to prevail on a false arrest claim pursuant to § 1983, Plaintiff must demonstrate a lack of probable cause. *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998) ("An essential predicate to any § 1983 claim for unlawful arrest is the absence of probable cause."). The existence of probable cause "is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006); *see also Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). The existence of probable cause "requires something more than a hunch," but "does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity – the officer's belief that the arrestee was committing a crime need only be reasonable." *Id*. Plaintiff bears the burden of demonstrating Officer Wlodarski lacked probable cause. *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009); *see also Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) ("[I]n order to survive summary judgment, [the plaintiff] needed to raise a genuine issue regarding whether the officers had probable cause to arrest him.").

It is illegal under Illinois law to bring contraband into a penal institution or to possess contraband in a penal institution "regardless of the intent with which he or she possesses it." 720 ILCS 5/31A-1.1. In Illinois, possession may be actual or constructive. *United States v. Perryman*, 20 F.4th 1127, 1133 (7th Cir. 2021); *People v. Love*, 937 N.E.2d 752, 756 (Ill. App. Ct. 2010).

**A-31**

"Actual possession is proved by testimony which shows [that the] defendant exercised some form of dominion over the unlawful substance, such as trying to conceal it or throwing it away." *People v. Scott*, 505 N.E.2d 42, 44 (Ill. App. Ct. 1987). "'Dominion' includes attempts to conceal or throw away illicit material." *People v. Wilson*, 2019 WL 3779416, *4 (Ill. App. Ct. Aug. 9, 2019).

Constructive possession is "a legal fiction whereby a person is deemed to possess contraband even when he does not actually have immediate, physical control of the object." *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). "Constructive possession" occurs when a defendant "has the intent and capability to maintain control and dominion over the contraband. . . . [and] may be proved by showing that the defendant had knowledge of the presence of the contraband and had immediate and exclusive control over the area where the contraband was found." *Love*, 937 N.E.2d at 756. The state must prove beyond a reasonable doubt that a defendant "had knowledge of the presence of the narcotics and that the narcotics were in his immediate and exclusive control" in order to support a finding of possession of a controlled substance. *People v. Scott*, 854 N.E.2d 795, 798 (Ill. App. Ct. 2006).

"Not only can possession be actual or constructive it can also be exclusive or joint." *United States v. Lawrence*, 788 F.3d 234, 240 (7th Cir. 2015). Exclusive control does not mean only one individual can have constructive possession. *People v. Givens*, 934 N.E.2d 470, 484–85 (Ill. 2010) ("If two or more persons share the intention and power to exercise control, then each has possession."); *see also Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021). Several factors support a finding of knowledge including visibility of the contraband from defendant's location, the amount of time defendant had to observe the contraband, "any gestures or movements made by the defendant that would suggest that the defendant was attempting to retrieve or conceal the contraband," and the size of the contraband at issue. *Love*, 937 N.E.2d at 756.

Officer Wlodarski had probable cause for his belief that Lumar possessed a controlled substance. It is undisputed Officer Wlodarski observed Lumar pick something up from the ground with his left hand and drop it behind the bench he was sitting on. (Dkt. 362 ¶¶ 19–20; Dkt. 373 ¶¶ 19–20; Dkt. 334 ¶ 32; Dkt. 360 at 8 ¶ 32; Dkt. 360 at 14–16 ¶¶ 3–4, 11; Dkt. 374 ¶¶ 3–4, 11). The Plaintiff takes issue with the claim that Lumar "held" the baggie, but even viewing the facts in the light most favorable to Plaintiff, Officer Wlodarski had probable cause to believe Lumar possessed a controlled substance. (Dkt. 360 at 15 ¶ 7; Dkt. 374 ¶ 7). "'[F]leeting' possession is still possession." *United States v. Coles*, 97 Fed. Appx. 665, 667 (7th Cir. 2004).

Plaintiff makes a series of arguments to undermine probable cause, but the arguments are unavailing. First, Plaintiff argues there is no confirmation the baggie picked up by Officer Wlodarski was the same baggie Lumar picked up and dropped. Plaintiff's claim is not based on any evidence in the record. "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Even if the baggies were different, it would not undermine what Officer Wlodarski allegedly saw, and his observations are the basis of probable cause. Officer Wlodarski observed Lumar dropping a baggie of suspected narcotics. *See United States v. Griffin*, 684 F.3d 691, 696 (7th Cir. 2012) ("[P]roximity coupled with evidence of some other factor – including connection with [an impermissible item], proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise is enough to sustain a guilty verdict.") (quoting *United States v. Morris*, 576 F.3d 661, 668 (7th Cir. 2009)). A finding of probable cause "does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable." *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999).

