No. 22-2948

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

Lisa Alcorn, as Independent
Administrator of the Estate of
Tyler Lumar,

      Plaintiff-Appellant,

        v.

The City of Chicago, *et al.,*

      Defendants-Appellees.

Appeal from the United States
District Court for the Northern District
of Illinois, Eastern Division

17 CV 5859

Honorable Virginia M. Kendall,
District Judge

---

BRIEF OF DEFENDANTS-APPELLEES SHERIFF DART,
COOK COUNTY, AND OFFICER WLODARSKI

---

KIMBERLY M. FOXX
State's Attorney of Cook County
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-3440

CATHY MCNEIL STEIN
Chief, Civil Actions Bureau
JONATHON D. BYRER
Supervisor, Civil Appeals & Special Projects
JOHN POWER
Supervisor, Civil Rights & Torts Litigation
Assistant State's Attorneys
*Of Counsel*

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………i

TABLE OF AUTHORITIES ……………………………………………………………ii

JURISDICTIONAL STATEMENT …………………………………………………1

ISSUES PRESENTED……………………………………………………................... 2

STATEMENT OF THE CASE…………………………………………………………3

    A.   Factual Background ……………………………………………………… 3

    B.   This Lawsuit …………………………………………………………… 8

SUMMARY OF ARGUMENT .………………………………………….……………10

ARGUMENT ………………………………………………………………………… 11

    I.   Officer Wlodarski Had Probable Cause For Lumar's Arrest…………… 12

    II.   Qualified Immunity Defeats Plaintiff's Fourth Amendment Claim………… 24

    III.   Plaintiff's Wrongful Death Claim Fails For Lack Of A Wrongful Act And Proximate Cause ……………………………………………… 26

CONCLUSION……………………………………………………………………… 31

CERTIFICATE OF RULE 32 COMPLIANCE ……………………………………… 32

CERTIFICATE OF SERVICE………………………………………………………… 32

# TABLE OF AUTHORITIES

**Cases**                                                                    <u>Pages</u>

*Abbott v. Sangamon Cty*, 705 F.3d 706 (7th Cir. 2012) ............................................ 12

*Alexander v. United States*, 721 F.3d 418 (7th Cir. 2013) ........................................ 23

*Alicea v. Thomas*, 815 F.3d 283 (7th Cir. 2016) ....................................................... 25

*Anderson v. Creighton*, 483 U.S. 635 (1987)............................................................. 25

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011) .............................................................. 25

*Bianchi v. McQueen*, 818 F.3d 309 (7th Cir. 2016) ................................................... 25

*City of Escondito v. Emmons*, 139 S. Ct. 500 (2019) ................................................. 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................... 11

*Crumpton v. Walgreen Co.*, 871 N.E.2d 905 (Ill. App. 2007) ................................... 29

*Draper v. Martin*, 664. F.3d 1110 (7th Cir. 2011) ..................................................... 11

*Dunn v. City of Elgin*, 347 F.3d 641 (7th Cir. 2003) ................................................. 25

*Estate of Novack ex rel. Turbin v. Cty. of Wood*,
226 F.3d 525 (7th Cir. 2000) ....................................................................................... 28

*Estate of Williams v. Ind. State Police Dep't*,
797 F.3d 468 (7th Cir. 2015) ....................................................................................... 30

*First Springfield Bank & Trust v. Galman*,
720 N.E.2d 1068 (Ill. 1999) ........................................................................................ 27

*Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318 (2012) ........................... 15, 18

*Franks v. Delaware*, 438 U.S. 154 (1978) .......................................................... 21, 23

*Furry v. United States*, 712 F.3d 988 (7th Cir. 2013) ............................................... 27

*Homles v. Vill. of Hoffman Estates*, 511 F.3d 673 (7th Cir. 2007) .......................... 16

*Horton v. Pobjecky*, 883 F.3d 941 (7th Cir. 2018) .................................................... 14

*Humphrey v. Staszak*, 148 F.3d 719 (7th Cir. 1998) ................................ 26

*Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439 (7th Cir. 2009) ............................ 28

*Lewis v. City of Chi.*, 914 F.3d 472 (7th Cir. 2019) ................................ 23

*Little v. Chicago Hoist & Body Co.*, 203 N.E.2d 902 (Ill. 1965) ............................ 29

*Lopez v. Sheriff*, 993 F.3d 981 (7th Cir. 2021) ........................................ 26

*Manuel v. City of Joliet*, 137 S.Ct. 911 (2017) ........................................ 23

*Matthews v. City of East St. Louis*, 675 F.3d 703 (7th Cir. 2012) ........................ 20

*McBride v. Grice*, 576 F.3d 703 (7th Cir. 2009) ........................................ 13

*McLaughlin v. Sullivan*, 461 A.2d 123 (N.H. 1983) ................................ 29

*Mullenix v. Luna*, 577 U.S. 7 (2015) ................................................ 25, 26

*Paredes v. Cook Cty*, 2018 U.S. Dist. LEXIS 175796,
No. 15-cv-3644 (N.D. Ill. Oct. 12, 2018) ................................ 30

*Pasiewicz v. Lake Cty. Forrest Pres. Dist.*, 270 F.3d 520 (7th Cir. 2001) .............. 20

*Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020) ........................ 24

*Pearson v. Callahan*, 555 U.S. 223 (2009) ................................ 25

*People v. Hill*, 589 N.E.2d 1087 (Ill. App. 1992) ........................ 14

*People v. Love*, 937 N.E.2d 752 (Ill. App. 2010) ........................ 13

*People v. Scott*, 505 N.E.2d 42 (Ill. App. 1987) ........................ 13

*People v. Walls*, 408 N.E.2d 1056 (Ill. App. 1980) ................................ 16

*Qian v. Kautz*, 168 F.3d 949 (7th Cir. 1999) ........................ 13

*Scott v. Harris*, 550 U.S. 373 (2007) ........................ 14

*Skyrise Constr. Grp., LLC v. Annex Constr., LLC*,
956 F.3d 950 (7th Cir. 2020) ................................ 11

iii

*Stanphill v. Ortberg*, 2018 IL 122974 ........................................... 30

*Stokes v. Board of Educ. of the City of Chicago*,
599 F.3d 617 (7th Cir. 2010) .................................... 20

*Turcios v. DeBruler Co.*, 2015 IL 117962 ................................ 28

*United States v. Coles*, 97 Fed. Appx. 665 (7th Cir. 2004) ...................... 14

*United States v. Williams*, 495 F.3d 810 (7th Cir. 2007) ........................ 12

*United States v. Lane*, 267 F.3d 715 (7th Cir. 2001) ............................ 14

*United States v. Matthews*, 520 F.3d 806 (7th Cir. 2008) ..................... 14

*United States ex rel. Yannacopoulos v. Gen. Dynamics*,
652 F.3d 818 (7th Cir. 2011) .................................... 31

*Wheeler v. Lawson*, 539 F.3d 629 (7th Cir. 2008) ........................... 12

*Williams v. Rodriquez*, 509 F.3d 392 (7th Cir. 2007) ........................ 12

*Young v. City of Chicago*, 987 F.3d 641 (7th Cir. 2021) ....................... 20

## Rules and Statutes

28 U.S.C. §1331 ................................................................. 1

28 U.S.C. §1367 ................................................................. 2

Fed. R. Civ. Pro. 56(c)(2) ................................................... 11

720 ILCS 5/31A-1.1 .......................................................... 13

740 ILCS 180/1 ................................................................ 27

## JURISDICTIONAL STATEMENT

The jurisdictional statement of Plaintiff-Appellant Lisa Alcorn as Independent Administrator of the Estate of Tyler Lumar ("Plaintiff") is not complete and correct.