**A-33**

Plaintiff argues Officer Wlodarski failed to further investigate and seek out exculpatory evidence by viewing video footage of the bullpen, namely that other detainees could have had access to or possession of the narcotics or that Lumar's first contact with the narcotics took place in the bullpen.   Even if Officer Wlodarski had further investigated by watching the bullpen video, and even if that investigation led him to believe the narcotics were brought into the bullpen by other detainees and Lumar's first contact with the narcotics was in the bullpen, it would not undermine probable cause.   *See Lawrence*, 788 F.3d at 346 (upholding as an accurate statement of law as a jury instruction: "Possession of an object is the ability to control it.   Possession may exist even when a person is not in physical contact with the object, but knowingly has the power and intention to exercise direction and control over it, either directly or through others.   Also, an individual may possess an object if other individuals share the ability to exercise control over the object.   Possession may be either sole or joint.").   The Supreme Court has recognized, "Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies. . . . Detecting contraband concealed by new detainees . . . is a most serious responsibility.   Weapons, drugs, and alcohol all disrupt the safe operation of a jail."   *Florence v. Bd. of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 322, 332 (2012).   "This could happen any time detainees are held in the same area, including in a van on the way to the station or in the holding cell of the jail. . . .   A hardened criminal or gang member can, in just a few minutes, approach the person and coerce him into hiding the fruits of a crime, a weapon, or some other contraband."   *Id.* at 336.   Regardless of whether Lumar brought the baggie into the bullpen, a reasonable officer could have believed Lumar found the narcotics and took the opportunity to possess the baggie.   Whether other detainees also had access to the contraband does not undermine probable cause for Lumar's possession.

11

**A-34**

Exclusive control does not mean only one individual can have constructive possession. *Givens*, 934 N.E.2d at 484–85 ("If two or more persons share the intention and power to exercise control, then each has possession."); *see also United States v. Ford*, 22 F.4th 687, 693 (7th Cir. 2022) ("Constructive possession can be joint or sole.").

Further, once an officer establishes probable cause, he or she is not required to conduct additional investigation. *Holland v. City of Chicago*, 643 F.3d 248, 254–55 (7th Cir. 2011); *see also Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004) ("Once a police officer discovers sufficient facts to establish probable cause, she has no constitutional obligation to conduct any further investigation in the hope of discovering exculpatory evidence."). An officer may not "close his or her eyes to clearly exculpatory facts," but "the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation." *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 624 (7th Cir. 2010). Officer Wlodarski had no reason to further investigate by watching the bullpen video since he observed Lumar's actions himself.

Plaintiff relies heavily upon the argument that Officer Wlodarski fabricated evidence, prohibiting a finding of probable cause. *Lewis*, 914 F.3d at 477. The record belies this assertion. In fact, Officer Wlodarski is not alleged to have fabricated evidence but rather purportedly falsified a report. The discrepancy in the report is Officer Wlodarski's statement that he "took detainees hand from the back of bench and saw prisoner drop a plastic package." (Dkt. 362 ¶ 8; Dkt. 373 ¶ 8; Dkt. 334 ¶ 18; Dkt. 360 at 4 ¶ 18). In fact, Officer Wlodarski testified as follows:

Q. Is your statement of facts narrative true and accurate?
A. After reviewing the tape, I believe no.
Q. What is inaccurate about it?
A. The order of – well, I should say the sequence of the events, that I noticed the bag or him pick up an object, he – when I grabbed his hand, the bag was still down on the ground, and then I reached down and picked it up.

12

**A-35**

Q. Okay. So if I'm understanding your testimony, what's incorrect about [the incident report] is – well, what is – actually, in terms of the substance of it, if anything, what's incorrect?

A. Of me I believe seeing the bag, him dropping the bag. It wasn't dropped when he – when I went and reached for his hand. It was already dropped.

Q. So when you went and pulled his left wrist, the contraband was already on ground, correct?

A. Correct.

Q. Okay. Is the portion where you say, "Tyler Lumar, IR number 2025878 reaching behind the bullpen bench," is that accurate?