Plaintiff filed suit in the district court alleging: a Fourth Amendment wrongful detention claim against City of Chicago Police Officers Warren, Vega, Esteban, District Commander Jones, Sergeant Lasch, and Sergeant Geyer (Count I); a Fourteenth Amendment *Monell* claim against the City of Chicago (Count II); a Fourth Amendment unlawful arrest and detention claim against Sheriff's Officers Wlodarski, Crawford, Garmon, Leon, Lieutenant Lewis, and Lieutenant Latham (Count III); a Fourth Amendment *Monell* claim against the Sheriff of Cook County (Count IV); a Fourth Amendment unlawful arrest and detention claim against Chicago Police Officers Vinson and Alexander (Count V); a Fourth Amendment *Monell* claim against the Chicago Police Department (Count VI); a Fourth Amendment denial of medical care claim against the Chicago Police Detention Aides Barry and Errum (Count VII); a Fourth Amendment *Monell* claim against the City of Chicago (Count VIII); a state law wrongful death claim against the City of Chicago (Count IX); and a state law wrongful death claim against the Cook County Sheriff. (Count X). (R.1, 69, 279.)[1] The district court had federal question jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §1331, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

---

[1]     We cite the district court record as "R. __," Plaintiff's opening brief as "Pl. Br. __," and the appendix to Plaintiff's opening brief as "A. __."

On July 27, 2018, the district court dismissed Count II, Count IV, Count V, Count VI, Count VII as to Detention Aide Barry, and Count VIII. (R. 116.) Plaintiff voluntarily dismissed Defendant Lasch on September 23, 2019. (R. 209, 212.) On July 15, 2021, Plaintiff moved to voluntarily dismiss certain other defendants, and four days later the district court dismissed Defendants Crawford, Garmon, Leon, Latham, Lewis, Warren, Vega, Esteban, Jones, and Errum. (R.318, 322.) The district court granted summary judgment for defendant Geyer and the City of Chicago on Counts I, II, and IX on September 27, 2022, (A1-A23,) and granted summary judgment for Officer Wlodarski, Sheriff Dart, and Cook County on Counts III and X on September 28, 2022. (A24-A41.) The district court entered judgement in favor of all Defendants against the Plaintiff on September 29, 2022. (R. 409.) On October 28, 2022, Plaintiff timely filed her notice of appeal. (R. 413.) This Court has jurisdiction over this appeal from a final judgment pursuant to 28 U.S.C. §1291.

## ISSUES PRESENTED

1.      Whether Officer Wlodarski had probable cause for Tyler Lumar's arrest when he saw Lumar reach for, possess, and surreptitiously discard a baggie that looked like it held, and in fact did hold, cocaine, while going through receiving at Cook County Jail.

2.      Whether Officer Wlodarski's actions proximately caused Lumar's suicide where Illinois law considers suicide an intervening act, and there is no evidence that Lumar suffered a physical injury or was bereft of reason at the time of his death.

2

## STATEMENT OF THE CASE

### A.     Factual Background.

On the afternoon of August 18, 2016, after doctors at the Madison Family Health Center refused to give Tyler Lumar ("Lumar") the codeine he demanded, Lumar became agitated, knocked over papers, balled up his fists, and threatened to shoot up the place. (R. 361 ¶2.) Medical personnel retreated into a locked office and called the police. (Id. ¶3.) By the time Chicago Police Officers Warren and Vega arrived on the scene, a security guard had managed to calm Lumar and escort him out to the vestibule area. (Id. ¶4.) Officers Warren and Vega began an investigation, and the medical personnel told the police they would not press charges as long as Lumar left and was told never to return. (Id. ¶5.) Officers Warren and Vega did just that, and Lumar left the Madison Family Health Center. (Id. ¶6.)

Once back in their squad car, however, Warren and Vega entered Lumar's name into their on-board computer and discovered that Lumar had an outstanding warrant for his arrest. (Id. ¶7.) In fact, Lumar had been arrested several times in the past. (Id. ¶8.) Warren and Vega then went looking for Lumar, found him a short time later, and arrested him at 3:58 p.m. on that outstanding warrant. (Id. ¶9.) They brought Lumar to Chicago Police Department ("CPD") District 11, where he was processed and placed in a holding cell. (Id. ¶10.) Neither Officer Warren nor Vega thought Lumar was likely to commit suicide or harm himself during their interactions with him, although Lumar was argumentative. (Id. ¶11.)

Lumar's arrest warrant was from Lee County, Illinois, and pursuant to CPD

policy derived from an order by Chief Judge Evans, Chief Judge of the Circuit Court of Cook County, anyone arrested on an out-of-county warrant could not simply bond themselves out at the police station, but was instead required to appear in bond court. (Id. ¶12.)

During the processing of Lumar into that District 11 holding cell, Lumar was visually examined and asked a series of questions as part of an initial screening. (Id. ¶13.) Lumar informed CPD that he had been arrested before. (Id. ¶14.) Lumar was also screened for the potential for suicide or self-harm, and found to be not despondent or suicidal. (Id. ¶15; R. 332-38 at FCRL 10.) Lumar was also searched as a part of that intake. (R. 361 ¶16.) None of the CPD officers or lockup keepers who interacted with Lumar thought Lumar was likely to harm himself or commit suicide. (Id. ¶17.)

Lumar remained at District 11 until approximately midnight when, due to a purported asthma attack, he was brought via ambulance from District 11 to Mt. Sinai Hospital, because CPD personnel are not permitted to administer medicine, including asthma inhalers, to arrestees. (Id. ¶18.) Lumar spent several hours at Mt. Sinai before returning to District 11 at approximately 7:00 a.m. on August 19, 2016. (Id. ¶19.) The Chicago Police Officer who took Lumar to Mt. Sinai thought Lumar was angry, but not suicidal or likely to harm himself. (Id. ¶20.) Similarly, the doctor who treated Lumar at Mt. Sinai noted that Lumar was yelling at his police officer escorts, but she noted that because yelling is inconsistent with respiratory distress; she did not think Lumar's agitation was a sign that he was suicidal. (Id. ¶21.)