A. Yes, ma'am.

Q. Is the portion that says, "RD took detainee's hand from the back of the bench," is that accurate?

A. I believe he already had it on his lap.

Q. Already had what on his lap?

A. His hand on his lap.

(Dkt. 332 Ex. 30 pp. 63–64). Plaintiffs claim to have caught Officer Wlodarski in a blatant lie, arguing, "Wlodarski fabricated a set of facts creating an illusion of probable cause." (Dkt. 333 at 11). Plaintiff similarly points to testimony about conversations Officer Wlodarski had with other officials where he "failed to tell anyone that he saw the baggie on the floor before Lumar picked it up and he further failed to tell anyone that Lumar dropped the bag within seconds." (Dkt. 333 at 9).

Officer Wlodarski did not admit to fabrications or a false report but rather that the order of events in the report was inaccurate. Of course, the Court recognizes that fabricated evidence and false statements cannot serve as the basis for probable cause. *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013). Yet, Officer Wlodarski's statements in the report and to other officers did not create probable cause. *Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021) ("[T]he police reports do not alter the facts on the ground; Young was sitting next to the gun."); *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994) ("[P]robable cause depends on information known to the police at the time, not on how things turn out.").

**A-36**

Defendants assert that Officer Wlodarski is protected by qualified immunity. Qualified immunity "shields federal and state officials from money damages." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The protection "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (citation omitted). To overcome qualified immunity, a plaintiff must establish a violation of a constitutional right, and the court must decide if the right at issue was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A right is "clearly established" if "every 'reasonable official would [have understood] that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Reichle v. Howards*, 566 U.S. 658, 664–65 (2012) ("This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can "'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" (citation omitted)).

It is unclear how Officer Wlodarski could have violated a clearly established right by the actions he took in response to observing Lumar's possession of a controlled substance. Plaintiff fails to put forward any analogous cases that support such a conclusion. Plaintiff's only substantive argument is that Officer Wlodarski fabricated evidence which violated clearly established constitutional rights. Yet, as the Court has set forth above, no such fabrication occurred. Qualified immunity does not extend where an officer knowingly or recklessly made false statements and "no accurate information sufficient to constitute probable cause attended the false statements." *Lawson v. Veruchi*, 637 F.3d 699, 705 (7th Cir. 2011) (quoting *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir.

14

**A-37**

1985)).  The opposite is true here where the substantive basis for probable cause remains true and the officer testified consistent with that probable cause.

**B. Count X: State Law Wrongful Death Claim against Cook County Sheriff**

The final claim at issue against Cook County is brought under the Illinois Wrongful Death Act.  (Dkt. 279).  Plaintiff must provide evidence of causation to survive summary judgment under the Illinois wrongful death statute, 740 ILCS 180/1, *et seq.*  The Illinois wrongful death statute permits a decedent's estate to sue a party whose alleged "wrongful act, neglect or default" caused the individual's death.  740 ILCS 180/1.  Plaintiff must establish "(1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of duty proximately caused decedent's death; and pecuniary damages arising therefrom to persons designated under the Act." *Thompson v. City of Chicago*, 472 F.3d 444, 457 (7th Cir. 2006) (quoting *Leavitt v. Farwell Tower Ltd. Partnership*, 625 N.E.2d 48, 52 (Ill. App. Ct. 1993)).  The proximate cause element includes both cause in fact and legal cause.  *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015).  Legal cause is only established when an injury is reasonably foreseeable.  *Id.*  Proximate cause is a question of fact for the jury unless there is no material issue regarding the matter or only one conclusion is clearly evident.  *Williams v. Univ. of Chicago Hospitals*, 688 N.E.2d 130, 134 (Ill. 1997).