Lumar was not re-searched or re-screened by CPD when placed back in lockup

after returning from the hospital, in part because release from the hospital meant that he was cleared to return with law enforcement. (Id. ¶22.) That clearance included a mental health component, and Dr. Ferguson did not note any mental health disturbances or suicidal ideation with Lumar. (Id. ¶23.) Had Dr. Ferguson thought Lumar was suicidal, she would not have discharged him back into Police custody, but would have sent him for a further psychiatric evaluation. (Id ¶ 24.)

Later that morning, Chicago Police Officers Vinson and Alexander retrieved Lumar from District 11 and brought him to the Cook County Jail ("CCJ") so he could begin the process of being booked through and brought to bond court. (Id. ¶25.) Officers Vinson and Alexander brought Lumar in a van with more than 20 other arrestees from various Chicago Police Districts, and while the arrestees are sometimes handcuffed together, they are not seat-belted. (Id.) The first step in the process when arrestees arrive at CCJ, before arrestees are even officially taken into custody by CCJ, is to search the arrestees to see if they are in possession of weapons or other contraband. (Id. ¶26.) If any arrestees are found in possession of contraband during that search, they are rejected from admission to CCJ, remain in CPD custody, and are sent back to the CPD station they came from so that additional charges may be filed. (Id. ¶ 27.)

Approximately 25 new arrestees, including Lumar, were placed in Bullpen 23 at the Jail around 9:00 a.m. so they could be searched. (Id. ¶28.) The new arrestees did not go through a metal detector or body scanner at CCJ before that search. (Id. ¶29.) Cook County Sheriff's Officer Wlodarski, a veteran of the Sheriff's Office with

over ten years of experience at the time, and who was familiar with the appearance of crack cocaine, took part in that search. (Id. ¶30.)

During that initial search, Cook County Sheriff's Officer Wlodarski saw Lumar acting suspiciously, looking back and forth, and reaching down behind the bench Lumar was sitting on. (Id. ¶31, R. 372 at 8-9.) As Officer Wlodarski testified:

> I'm watching—I can only tell you what—I can't recall exact time when I noticed his movements, but that is—what catches me is that these guys have already been patted down. And that's still summertime, so there's no jackets, no nothing. **There shouldn't be anything behind the bench that would make him want to go behind the bench.** If—you said you didn't walk through it. I can only—I don't know even how to explain it. It's not the cleanliest place in the world. **So for you to want something from the ground, it's strange after I already—after you've already been patted down. That's what makes those actions stick out to me.**

(R. 374 ¶1 (emphasis added.)) The first thing Wlodarski, a veteran of the Sheriff's Office who had recovered contraband, including narcotics, on hundreds of occasions, noticed, was Lumar looking around, leaning side to side, and reaching down, which Wlodarski thought was suspicious. (Id. ¶2.) Wlodarski saw Lumar pick something up off the floor, which Wlodarski thought was incriminating. (Id. ¶3.) Wlodarski then saw Lumar discard the item, which Officer Wlodarski considered incriminating because he knew arrestees try to discard contraband in the bullpen. (Id. ¶4; R. 373 ¶19-21.) Officer Wlodarski thought it was incriminating to see an arrestee who had already been searched reach for and grab something off the bullpen floor that was packaged like drugs and looked like drugs, only to then throw it away it when an officer approached. (R. 374 ¶6.) Then Officer Wlodarski recovered the item Lumar had picked up and discarded from directly behind Lumar, and the item appeared to

be a baggie of narcotics. (Id. ¶5.)

Wlodarski approached, grabbed Lumar's hand, retrieved the baggie from the floor directly behind where Lumar was sitting, and led Lumar out of the bullpen. (R. 361 ¶¶ 31-34; R. 374 ¶¶5, 9-13, 15-16; R.373 ¶¶ 19-22, 24.) That baggie held 12 individually wrapped baggies of a white substance that appeared to be crack cocaine. (R. 361 ¶33.) Testing by the Illinois State Police later confirmed that the substance was in fact cocaine. (Id. ¶34.) Lumar again became agitated, was handcuffed, and separated from the other arrestees while Wlodarski completed paperwork related to Lumar's contraband, and the other arrestees continued through booking. (Id. ¶35.)

Due to the drugs Officer Wlodarski recovered, Lumar was rejected from admission to CCJ and sent back to District 11 with the contraband itself. (Id. ¶36.) Chicago Police Officers Vinson and Alexander took Lumar out of CCJ, departing Jail grounds at approximately 10:33 a.m., and brought Lumar back to District 11, where he arrived around 11:00 a.m. on August 19, 2016. (Id. ¶39.) They turned the drugs over to Chicago Police Sergeant Gartner for further processing and storage. (Id ¶40.) Neither Vinson nor Alexander thought Lumar was likely to commit suicide or harm himself. (Id ¶41.) Upon arrival at District 11 Lumar was searched again, but not re-screened for suicidal tendencies, then placed back in lockup. (Id. ¶ 42.) A few minutes after being placed in lockup, Lumar hung himself. (Id. ¶43.) Upon discovery, Lumar was rushed to Mount Sinai Hospital, eventually transferred to other facilities for long term care, but passed away on April 18, 2018 as a result of his injuries. (Id. ¶44-45.)

No Chicago Police Officer or detention aid who interacted with Lumar on

August 19, 2016, during and after the time Lumar was returned from CCJ to District 11, thought Lumar was likely to commit suicide or harm himself. (Id. ¶46.) Similarly, while Lumar's family was aware that Lumar had been arrested in the past, and that he could be impulsive, they were not aware of Lumar having mental health issues in 2016, and did not report any concerns about Lumar's mental health to CPD or anyone at the Sheriff's Office. (Id ¶47.)

Lumar was searched multiple times from the start of his arrest until his attempted suicide, although he did not go through any sort of metal detector or have a full body cavity search. (Id. ¶48.) Additionally, there were several times when Lumar was in unsecure locations, or was left unsupervised, that he could have obtained contraband that he may not have initially had on his person, for example: in the ambulance, at Mt. Sinai Hospital, in holding cells with other arrestees, or in the transport vehicle with other arrestees on the way to CCJ. (Id ¶49.) Further, arrestees are routinely searched multiple times because searches can miss items like drugs, weapons, or other contraband, and contraband is routinely found on individuals who have already been searched. (Id. ¶ 50, 51, 37.)

## B.   This Lawsuit.

Following Lumar's death, the administrator of his estate filed suit, claiming in relevant part that Officer Wlodarski arrested and detained Lumar in violation of the Fourth Amendment, and also brought a state law claim for wrongful death against

Sheriff Thomas Dart based on Officer Wlodarski's conduct. (R. 279 at 24, 57.)[2] Following discovery, the parties filed cross-motions for summary judgment. (R. 329-341, 359-361, 363, 372-376.)