"In wrongful death cases involving suicide, the general rule is that the injured party's voluntary act of suicide is an independent intervening act, which is unforeseeable as a matter of law and breaks the causal link between any alleged negligent conduct and the injury. . . . Nevertheless, our courts have held that, where a plaintiff can show the suicide was a reasonably foreseeable result of the defendant's conduct, liability will attach." *Stanphill v. Ortberg*, 129 N.E.3d 1167, 1177 (Ill. 2018) (citing *Turcios*, 32 N.E.3d); *see also Johnson v. Wal-Mart Stores,*

15

**A-38**

*Inc.*, 588 F.3d 439, 442 (7th Cir. 2009).  The question of reasonable foreseeability is an objective one, and "the question is what a reasonable person would see the likely result to be."  *Id.*

Plaintiff points to an exception to this general rule when "as the proximate result of an injury upon his head caused by the negligence of another; the person injured becomes insane and bereft of reason, and while in this condition and as a result thereof he takes his own life.  His act in this case is not a voluntary one, and therefore does not break the causal connection between the suicide and the act which caused the injury."  *Crumpton v. Walgreen Co.*, 871 N.E.2d 905, 911 (Ill. App. Ct. 2007) (quoting *Stasiof v. Chicago Hoist & Body Co.*, 200 N.E.2d 88 (Ill. App. Ct. 1964)).  Plaintiff argues this Court should find Lumar's suicide took place as a direct result of his prolonged detention with no intervening force.

Plaintiff relies on a district court case for the premise that although it is rare that suicide would not break the chain of causation, it is not impossible.  *Hankins v. Alpha Kappa Alpha Sorority, Inc.*, 447 F. Supp. 3d 672, 682 (N.D. Ill. 2020).  The court in *Hankins* found, "[T]he Illinois Supreme Court did not hold that suicide is always unforeseeable as a matter of law.  Rather, *Turcios* only set forth a general presumption – albeit a strong one – that can still be overcome if a plaintiff is able to 'plead facts demonstrating that the suicide was foreseeable.'"  *Id*. at 681–82.  The court's finding at the motion to dismiss stage in *Hankins* bears no impact on the decision here.  In *Hankins*, the court found Plaintiff sufficiently plead foreseeability since, "there does not appear to be any Illinois precedent foreclosing liability based on allegations that a victim explicitly told defendants that (1) their misconduct was triggering symptoms of the victim's mental-health issues; and (2) the victim had a plan to commit suicide. It is of course possible that discovery will eventually reveal facts that undermine the causal link."  *Id*. at 683.  Even if the holding in *Hankins* were precedential, which it is not, it would not persuade the Court of foreseeability in this case.

**A-39**

Lumar did not explicitly tell any Defendants that conduct was triggering, or that he intended to commit suicide.

In Lumar's case, there was no basis for Defendants to be aware of a risk of suicide. None of the individuals that interacted with Lumar believed he was at risk (Dkt. 361 ¶¶ 11, 17, 41, 46). Even if any individuals perceived some risk in his behavior, it would not be sufficient to find reasonable foreseeability and therefore liability. *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) ("[S]trange behavior alone, without indications that the behavior has a substantial likelihood of taking a suicidal turn, is not sufficient to impute subjective knowledge of a high suicide risk to jail personnel.").

Plaintiff argues Lumar's suicide was legally foreseeable by virtue of his position as a detainee. *La Bombarbe v. Phillips Swager Associates Inc.*, 474 N.E.2d 942, 944 (Ill. App. Ct. 1985) ("[I]t is reasonably foreseeable that an inmate may attempt suicide."); *see also Jutzi-Johnson v. United States*, 263 F.3d 753, 757 (7th Cir. 2001) ("It is true that jail inmates are much more likely to commit suicide than free persons are – in fact, nine times as likely."). The fact that the risk exists does not make it such that prison officials will be held liable for wrongful death if a suicide occurs when no additional risk factors are present. Plaintiff cites to Doctor Fabian's report on the risk of suicide based on Lumar's circumstances. The report submitted by Plaintiff does not alter the factual circumstances where Defendants had no reason to be aware of a heightened risk of suicide for Lumar while he was in custody. Plaintiff fails to cite to any legal or evidentiary support for a finding of foreseeability, much less one that would overcome the general rule that suicide "is an independent intervening event that the tortfeasor cannot be expected to foresee." *Johnson*, 588 F.3d at 442. Therefore, Sheriff's Office Defendants' motion for summary judgment on Count X is granted. (Dkt. 329).

17

**A-40**

## CONCLUSION

For the foregoing reasons, Sheriff's Office Defendants' motion for summary judgment [329] is granted in full.  Plaintiff's motion for summary judgment [333] is denied in full.


Virginia M. Kendall
United States District Judge

Date: September 28, 2022

**A-41**