On September 28, 2022, the district court granted Defendants' motion for summary judgment and denied Plaintiff's motion for summary judgment, and entered judgment the next day. (R. 408, 409.) The district court began by explaining that the key issue was whether Officer Wlodarski had probable cause for Lumar's arrest, or even the lower "arguable probable cause" standard pursuant to qualified immunity, and that Wlodarski did have probable cause. (A. 30.) While probable cause requires more than a hunch, it does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity, and the officer's belief need not be correct. (Id. at 31, 33.) In Illinois, it is illegal to possess contraband in a penal institution; possession may be actual or constructive, exclusive or joint; and fleeting possession is still possession. (Id.) The district court then noted, "It is undisputed that Officer Wlodarski observed Lumar pick something up from the ground with his left hand and drop it behind the bench he was sitting on." (Id. at 33.)

The district court rejected each argument Plaintiff made to challenge probable cause, explaining: Plaintiff offered no evidence to suggest that the baggie Officer Wlodarski recovered was not the same baggie Lumar dropped; Officer Wlodarski had no obligation to review bullpen video, and even if he had, the video would not have

---

[2] Plaintiff also brought claims against the City of Chicago and various City employees and officers, which are not addressed here.

undermined probable cause; even though Officer Wlodarski's Incident Report contained a chronological mistake, probable cause was based on Wlodarski's actual observations of Lumar holding the baggie of drugs and not the Report. (Id. at 33-38.)

Turning to Plaintiff's wrongful death claim, the district court explained that a wrongful death claim requires proof that the defendant caused the decedent's death, but Illinois law treats suicide as an independent act that breaks the chain of causation. (Id. at 38-40.) Even to the extent that some cases recognize liability for a voluntary suicide when the defendant was aware that his conduct was encouraging the decedent to kill himself, Lumar offered no evidence that the defendants were aware he was at risk of suicide. (A. at 39-40.) The court also rejected the notion that suicide by a jail detainee is always legally foreseeable. (A. at 40.) This appeal followed.

## SUMMARY OF ARGUMENT

The district court correctly granted summary judgment on Plaintiff's false-arrest and wrongful death claims. Plaintiff concedes that Officer Wlodarski saw Lumar reach for, pick up, hold, and then discard a baggie of drugs while being processed into Cook County Jail, and video evidence corroborates Officer Wlodarski's account. Those first-hand observations establish probable cause, defeating the false-arret claim. In addition, qualified immunity bars any false-arrest claim against Officer Wlodarski because at the very least he had arguable probable cause for Lumar's arrest. Plaintiff's wrongful death claim fails as well because Officer Wlodarski committed no wrongful conduct when he arrested Lumar. In addition, suicide is not foreseeable under Illinois law, and the exception to that rule for suicides

resulting from insanity is inapplicable here.

## ARGUMENT

After reviewing the evidence in the record, the district court granted summary judgment in favor of Defendants on Plaintiff's false-arrest and wrongful death claims. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). This Court reviews the granting of summary judgment *de novo. Draper v. Martin*, 664. F.3d 1110, 1113 (7th Cir. 2011). Further, this Court may affirm for any basis in the record. *Skyrise Constr. Grp., LLC v. Annex Constr., LLC*, 956 F.3d 950, 956 (7th Cir. 2020).

Applying those standards, this Court should affirm. Officer Wlodarski had probable cause for Lumar's arrest because he saw Lumar act suspiciously by leaning back and forth, reach for and actually pick up a baggie of drugs that looked like a baggie of drugs, and then attempt to rid himself of the evidence once he noticed Officer Wlodarski was looking at him. Officer Wlodarski then recovered the baggie from directly behind Lumar. Plaintiff's wrongful death claim fails as a matter of law because Lumar's suicide was an independent act that breaks the chain of causation, and no Sheriff's officer did anything wrongful to cause his suicide; in fact, Lumar was not even in the Sheriff's custody or control when he committed suicide. We address these issues in turn.

## I.   Officer Wlodarski Had Probable Cause For Lumar's Arrest.

The existence of probable cause defeats a claim of false arrest. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008); *Williams v. Rodriquez*, 509 F.3d 392, 398 (7th Cir. 2007). "Police officers possess probable cause to arrest when the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect had committed an offense." *Id.* (internal quotes and citations omitted); *see also Abbott v. Sangamon Cty*, 705 F.3d 706, 714 (7th Cir. 2012) ("Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing or about to commit a crime"); *United States v. Williams*, 495 F.3d 810, 817-818 (7th Cir. 2007) (irrelevant what charges were eventually brought, so long as officers had probable cause to arrest for any crime). "[P]robable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity—the officer's belief that the arrestee was committing a crime need only be reasonable." *Abbott*, 705 F.3d at 714 (internal citations omitted). The probable cause standard "does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable." *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999). At summary judgment, the plaintiff has the burden of showing an absence of probable cause. *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009)

The facts show that Officer Wlodarski had probable cause for Lumar's arrest. In Illinois it is illegal to bring contraband into a penal institution, or to possess

contraband in a penal institution, regardless of the intent with which it is possessed. 720 ILCS 5/31A-1.1. Possession can be actual or constructive. *People v. Love*, 937 N.E.2d 752, 756 (Ill. App. 2010). "Actual possession is proved by testimony which shows defendant exercised some form of dominion over the unlawful substance, such as trying to conceal it or throwing it away." *People v. Scott*, 505 N.E.2d 42, 44 (Ill. App. 1987). Further, knowledge of the contraband "may be inferred from several factors, including: (1) the visibility of the contraband from the defendant's location; (2) the amount of time that the defendant had to observe the contraband; (3) any gestures or movements made by the defendant that would suggest that the defendant was attempting to retrieve or conceal the contraband; and (4) the size of the contraband." *People v. Love*, 937 N.E.2d 752, 756 (Ill. App. 2010). Additionally, "The law is clear that the exclusive dominion and control required to establish constructive possession is not diminished by evidence of other's access to the contraband. When the relationship of others to the contraband is sufficiently close to constitute possession, the result is not vindication of the defendant, but rather a situation of joint possession. To hold otherwise would enable persons to escape criminal liability for possession of contraband by the simple expediency of inviting others to participate in the criminal enterprise." *People v. Hill*, 589 N.E.2d 1087, 1089 (Ill. App. 1992). Similarly, as the district court noted, "'fleeting' possession is still possession." (A. at 10, citing, *United States v. Coles*, 97 Fed. Appx. 665, 667 (7th Cir. 2004)). *See also United States v. Matthews*, 520 F.3d 806, 811 (7th Cir. 2008); *United States v. Lane*, 267 F.3d 715, 719 (7th Cir. 2001).

Both in this Court and before the district court below, Plaintiff has already admitted all material facts necessary to establish that Officer Wlodarski had probable cause for Lumar's arrest. As Plaintiff admits, Officer Wlodarski, who Plaintiff calls the "sole eyewitness," saw Lumar reach for, pick up, hold, and then attempt to surreptitiously throw away a baggie of drugs once he saw Officer Wlodarski approach. (Pl. Br. at 3, 19, 39-41.) Officer Wlodarski's testimony is not only undisputed, but is also corroborated by the Cook County Jail video footage which, from two separate angles, shows Lumar leaning back and forth in a suspicious manner and reaching down behind the bench he is sitting on, before returning his hand to his lap as Officer Wlodarski approaches. (R. 332-31 & 332-32 CCJ videos at 20:37-20:49 timestamps; R. 374 ¶2-6, 9, 12, 19-20.) *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018), *citing Scott v. Harris*, 550 U.S. 373, 378-81 (2007) (stating that the court "should have viewed the facts in the light depicted by the videotape.") The video shows Officer Wlodarski standing close by, well-positioned to see Lumar's actions, and shows that Wlodarski responds promptly by securing Lumar's hand and reaching down to recover the baggie from behind the bench, right where Lumar is sitting. (R. 374 ¶20.)

The Supreme Court has recognized that "Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies." *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 322 (2012). In particular, "Detecting contraband concealed by new detainees . . . is a most serious responsibility [because w]eapons, drugs, and alcohol all disrupt the safe operation of a jail." *Id.* at 332. Individuals least

likely to smuggle contraband into a prison may be compelled to do so because "Gangs do coerce inmates who have access to the outside world, such as people serving their time on the weekends, to sneak things into the jail. . . . These inmates, who might be thought to pose the least risk, have been caught smuggling prohibited items into jail. Concealing contraband often takes little time and effort. It might be done as an officer approaches a suspect's car or during a brief commotion in a group holding cell." *Id.* at 333. "There is substantial interest in preventing any new inmate, either of his own will or as a result of coercion, from putting all who live or work at these institutions at even greater risk when he is admitted to the general population." *Id.* at 333-34. Invasive search procedures are often necessary "to uncover contraband that can go undetected by a patdown, metal detector, and other less invasive searches." *Id.* at 334. Individuals detained for minor offenses may in fact be devious and dangerous criminals, while at the same time, people who may not wish to introduce contraband may be coerced by others into doing so. *Id.* at 335. "This could happen any time detainees are held in the same area, including a van on the way to the station or in the holding cell of the jail. . . . A hardened criminal or gang member can, in just a few minutes, approach the person and coerce him into hiding the fruits of a crime, a weapon, or some other contraband." *Id.* at 336.

Although Plaintiff cites the standard for probable cause in her appellate brief, that brief is written as if Lumar is in criminal court and Plaintiff is putting forth Lumar's best criminal defense. That is the incorrect procedural posture. The Defendant does not have to prove Lumar's guilt beyond reasonable doubt or prove his

knowing possession, as Plaintiff repeatedly argues. *Homles v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007) (stating "Probable cause requires more than a bare suspicion of criminal activity, but it does not require evidence sufficient to support a conviction.") Rather, the issue is merely if Officer Wlodarski had probable cause to believe Lumar was involved in criminal activity, and "In making that assessment, the court must consider the facts as they reasonably appeared to the arresting officer, seeing what he saw, hearing what he heard, and . . . . [a] police officer may of course exercise common sense and draw upon his training and experience in evaluating the totality of the circumstances confronting him." *Id.* Courts also recognize that officers must act upon a quick appraisal of the data before them, and that the reasonableness of their conduct must be judged in light of their responsibility to prevent crime and catch criminals. *People v. Walls*, 408 N.E.2d 1056, 1062-63 (Ill. App. 1980). The Defendants need not establish that Lumar was in possession of drugs from the point of his arrest until they were recovered from his person. Defendants need not establish that Lumar, acting alone and free from coercion, decided to smuggle drugs into CCJ for his own personal gain. Defendants need not even establish that Lumar in fact had drugs, or that he was the only one who could have possessed them in Bullpen 23. Defendants need only show that a reasonable officer could have believed Lumar had just committed a crime. Defendants have done so, and Plaintiff has admitted as much.

Plaintiff's arguments to the contrary are without merit. Plaintiff repeatedly states, falsely, that Officer Wlodarski saw Lumar's first contact with the baggie of

drugs because Wlodarski saw the baggie on the floor before Lumar touched it, and then saw Lumar reach for and pick up the baggie. (Pl. Br. 19, 35, 37-38.) While Officer Wlodarski did testify that he saw the baggie on the floor and saw Lumar reach for and pick up the baggie, Wlodarski never testified that he thought it was Lumar's "first contact" with the baggie.[3]  Likewise, Plaintiff has offered no evidence, either in the district court or in this Court, that Wlodarski in fact saw Lumar's first contact. Regardless, a reasonable officer could have assumed Lumar had dumped the drugs earlier to avoid the pat down search conducted by Officer Crawford, and was now attempting to recover them, not realizing Wlodarski was standing close by. Or, a reasonable officer could have believed Lumar thought this was simply a good opportunity to pick up the baggie for the first time to later use, trade, sell, return to the owner, or give away for some other benefit. *Florence*, 566 U.S. at 332-336 (describing the various ways contraband may be smuggled into a prison, including by having new arrestees work together, and the importance of keeping it out). Either way, just as Officer Wlodarski described how Lumar's actions made him suspicious,

---

[3] Plaintiff's statement of facts also implies that Officer Wlodarski and other officers first searched Lumar and the other arrestees, then took them into custody, placed them in Bullpen 23, and that Wlodarski then reached down and recovered cocaine from the ground next to Lumar. (Pl. Br. at 11-12.) As discussed in the Statement of the Case, above, more accurately, the arrestees were placed in Bullpen 23 so that they could be searched prior to being officially taken into custody. Officer Crawford patted-down the line of arrestees with Lumar, while Officer Wlodarski patted-down another line of arrestees. The officers then began inspecting the arrestees' shoes, with Officer Wlodarski now moving down Lumar's line, when Officer Wlodarski then noticed Lumar's actions. Wlodarski approached and recovered the cocaine. Lumar was rejected from CCJ, but the other arrestees were processed through into CCJ custody. (R. 332-31 & 332-32, CCJ videos; R. 373 ¶23.)

a reasonable officer would have thought it was suspicious for Lumar to lean side-to-side, look back-and-forth, and then reach for and pick up a baggie of drugs off of a prison bullpen floor that Lumar had no good reason to reach for and pick up, whether or not it was Lumar's first time touching the baggie.

It is also legally irrelevant whether Officer Wlodarski observed Lumar's first contact with the drugs when Illinois law makes the mere *possession* of drugs while inside a jail illegal, *id.* 5/31A-1.1(b), and possession that is part of an individual's "first contact" with illegal drugs is still possession, and thus still grounds for arrest. And, again, Plaintiff offers no evidence that it was Lumar's first contact or that Wlodarski thought it was Lumar's first contact.

Similarly, while Plaintiff repeatedly argues it is exculpatory that Wlodarski saw Lumar reach for and pick up the baggie, Wlodarski himself explained how it was incriminating:

> I'm watching—I can only tell you what—I can't recall exact time when I noticed his movements, but that is—what catches me is that these guys have already been patted down. And that's still summertime, so there's no jackets, no nothing. **There shouldn't be anything behind the bench that would make him want to go behind the bench**. If—you said you didn't walk through it. I can only—I don't know even how to explain it. It's not the cleanliest place in the world. **So for you to want something from the ground, it's strange after I already—after you've already been patted down. That's what makes those actions stick out to me**.

(R. 374 ¶1 (emphasis added.)) Officer Wlodarski, however, did not stop there. After seeing Lumar's furtive movements he moved in closer, saw Lumar drop the baggie, secured Lumar's hand, and then recovered the baggie. The baggie looked like narcotics to Wlodarski, and he then documented his recovery of the contraband and

arranged for it and Lumar to be sent back to CPD, where the contraband was later confirmed to be cocaine.

Likewise, while Plaintiff wants to spin Lumar's act of dropping the baggie as exculpatory, (Pl. Br. 19,) that is not so. Illinois law considers the act of disposing of an item as evidence not only of actual possession, *Scott*, 505 N.E.2d at 44, but of knowing possession, *Love*, 937 N.E.2d at 756. Accordingly, Officer Wlodarski's experience correctly taught him that the act of dropping contraband was inculpatory. Indeed, while Plaintiff repeatedly claims that Lumar "abandoned" the drugs, Plaintiff ignores the reason Lumar threw the baggie away. As the video shows, after leaning side to side, looking behind the bench, and intentionally reaching down to pick up the baggie, Lumar looks up and suddenly realizes Officer Wlodarski is looking right at him. (R. 332-31 & 332-32 CCJ videos at 20:37-20:49 timestamps.) Lumar's time of possession was cut short not by Lumar voluntarily "abandoning" the baggie, but by Officer Wlodarski's presence prompting Lumar to try to hide the evidence. Discarding the baggie, which looked like a baggie of drugs and which Lumar had no good reason to pick up in the first place, is not evidence of innocence, but evidence that Lumar knew he was doing something he should not have been doing.

Once probable cause was established, neither Officer Wlodarski nor anyone else was required to seek additional information to attempt to undermine Wlodarski's probable cause. *Pasiewicz v. Lake Cty. Forrest Pres. Dist.*, 270 F.3d 520, 524 (7th Cir. 2001) ("[w]hen probable cause has been gained from a reasonably credible victim or eyewitness, there is no constitutional duty to investigate further."); *Matthews v. City*

*of East St. Louis*, 675 F.3d 703, 707 (7th Cir. 2012) ("Once an officer has probable cause to arrest an individual, he need not continue to investigate or seek out exculpatory evidence."); *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 625 (7th Cir. 2010) ("While an officer may not close his or her eyes to clearly exculpatory facts, the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation.").

Finally, Plaintiff argues at great length that probable cause was lacking because Officer Wlodarski "fabricated" evidence in his Incident Report and statements to other officers. (Pl. Br. 37-41.) In making that argument Plaintiff misunderstands the basis of probable cause, which turns on what Officer Wlodarski actually observed, not what he said to others or memorialized in reports. *See Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021) ("[T]he police reports do not alter the facts on the ground . . . .") Thus, even generously assuming that those omissions would constitute a "fabrication" of evidence, this argument is a nonstarter for the simple reason that the addition of those facts simply do not defeat probable cause. It is well-settled that fabrications are relevant to the Fourth Amendment analysis only if their omission would negate probable cause. *E.g.*, *Franks v. Delaware*, 438 U.S. 154, 172 (1978). Here, omission of the supposed fabrications do not negate probable cause – to the contrary, as explained above, there was probable cause for Lumar's arrest even if Officer Wlodarski saw him pick up the drugs from the floor and then quickly drop them. Officer Wlodarski's statements to other officers and the Incident Report did not "create" probable cause, and therefore, even if there were problems

with the Incident Report or later verbal statements, that could not defeat the probable cause that existed based upon what Wlodarski actually saw, and what the video confirms.

Plaintiff claims Officer Wlodarski admitted the Incident Report is inaccurate and false, but to the contrary, Wlodarski said the only issue was "The order of—well, I should say the sequence of the events, that I noticed the bag or him pick up an object, he—when I grabbed his hand, the bag was still down on the ground, and then I reached down and picked it up. . . . It wasn't dropped when he – when I went and reached for his hand. It was already dropped." (R. 360 ¶30.)

Specifically, the Incident Report states Wlodarski was conducting a search of new prisoners in Bullpen 23 at approximately 9:05 a.m. on August 19, 2016, when Wlodarski noticed Lumar reaching behind the bullpen bench. That is true. (R. 374 ¶10.) The Report then states Wlodarski "took detainees [sic] hand from the back of the bench and saw prisoner drop a plastic package." (Id. ¶11.) Both clauses of that sentence are true, and the Report does not expressly state which clause came first. (Id. ¶12-13.) Nevertheless, Wlodarski admits that the sequence is reversed, and that he first saw Lumar drop the baggie, and then grabbed Lumar's hand. (Id. ¶14.) The Report then states Wlodarski recovered the package, which contained 12 individually packaged small white rocks that were suspected to be crack cocaine. That is also true. (Id. ¶15.) The Report says Wlodarski notified his supervisor, and that the prisoner and the contraband were returned to CPD District 11 for charges, and that is also true. (Id. ¶16; R. 334 ¶20-21, 40-41.) In short, to the extent the narrative section

Officer Wlodarski drafted is inaccurate, the mistake is to sequencing and does not discredit the fundamental truths—Wlodarski saw Lumar behaving suspiciously, saw Lumar reach behind the bench for no good reason, saw Lumar pick up a baggie that looked like a baggie of drugs, hold the baggie, and then drop the baggie, and Wlodarski then recovered that same baggie, which in fact contained cocaine, from directly behind Lumar.

Plaintiff's argument that the Incident Report omits the fact that Wlodarski saw Lumar pick up the baggie is similarly misplaced. As discussed above, it is simply irrelevant that Wlodarski saw Lumar pick up the baggie because, in a jail setting, Lumar's act of reaching for and picking up something that looks like drugs off the floor only adds to probable cause, regardless of whether or not that was Lumar's first time touching the baggie. Plaintiff suggests no requirement that Wlodarski include in the Report that he saw Lumar purposefully pick up the drugs, and had Wlodarski done so, it would not have offered any defense.

Plaintiff relies on *Lewis v. City of Chi.*, 914 F.3d 472 (7th Cir. 2019), for the proposition that probable cause cannot be based on "police fabrications," (Pl. Br. at 40,) but in *Lewis* the police falsely claimed Lewis admitted living at the residence in question, and falsely claimed they seized evidence establishing that Lewis lived at that residence. Those lies were complete and total police fabrications. In contrast, here, as the video corroborates, Office Wlodarski saw Lumar reach for, pick up, and hold a baggie of drugs, which Wlodarski recovered from directly behind Lumar. Plaintiff's claim that evidence was fabricated or false is a gross exaggeration of the

22

truth. The fact is that Wlodarski did not fabricate any evidence and did not create a "misleading and false" story, as Plaintiff wrongly claims. (Pl. Br. at p. 39.)

The other cases Plaintiff cites are similarly distinguishable. In *Manuel v. City of Joliet*, 137 S.Ct. 911 (2017), suspect pills were field tested and lab tested for the presence of drugs, with negative results both times, but officers and the technician lied in their reports to say the pills were in fact ecstasy. In *Alexander v. United States*, 721 F.3d 418, 421 (7th Cir. 2013), the plaintiff alleged that the prosecutor and investigators destroyed recordings of two exculpatory meetings, drafted a completely false "exit interview" for one of those meetings in which the plaintiff now admitted his involvement in a criminal scheme, and manipulated the recording of a third meeting to exclude exculpatory evidence. The prosecutor and investigators then prepared an affidavit with false information, and lied at their depositions and at trial. In *Franks v. Delaware*, 438 U.S. 154 (1978), officers allegedly fabricated plaintiff's "typical outfit" to match the description of an assailant in a prior rape case, without ever actually speaking to any witness about plaintiff's "typical outfit." In *Patrick v. City of Chicago*, 974 F.3d 824, 828-830 (7th Cir. 2020), officers beat confessions out of arrestees, falsified the record of a lineup where the witness said the arrestees were definitively not the men she had seen, created false records to undermine an alibi, arrested a drug addict and induced him to lie about what he had seen, and got two other officers to create a false report placing the arrestees at the scene of the crime. In short, Plaintiff's caselaw all stands for the unsurprising position that law enforcement cannot fabricate evidence. But none of that caselaw suggests that Officer

Wlodarski's conduct came anywhere at all close to the fabrication of evidence.

Wlodarski saw Lumar intentionally reach for, hold, and drop the baggie, and Wlodarski grabbed Lumar's hand before recovering the baggie from the floor behind Lumar, as Plaintiff admits and the video corroborates. (Pl. Br. at p. 12-14, 41; R. 361 ¶30-34; R. 362 ¶19-22; R. 372 at p. 9; R. 332-31, video at 20:00 minutes to 21:00 minutes; R. 332-32, video at 20:00 minutes to 21:00 minutes.) The fact is that Wlodarski did not fabricate evidence, did not create a "misleading and false" story, and the statement of facts Officer Wlodarski drafted in the Incident Report, the video, and Officer Wlodarski's deposition testimony, stand uncontroverted. Because Officer Wlodarski had probable cause for arresting Lumar, Plaintiff's false-arrest claim fails as a matter of law.

## II. Qualified Immunity Defeats Plaintiff's Fourth Amendment Claim.

Plaintiff's Fourth Amendment claim is also foreclosed by qualified immunity. Qualified immunity shields government officials from civil damages liability in the performance of their duties unless the official violated a statutory or constitutional right that was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2078 (2011); *City of Escondito v. Emmons*, 139 S. Ct. 500 (2019). A plaintiff seeking to defeat the defense of qualified immunity must establish two things: first, that he has alleged a deprivation of a constitutional right; and second, that the defendant violated a "clearly established" right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). To meet that standard, conduct must be so clearly prohibited "that every reasonable official would [have understood] that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That

requires either that the Plaintiff point to closely analogous cases or prove that the right is "so clear…that no one thought it worthwhile to litigate the issue." *Dunn v. City of Elgin*, 347 F.3d 641, 650 (7th Cir. 2003); *City of Escondito v. Emmons*, 139 S. Ct. 500 (2019). The question is "whether the right at issue was clearly established at the time and under the circumstances presented." *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016) (emphasis added). A plaintiff must show that the constitutional right allegedly violated was clearly established "in a particularized sense, rather than at a high level of generality," at the time of the violation. *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016).

"Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *Lopez v. Sheriff*, 993 F.3d 981, 988 (7th Cir. 2021). The Supreme Court has stressed that qualified immunity is especially important in the Fourth Amendment context where it is difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation the officer confronts. *Mullenix*, 577 U.S. at 12. Where a case turns on the question of probable cause, the question is not even whether the officer had probable cause, but the even lower "arguable probable cause". *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998).

Here, even in the light most favorable to Plaintiff, as discussed above, at a bare minimum Officer Wlodarski had arguable probable cause for Lumar's arrest. Indeed, Plaintiff admits Officer Wlodarski saw Lumar pick up and hold a baggie of drugs in Cook County Jail. (Pl. Lumar Br. 19, 38, 41.) Officer Wlodarski was performing his

duty to search newly arrived arrestees, and he was in fact successful in preventing the introduction of narcotics into CCJ. Even if Wlodarski was somehow mistaken about what he saw or who was ultimately responsible for introducing the narcotics, Officer Wlodarski had arguable probable cause based on Lumar's suspicious actions, reaching for the baggie of drugs, holding the baggie of drugs, throwing away the baggie of drugs when he noticed Wlodarski watching him, and Officer Wlodarski's recovery of drugs from the floor directly behind Lumar.

### III.    Plaintiff's Wrongful Death Claim Fails For Lack Of A Wrongful Act And Proximate Cause.

Summary judgment was also appropriate on Plaintiff's wrongful death claim stemming from Lumar's suicide while in CPD custody. Under Illinois' wrongful death statute, a cause of action exists where: (1) a wrongful act; (2) causes a person's death. 740 ILCS 180/1. Here, Lumar has failed to show that any wrongful conduct of the Sheriff's Office, Cook County, or Officer Wlodarski caused his death. The only wrongful act Lumar attributes to either Sheriff Dart or Officer Wlodarski is his supposed false arrest for drug possession, (Pl. Br. 47,) but as explained above, that arrest was not wrongful because it was supported by probable cause.[4] Absent a wrongful act, Plaintiff's wrongful death claim fails as a matter of law.

Plaintiff's wrongful death claim also fails for a lack of causation. As this Court has recognized, a wrongful death claim requires proof that the defendant's alleged

---

[4] To the extent that Lumar also appears to claim that his treatment while detained led to his suicide, (*e.g.*, Pl. Br. 43,) he expressly waives any claim under the Eighth Amendment. (Id. at 42.) Moreover, because Lumar was not in the Sheriff's custody at the time of his suicide, complaints about his custody are properly directed at the City.

wrongful actions were the "proximate cause" of the decedent's death. *Furry v. United States*, 712 F.3d 988, 992 (7th Cir. 2013). For purposes of Illinois law, proximate cause consists of two distinct components: "cause in fact" and "legal cause." *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1072 (Ill. 1999). "Cause in fact" exists only if the defendant's conduct is a material element and a substantial factor in bringing about the decedent's injury. *Id.* "Legal cause" is an inquiry into foreseeability, and asks whether the decedent's injury is of a type that a reasonable person would see as a likely result of his or her conduct. *Id.* Even assuming Plaintiff could show cause in fact, legal cause is absent because Illinois follows the general rule that suicide is an unforeseeable intervening act that breaks the causal chain. *Turcios v. DeBruler Co.*, 2015 IL 117962 ¶40-43; *Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439 (7th Cir. 2009)

While that general rule is enough, standing alone, to defeat the wrongful death claim, the facts further demonstrate that Lumar's suicide was unforeseeable. As discussed above, at no point during August 18 or 19, 2016, did anyone who interacted with Lumar think he was despondent or likely to hurt himself, including the CPD employees who performed a suicide screening on Lumar on August 18, the medical personnel who interacted with Lumar in the early morning hours of August 19, the Sheriff's officers who interacted with Lumar, or the CPD officers and lockup keepers who interacted with Lumar, including after he was refused entry at CCJ and sent back to District 11. (R. 361 ¶11, 15, 17, 20, 21, 23-24, 41, 47.) Similarly, none of Lumar's family members thought Lumar was likely to commit suicide, and none of

them reported any concerns about suicide to the Sheriff's Office or CPD. (Id. ¶47.) Even if they had, that alone would not be enough. *See Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) (officers who knew decedent had recently been at mental health facility, had a potential for risk of suicide, and exhibited strange behavior was not enough to impute subjective knowledge of a high suicide risk.)

Plaintiff's arguments are without merit. Indeed, Plaintiff's cases recognize only a narrow exception to the general rule for those rare instances in which the decedent's actions have made it such that he is either no longer in control of his faculties or cannot appreciate the nature of his suicidal actions. *See Little v. Chicago Hoist & Body Co.*, 203 N.E.2d 902, 903-04 (Ill. 1965) (when "insanity prevents [the decedent] from realizing the nature of his act or controlling his conduct, his suicide is to be regarded either as a direct result and no intervening force at all"); *Crumpton v. Walgreen Co.*, 871 N.E.2d 905, 911 (Ill. App. 2007) (recognizing exception when a "person injured becomes insane and bereft of reason, and while in this condition and as a result thereof he takes his own life"); *McLaughlin v. Sullivan*, 461 A.2d 123, 124 (N.H. 1983) (recognizing exception "where a tortious act is found to have caused a mental condition in the decedent that proximately resulted in an uncontrollable impulse to commit suicide, or prevented the decedent from realizing the nature of his act"). As a result, proximate causation for a suicide is lacking absent "evidence . . . that the mental condition of [the decedent] was such that the attempt was other than

of his own deliberate choice." *Little*, 203 N.E.2d at 904.[5] While Lumar may have been angry, as he had been when he threatened to shoot up the Madison Family Health Center which initiated his arrest, Plaintiff has admitted that no one thought Lumar was likely to commit suicide. (R. 361 at ¶ 11, 17, 21-24, 41, 46.)

In short, Plaintiff agrees that suicide is an intervening act that breaks the chain of causation, cites old and out-of-state authority that suggests a theoretical exception may exist, does not cite a case that applies the exception, and offers no facts that come anywhere close to suggesting Lumar's suicide falls into that narrow exception for cases where a physical injury renders suicide an involuntary act. Plaintiff argues that Lumar was "angry, upset, ranting and raving and repeatedly saying 'this is bullshit'", (Pl. Br. 47,) but none of that demonstrates Lumar was not in control of his faculties or unable to appreciate his actions.

In a final attempt to try to establish causation, Plaintiff refers to her hired expert, but it is well settled that a plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct was imprudent, inappropriate, or even reckless. *Estate of Williams v. Ind. State Police Dep't*, 797 F.3d 468, 475 (7th Cir. 2015). Further, Dr. Fabian does not claim that Lumar was unable to control his conduct or appreciate his actions, as the above caselaw requires, and

---

[5] Plaintiff argues that Lumar was suffering from "mental torture," but offers no caselaw to either support that "mental torture" makes suicide foreseeable, or to even define what "mental torture" means. (Pl. Br. at 20, 45-47.) Indeed, Plaintiff's caselaw only discusses suicide after a physical injury, which Plaintiff does not claim, making Plaintiff's caselaw easily distinguishable and offering no support for any sort of "mental torture" theory.

Dr. Fabian provides no analysis of how Officer Wlodarski's actions caused Lumar to hang himself. Dr. Fabian did not render an opinion on proximate cause or legal foreseeability, instead opined that suicide was "within the realm of possibility," and Dr. Fabian's Report further admits that, "Obviously, my evaluation and opinion are somewhat speculative as I cannot interview and evaluate Tyler Lumar." (R. 373 ¶38.) Speculation is not sufficient to withstand summary judgment. *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 831 (7th Cir. 2011). Being "within the realm of possibility" is insufficient to show Lumar's attempted suicide was reasonably foreseeable to the Sheriff's Office Defendants. *Stanphill v. Ortberg*, 2018 IL 122974, ¶ 34 (legal cause is established only when it can be said that the injury was reasonably foreseeable).

Similarly, Dr. Fabian admitted that Lumar never put anyone on notice that he was suicidal. (R. 373 ¶38.) Fabian's conclusions are exactly the sort of "post hoc ergo propter hoc" conclusory analysis that is not sufficient to withstand summary judgment. *Paredes v. Cook Cty*, 2018 U.S. Dist. LEXIS 175796 at *11, No. 15-cv-3644 (N.D. Ill. Oct. 12, 2018).

Plaintiff offers no evidence or caselaw to suggest that Officer Wlodarski's actions were the sort that would reasonably lead to suicide, no one in fact suspected that Lumar would commit suicide, and Lumar was in CPD custody and control when he did hang himself. Additionally, as a matter of law, suicide is an intervening cause that breaks the causal chain, and Officer Wlodarski had probable cause for the

actions he took, meaning there was no wrongful act. As a matter of law, Plaintiff cannot establish causation against the Sheriff's Office Defendants.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

Kimberly M. Foxx
State's Attorney of Cook County

By: */s/ John Power*
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-4370

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

In accordance with Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 8,738 words, beginning with the words "JURISDICTIONAL STATEMENT" on page 1 and ending with the words "Respectfully submitted" on page 31. In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was Microsoft Word.

*/s/ John Power*
JOHN POWER, Attorney

**CERTIFICATE OF SERVICE**

I certify that on May 10, 2023, I electronically filed the attached Brief of Defendants-Appellees with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ John Power*
JOHN POWER, Attorney