No. 22-2948

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

LISA ALCORN, as Independent
Administrator of the Estate of TYLER
LUMAR,

                                        Plaintiff-Appellant,

    v.

CITY OF CHICAGO, et al.,

                                        Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 17-cv-05859
The Honorable Virginia M. Kendall, Presiding
————

**BRIEF OF DEFENDANT-APPELLEE CITY OF CHICAGO**
————

                              Corporation Counsel
                                of the City of Chicago
                              2 N. LaSalle Street, Suite 580
                              Chicago, Illinois 60602
                              (312) 744-2497

MYRIAM ZRECZNY KASPER
 Deputy Corporation Counsel
SUZANNE M. LOOSE
 Chief Assistant Corporation Counsel
ETHAN MEREL
 Assistant Corporation Counsel
   Of Counsel

# TABLE OF CONTENTS

———

Page

TABLE OF AUTHORITIES .................................................................iii

JURISDICTIONAL STATEMENT ....................................... 1

ISSUES PRESENTED ............................................................. 2

STATEMENT OF THE CASE .................................................. 2

SUMMARY OF ARGUMENT .................................................. 7

ARGUMENT .............................................................................. 8

I. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY
JUDGMENT TO THE CITY ON ALCORN'S SECTION 1983 CLAIM. .... 9

    A. A City Policy Was Not The "Moving Force" Behind Lumar's
       Overnight Detention. ......................................................... 10

    B. Lumar's Detention Was Not A Fourth Amendment
       Violation. ............................................................................ 13

        1. Lumar's detention was reasonable. ..................... 13

        2. Illinois law cannot change the scope of Lumar's
           constitutional rights. ............................................ 16

II. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY
JUDGMENT TO THE CITY ON ALCORN'S WRONGFUL
DEATH CLAIM. ......................................................................... 17

CONCLUSION ......................................................................... 24

# TABLE OF AUTHORITIES

———

| CASES | Page(s) |
|---|---|

Allen-Noll v. Madison Area Technical College,
  969 F.3d 343 (7th Cir. 2020) ................................................................. 8

Benedix v. Village of Hanover Park,
  677 F.3d 317 (7th Cir. 2012) ............................................................... 12

Bethesda Lutheran Homes & Services, Inc. v. Leean,
  154 F.3d 716 (7th Cir. 1998) ........................................................ 10-12

Bordelon v. Chicago School Reform Board of Trustees,
  233 F.3d 524 (7th Cir. 2000) ............................................................... 22

Chortek v. City of Milwaukee,
  356 F.3d 740 (7th Cir. 2004) ............................................................... 14

Cichon v. Exelon Generation Co.,
  401 F.3d 803 (7th Cir. 2005) ............................................................... 22

County of Los Angeles v. Mendez,
  581 U.S. 420 (2017) ............................................................................. 18

County of Riverside v. McLaughlin,
  500 U.S. 44 (1991) ......................................................................... 13-14

Crumpton v. Walgreen Co.,
  871 N.E.2d 905 (Ill. App. Ct. 2007) .................................................. 19

Donald v. Polk County,
  836 F.2d 376 (7th Cir. 1988) ........................................................... 9-10

Driveline Systems, LLC v. Arctic Cat, Inc.,
  936 F.3d 576 (7th Cir. 2019) .............................................................. 8-9

Estate of Novack ex rel. Turbin v. County of Wood,
  226 F.3d 525 (7th Cir. 2000) ............................................................... 21

First Midwest Bank v. City of Chicago,
  988 F.3d 978 (7th Cir. 2021) ................................................................. 9

Greenbank v. Great American Assurance Co.,
    47 F.4th 618 (7th Cir. 2022) ............................................................. 23

Heien v. North Carolina,
    574 U.S. 54 (2014) ............................................................................ 13

Houskins v. Sheahan,
    549 F.3d 480 (7th Cir. 2008) ............................................................ 13

Johnson v. Wal-Mart Stores, Inc.,
    588 F.3d 439 (7th Cir. 2009) ............................................................ 19

Jutzi-Johnson v. United States,
    263 F.3d 753 (7th Cir. 2001) ........................................................ 21-22

La Bombarbe v. Phillips Swager Associates Inc.,
    474 N.E.2d 942 (Ill. App. Ct. 1985) ................................................. 22

Lampe v. Ascher,
    376 N.E.2d 74 (Ill. App. Ct. 1978) ................................................... 15

Leavitt v. Farwell Tower Ltd. Partnership,
    625 N.E.2d 48 (Ill. App. Ct. 1993) ................................................... 18

Little v. Chicago Hoist & Body Co.,
    203 N.E.2d 902 (Ill. 1965)) ........................................................... 19-20

McNabola v. Chicago Transit Authority,
    10 F.3d 501 (7th Cir. 1993) ................................................................ 9

Monell v. New York City Department of Social Services,
    436 U.S. 658 (1978) ............................................................................ 9

Moore v. Marketplace Restaurant, Inc.,
    754 F.2d 1336 (7th Cir. 1985) .......................................................... 17

Patrick v. Jasper County,
    901 F.2d 561 (7th Cir. 1990) .............................................................. 9

Pembaur v. City of Cincinnati,
    475 U.S. 469 (1986) .......................................................................... 10

Petty v. City of Chicago,
    754 F.3d 416 (7th Cir. 2014) ............................................................ 13

iv

Portis v. City of Chicago, Ill.,
    613 F.3d 702 (7th Cir. 2010) ........................................................... 14-15

Raymond v. Ameritech Corp.,
    442 F.3d 600 (7th Cir. 2006) ............................................................. 22

Riley v. California,
    573 U.S. 134 (2014) .......................................................................... 13

Snyder v. King,
    745 F.3d 242 (7th Cir. 2014) ............................................................. 10

Stanphill v. Ortberg,
    129 N.E.3d 1167 (Ill. 2018) ............................................................... 18

Surplus Store & Exchange, Inc. v. City of Delphi,
    928 F.2d 788 (7th Cir. 1991) ......................................................... 10, 12

Thompson v. City of Chicago,
    472 F.3d 444 (7th Cir. 2006) ............................................................. 18

Turcios v. DeBruler Co.,
    32 N.E.3d 1117 (Ill. 2015) ................................................................ 18

Virginia v. Moore,
    553 U.S. 164 (2008) ....................................................................... 16-17

## OTHER AUTHORITIES

28 U.S.C. § 1291 ....................................................................................... 1

28 U.S.C. § 1331 ....................................................................................... 1

28 U.S.C. § 1367(a) ................................................................................... 1

42 U.S.C. § 1983 ....................................................................................... 1

Fed. R. App. P. 28(a)(8) ......................................................................... 23

Fed. R. Civ. P. 56(a) ................................................................................. 1

725 ILCS 5/109-2 ................................................................................. 7, 16

740 ILCS 180/1.......................................................................................................... 18

Ill. Sup. Ct. Rule 21(f)............................................................................................... 11

## JURISDICTIONAL STATEMENT

———————

The jurisdictional statement of plaintiff-appellant Lisa Alcorn is not complete and correct.  Alcorn, as the independent administrator of the Estate of Tyler Lumar, sued the City, Sergeant Kevin Geyer, Cook County, and various other city and county police officers and officials, alleging unlawful detention in violation of the Fourth Amendment, actionable under 42 U.S.C. § 1983, and a state-law claim for wrongful death.  R. 279 (third amended complaint).  The district court had jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state-law claim pursuant to 28 U.S.C. § 1367(a).  Alcorn included various other claims in her third amended complaint, which the district court struck. R. 306.  This left claims pending against only the City, Geyer, and the Cook County defendants; no claims against other individual City defendants remained.

On September 27, 2022, the district court granted summary judgment in favor of the City and Geyer on all remaining claims against them, see Appendix ("A.") 1-23; R. 407, and on September 28, 2022, the court entered summary judgment in favor of the Cook County defendants on the claims against them, see A. 24-41; R. 408.  On September 29, 2022, the court entered final judgment pursuant to Fed. R. Civ. P. 58.  R. 409.  Alcorn filed a notice of appeal on October 28, 2022.  R. 413.  This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

1

## ISSUES PRESENTED

———

1.      Whether the district court correctly granted summary judgment to the City on Alcorn's Fourth Amendment claim because no City policy caused Lumar's detention, and the detention was reasonable.

2.      Whether the district court correctly granted summary judgment to the City on Alcorn's wrongful death claim because Lumar's death was not reasonably foreseeable.

## STATEMENT OF THE CASE

———

Alcorn claims that the City violated Lumar's Fourth Amendment rights when Lumar was detained overnight on an out-of-county warrant, and that the City is liable under the Illinois Wrongful Death Act for Lumar's suicide while in detention. R. 279 at 18-23, 56-57.  The parties adduced the following evidence during discovery.

On August 18, 2016, Lumar visited the Madison Family Health Center, where he became agitated and made violent threats when medical personnel refused to provide him codeine.  R. 279 at ¶ 16; R. 351-31 at 46:12-47:2.  The medical staff called the Chicago Police Department ("CPD"), and two officers arrived.  R. 351-31 at 28:18-29:3. At the request of the medical staff, who did not want to press charges so long as Lumar left and never returned, the officers informed Lumar that he was free to leave but could not return to the clinic.  Lumar then left the building and began walking away.  R. 279 at ¶ 17-19, 21; R. 351-31 at

47:5-13.  When the officers returned to their squad car, they entered Lumar's name into their in-car personal terminal device, which informed them that Lumar had an outstanding warrant from Lee County.  R. 351-31 at 59:12-60:1, 69:6-22.  Shortly thereafter, at 3:58 p.m., the officers located Lumar walking down the street and arrested him on the outstanding warrant.  R. 351-3 at ¶ 3; R. 279 at ¶ 22.

At approximately 4:16 p.m., Lumar arrived at the 11th District police station, where he was searched and processed.  R. 351-3 at ¶ 4; R. 351-29 at 26:2-7.  The intake procedure included screening Lumar for medical and mental health problems.  Lumar advised CPD staff that he was taking prescription asthma medication, but he denied any mental health problems or any prior attempts at suicide or serious self-harm.  R. 351-26 at 29:18-30:6, 31:13-32:11; R. 351-2 at 4.  Lumar was not acting despondent or irrational throughout the process, R. 351-2 at 4; R. 351-26 at 38:13-39:1; detention aids observed his demeanor as "cool" and "pretty normal" with "normal" body language, R. 351-28 at 32:2-12, 72:20-73:12; R. 351-26 at 28:18-29:13.

During Lumar's processing, Lee County relayed to CPD that Lumar's warrant was valid, and that bond was set on the warrant in the amount of $500.00, with Lumar required to pay 10%.  R. 279 at ¶ 34; R. 351-5.  At the time of Lumar's detention, arrests of individuals by CPD for out-of-county warrants were governed by "Cook County General Administrative Order No. 2015-06-Procedures for Arrests on Illinois Intrastate Warrants Issued Outside of Cook County" (the "GAO").

R. 351-12; R. 351-11.  Cook County Chief Judge Timothy Evans issued the GAO on
June 17, 2015, which states in relevant part that:

> Defendants taken into custody by an arresting agency located within
> Cook County on an arrest warrant issued by an Illinois state court
> outside of Cook County shall be required to appear in bond court . . . A
> bail hearing shall be held, and the defendant shall be remanded by
> mittimus to the custody of the Cook County Sheriff.  R. 351-12.

In response to this court-ordered requirement, CPD issued Bureau of Patrol
Order 15-017415 (the "BOP Order"), which explained Chief Judge Evans' GAO and
provided instructions to ensure that CPD's processing procedures would comply
with the GAO.  R. 351-27 at 21:15-23:5, 50:21-24; R. 351-20 at 108:6-14.  The BOP
Order states, in part:

> In June 2015, Chief Judge Timothy C. Evans issued an order stating
> that every person arrested by the Chicago Police Department on an
> arrest warrant issued by an Illinois State court outside of Cook County
> shall be required to appear in bond court.

R. 351-11 at 2.

In compliance with these orders, Sergeant Geyer, the desk sergeant at the
11th District, determined that Lumar was ineligible to post bond at the police
station because he was arrested on an out-of-county warrant.  R. 351-20 at 22:6-14,
106:11-107:15, 112:21-113:11; R. 351-2.  Instead, Sergeant Geyer determined that
Lumar must be held pending his transport to the Cook County Department of
Corrections ("CCDOC") for bond court.  Id.  When CPD completed Lumar's intake
processing, he was placed into a cell in the 11th District lockup at about 6:40 p.m.,
where he would await the next transport for bond court the following morning.
R. 351-28 at 30:3-7; R. 279 at ¶ 44.

That night, at 12:08 a.m. on August 19, 2016, CPD officers transported Lumar to Mt. Sinai Hospital after he complained of shortness of breath attributed to his asthma.  R. 351-16 at 14:2-19; R. 351-2; R. 279 at ¶ 39.  While at the hospital waiting room, Lumar did not exhibit any signs of suicidal ideation to the transport officer; Lumar told the officer that he wanted to go home and to see his daughter.  R. 351-16 at 17:1-3, 62:5-24, 63:5-19.  After Lumar received treatment for his asthma, hospital staff released him back into police custody.  Dr. Erika Ferguson, the emergency department physician, testified that Lumar did not exhibit any signs of suicidal ideation while at the hospital, and that she would not have released Lumar back into police custody if he exhibited suicidal behavior.  R. 351-19 at 21:5-23:1.  Lumar returned to the police station later that morning, at approximately 7:00 a.m.  R. 351-21 at 15:10-23; R. 351-2.

At about 8:40 a.m., two CPD officers took Lumar to CCDOC to be held pending his appearance in bond court that morning.  R. 351-2; R. 351-36; R. 279 at ¶ 44.  During his detention at CCDOC, Cook County correctional officers reportedly observed Lumar drop a package containing twelve individually packaged small white rocks that were believed to be a controlled substance.  R. 351-8; R. 279 at ¶¶ 45, 46.  Cook County correctional officers reported their observations to CPD officers and released Lumar back into the custody of CPD to be processed for possession of a controlled substance.  R. 351-32 at 67:2-68:4; R. 351-30 at 75:9-24; R. 279 at ¶¶ 49-50.

CPD transported Lumar back to the police station for processing and placed him into a cell at 11:04 a.m.  R. 351-35.  During the transport, officers recall Lumar appearing nervous, but not angry.  R. 351-14 at 31:5-32:21.  And upon returning to the station, the detention aid who interacted with Lumar found him to be agitated, but he testified that there was no evidence that Lumar was despondent, irrational, suicidal, or otherwise suffering from any serious mental problem.  R. 351-17 at 76:22-77:22, 130:3-131:10.  At 11:15 a.m. – eleven minutes after Lumar was placed in his cell – a different detention aid conducting a routine check discovered Lumar hanging by his t-shirt.  R. 351-15 at 81:14-82:23, 84:4-19; R. 351-17 at 84:4-10.  CPD personnel cut Lumar down, performed CPR, and called for emergency services. R. 351-17 at 85:13-17, 89:3-11, 90:4-10; R. 351-25 at 18:12-19:4.  Paramedics then transported Lumar to Mt. Sinai Hospital.  R. 279 at ¶ 62.  On April 18, 2018, Lumar died from his injuries.  R. 279 at ¶ 65.

Alcorn filed suit, alleging, as relevant here, that the City violated Lumar's Fourth Amendment rights when Lumar was detained overnight, and that the City is liable under the Illinois Wrongful Death Act for Lumar's suicide.  R. 279 at 18-23, 56-57.  The City and Alcorn each filed motions for summary judgment on those claims, R. 345, 348, and the district court granted summary judgment in favor of the City, R. 407.  The court concluded that Alcorn's Fourth Amendment claim against the City failed because there was no unreasonable delay in the length of his detention.  A. 14-19.  The court also held that Alcorn's wrongful death claim failed because Lumar's suicide was not reasonably foreseeable.  A. 19-22.

Alcorn appeals, challenging the judgment for the City on the Fourth Amendment claim and the wrongful death claim.  R. 413.  Alcorn expressly waives any challenge to the judgment in favor of Sergeant Geyer, Brief of Plaintiff-Appellant ("Appellant Br.") 2, and presents no challenge to the dismissal of any claims against any other individual City defendants.

## SUMMARY OF ARGUMENT
———

The district court correctly granted summary judgment to the City.  On Alcorn's municipal liability claim under the Fourth Amendment, Lumar's detention was neither caused by a City policy nor was it unreasonable.  Lumar's detention awaiting his appearance in bond court was mandated by an order of the Chief Judge of Cook County, which stated that defendants in custody on "an arrest warrant issued by an Illinois state court outside of Cook County shall be required to appear in bond court."  R. 351-12.  The BOP Order, which instructs compliance with the Chief Judge's order, is not an independent City policy based on a deliberate choice for which the City can be held culpable.  The GAO, not the BOP Order, was the moving force behind Lumar's overnight detention.  Additionally, Lumar's detention was reasonable.  Not only is a detention lasting less than 48 hours presumptively reasonable, but there is no evidence that Lumar was held any longer than the time required to transport him to bond court in compliance with the Chief Judge's order.  A good faith effort to act in accordance with a court order does not constitute unreasonable delay.  Nor does the state statute Alcorn relies on, 725 ILCS 5/109-2, change the analysis.

Alcorn's wrongful death claim fails because Lumar's death was not reasonably foreseeable. Suicide is an independent intervening act, which is unforeseeable as a matter of law. Lumar denied any history of mental illness, and never displayed suicidal ideation while in custody. There is no evidence on which a reasonable person could foresee that detention would cause Lumar to attempt suicide. The district court's order granting summary judgment for the City should be affirmed.

## ARGUMENT

———

Alcorn's entire case rests on the flawed theory that the City should have ended Lumar's detention immediately after his initial arrest was administratively processed, even though the refusal to bring Lumar to bond court would violate an order issued by the Chief Judge of Cook County. The City's compliance with a judicial order does not amount to a municipal policy that violates Lumar's constitutional rights, nor did it proximately cause Lumar's suicide. Alcorn's Fourth Amendment and wrongful death claims fail, and the district court's ruling granting summary judgment for the City is sound.

This court reviews the grant of summary judgment de novo. Allen-Noll v. Madison Area Technical College, 969 F.3d 343, 349 (7th Cir. 2020). "Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." Driveline Systems, LLC v. Arctic Cat, Inc., 936 F.3d 576, 579 (7th Cir. 2019) (quotation omitted); see Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists whenever there is

sufficient evidence favoring the non-moving party for a jury to return a verdict for

that party." <u>Driveline Systems</u>, 936 F.3d at 579 (quotation omitted).

## I.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO THE CITY ON ALCORN'S SECTION 1983 CLAIM.

Summary judgment was proper on Alcorn's Fourth Amendment claim.  To

prevail on a section 1983 claim, plaintiffs "must show that: (1) they held a

constitutionally protected right; (2) they were deprived of this right in violation of

the Constitution; (3) the defendants intentionally caused this deprivation; and (4)

the defendants acted under color of law." <u>Donald v. Polk County</u>, 836 F.2d 376, 379

(7th Cir. 1988).  Additionally, because the City is a municipal defendant, plaintiffs

"must demonstrate that the constitutional deprivation was caused by 'a policy

statement, ordinance, regulation, or decision officially adopted and promulgated by

[the City's] officers.'" <u>Patrick v. Jasper County</u>, 901 F.2d 561, 565 (7th Cir. 1990)

(quoting <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658, 690

(1978)); <u>see also</u> <u>McNabola v. Chicago Transit Authority</u>, 10 F.3d 501, 510 (7th Cir.

1993) (a "direct causal link between the municipal policy and the constitutional

deprivation" is required).  In other words, the policy must be the "moving force"

behind the purported violation. <u>First Midwest Bank v. City of Chicago</u>, 988 F.3d

978, 987 (7th Cir. 2021).

Alcorn's section 1983 claim does not satisfy these requirements.  First,

Lumar's overnight detention – the conduct that allegedly violated his Fourth

Amendment rights – was mandated by the Chief Judge's GAO, not any independent

City policy.  Second, Lumar's overnight detention, which was necessary so that he

could appear in bond court as the Chief Judge's GAO required, was not an unreasonable delay; thus, Lumar did not experience any constitutional injury.

### A.    A City Policy Was Not The "Moving Force" Behind Lumar's Overnight Detention.

Alcorn cannot show that a City policy "intentionally caused [the] deprivation" alleged. Donald, 836 F.2d at 379.  The Chief Judge's GAO was the sole cause of Lumar's overnight detention.  This court has repeatedly explained that a municipality is not liable under section 1983 for conduct it is compelled to do by law. That is because "when the only local government 'policy' at issue is general compliance with the dictates of state law[,] . . . the state law is the proximate cause of the plaintiff's injury."  Snyder v. King, 745 F.3d 242, 247 (7th Cir. 2014).  As such, a "section 1983 claim against a municipal entity typically hinges on the extent to which that municipal entity was independently responsible for the allegedly unconstitutional act."  Id.; see Bethesda Lutheran Homes & Services, Inc. v. Leean, 154 F.3d 716, 718-19 (7th Cir. 1998) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986)) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives").  "When the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury." Bethesda Lutheran Homes, 154 F.3d at 718; see also Surplus Store & Exchange, Inc. v. City of Delphi, 928 F.2d 788, 791 (7th Cir. 1991) ("It is difficult to imagine a municipal policy more innocuous . . . and whose causal connection to the alleged

violation is more attenuated, than the 'policy' of enforcing state law.").

Here, the City was bound by the Chief Judge's GAO and had no choice other than to detain Lumar so that he could appear in bond court on his out-of-county warrant.  CPD, as "an arresting agency located within Cook County," is a covered agency under the Chief Judge's GAO, and the order mandates that individuals arrested on out-of-county warrants "*shall be required* to appear in bond court." R. 351-12 (emphasis added).  Illinois Supreme Court Rule 21 gives general administrative orders the force of law by authorizing court proceedings to compel compliance by any person or agency with such orders.  See Ill. Sup. Ct. Rule 21(f). The City is not free to ignore court orders.

The BOP Order is not an independent policy of the City, but merely an administrative tool setting out procedures for compliance with the GAO.  It expressly states that it is issued in response to the GAO, explains the practical effect of the GAO for law enforcement personnel, and instructs officers on how certain arrests must be processed for the City to comply with the Chief Judge's order.  R. 351-11.  The BOP Order does not enlarge the requirement prescribed by the GAO for those individuals arrested on out-of-county warrants to appear in bond court.  Indeed, if the City had never adopted the clarifying BOP Order, "[t]he injury of which the plaintiffs are complaining would have occurred regardless[,] . . . unless [the City] had decided to disobey" the Chief Judge's order.  Bethesda Lutheran Homes, 154 F.3d at 719.  Thus, the GAO, not the BOP Order, was the "moving force" behind Lumar's overnight detention.

11

Alcorn argues that this court should invalidate the Chief Judge's GAO. Appellant Br. 31-34. But that would not change the result here. In Bethesda Lutheran Homes, for example, this court struck down as unconstitutional various state laws and federal regulations relating to the treatment of individuals with intellectual disabilities at a residential facility, but also held that the county where that facility was located "cannot be held liable under section 1983 for acts that it did under the command" of those laws. 154 F.3d at 718. Until this court struck down the laws at issue in Bethesda Lutheran Homes, the county had no meaningful choice but to follow them. Id. Indeed, attributing policies to municipalities that are mandated by an entirely different entity "would render meaningless the entire body of precedent from the Supreme Court and 7th Circuit that requires culpability on the part of a municipality and/or its policymakers before the municipality can be held liable under § 1983." Surplus Store, 928 F.2d at 791 n.4.[1] In this case, the BOP Order is merely the City's effort to implement the Chief Judge's GAO, with which the City has no meaningful choice but to comply. The invalidation of the GAO could not retroactively make any policy other than the GAO the moving force

---

[1] Alcorn cites Benedix v. Village of Hanover Park, 677 F.3d 317 (7th Cir. 2012) for the proposition that, if the court finds that the GAO is invalid, but nevertheless finds that the City's adherence to it prevents liability under section 1983, that outcome would amount to giving the City "immunity." Appellant Br. 34. Benedix, which involves a municipality's own policies, and not a scenario where a municipality was bound by governing law, does not advance Alcorn's position. Instead, Benedix generally explains that "[m]unicipalities do not enjoy any kind of immunity from suits for damages under § 1983," id. at 318-319, a principle that is not in dispute.

behind any alleged violation of Lumar's constitutional rights.[2]

### B. Lumar's Detention Was Not A Fourth Amendment Violation.

Alcorn's Fourth Amendment claim independently fails because Lumar's overnight detention in anticipation of his morning appearance in bond court was reasonable and thus did not violate Lumar's constitutional rights. "[I]t is well established that there can be no municipal liability based on an official policy under Monell if the policy did not result in a violation of [a plaintiff's] constitutional rights." Petty v. City of Chicago, 754 F.3d 416, 424–25 (7th Cir. 2014) (quoting Houskins v. Sheahan, 549 F.3d 480, 493 (7th Cir. 2008)). In addition, contrary to Alcorn's assertion, Illinois law does not affect the scope of Lumar's federal constitutional rights.

### 1. Lumar's detention was reasonable.

Lumar's overnight detention pending his morning appearance in bond court, as ordered by the Chief Judge of Cook County, did not violate his Fourth Amendment rights. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Heien v. North Carolina, 574 U.S. 54, 60 (2014) (quoting Riley v. California, 573 U.S. 373 (2014)). The Supreme Court explained in County of Riverside v. McLaughlin, 500 U.S. 44 (1991), that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement." Id. at 56. A "delay of 48 hours

---

[2] Because the outcome of this appeal does not depend on whether the GAO was invalid, this court need not resolve that issue.

or less," therefore, "is presumed reasonable, and the arrested person bears the burden of establishing that the length of his custody is nonetheless unreasonable." Portis v. City of Chicago, Ill., 613 F.3d 702, 704 (7th Cir. 2010). "In evaluating whether the delay in a particular case is unreasonable . . . courts must allow a substantial degree of flexibility" to arresting agencies, taking into account "practical realities" such as "delays in transporting arrested persons" and "handling late-night bookings where no magistrate is readily available." McLaughlin, 500 U.S. at 56-57. Lumar's detention was less than 48 hours, and Alcorn presents no evidence to overcome the presumption of reasonableness. Without evidence of an improper purpose, the government's explanation will be deemed sufficient. See Chortek v. City of Milwaukee, 356 F.3d 740, 748 (7th Cir. 2004). Examples of unreasonable delay include "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." McLaughlin, 500 U.S. at 56.

Lumar's detention lasted approximately seventeen hours, from the time he was arrested at 3:58 p.m. until the time he left the 11th District to go to CCDOC for bond court at 8:40 a.m.[3] Alcorn does not challenge the first three hours of Lumar's detention for "administrative processing," which she claims ended when Lumar was placed into a cell at 6:40 p.m. Appellant Br. 28. The remaining period includes a seven-hour stretch (from 12:08 a.m. until 7:01 a.m.) that Lumar spent at Mt. Sinai

---

[3] Alcorn does not appear to count toward his Fourth Amendment claim the time period, after his stay at CCDOC, when he returned to CPD custody because of the new controlled substance charge. In any event, Alcorn acknowledges that such administrative processing time is generally permissible. Appellant Br. 28-29.

Hospital to treat his asthma.  And, although Alcorn argues that Lumar's appearance at bond court was not necessary, she has not contested that Lumar was on the first available transport to CCDOC after his arrest; there is no evidence that Lumar was held any longer than required to transport him to bond court in compliance with the Chief Judge's order.  Alcorn, in short, has no evidence of unreasonable delay.

Alcorn's only argument in support of her claim that the detention was unreasonable is that because she believes the GAO was invalid, the City was under no obligation to take Lumar to bond court, and thus any amount of time after the completion of his intake processing was unnecessary delay.  Appellant Br. 30-34.  As part of this argument, Alcorn notes that this court explained in <u>Portis</u> that "the 48–hour burden-shifting approach does not apply when the police don't plan to present the suspect to a magistrate for a probable-cause hearing."  613 F.3d at 704; <u>see</u> Appellant Br. 30.  But that exception is inapplicable to this case because the City *did* plan to promptly present Lumar to a judge, and, in fact, the City actually transported Lumar to the CCDOC in order to appear in bond court.  Moreover, under any analysis, the detention was reasonable for the reasons we explain above – it lasted approximately seventeen hours, during which he was processed, treated for asthma at the hospital, and promptly taken to bond court, which appearance was required by the GAO and not motivated by any improper purpose.[4]  Compliance

---

[4]  Alcorn cites <u>Lampe v. Ascher</u>, 376 N.E.2d 74, 77 (Ill. App. Ct. 1978), to argue that the City was required to release Lumar on bail.  Appellant Br. 26-27.  <u>Lampe</u> does not account for the GAO, which was issued in 2015.

with a binding order of the Chief Judge of Cook County is not unreasonable.

Alcorn's belief that the City should have flagrantly disobeyed a judicial order does

not constitute evidence that the length of Lumar's detention was unreasonable.

### 2. Illinois law cannot change the scope of Lumar's constitutional rights.

Alcorn devotes a significant portion of her brief to discussing the effect of a

state statute, 725 ILCS 5/109-2.  That statute provides, in pertinent part:

> (a) Any person arrested in a county other than the one in which a
> warrant for his arrest was issued shall be taken without unnecessary
> delay before the nearest and most accessible judge in the county where
> the arrest was made [. . . .]
>
> (b) [A]ny person arrested in a county other than the one in which a
> warrant for his arrest was issued, may waive the right to be taken
> before a judge in the county where the arrest was made. If a person so
> arrested waives such right, the arresting agency shall surrender such
> person to a law enforcement agency of the county that issued the
> warrant without unnecessary delay.

725 ILCS 5/109-2.[5]  The state statute is irrelevant to the constitutional analysis.

Alcorn admits as much, noting that "it is not the province of the Fourth

Amendment to enforce state law," R. 266 at 14 (quoting Virginia v. Moore, 553 U.S.

164, 178 (2008), and that she "does not claim that a mere violation of state law is

actionable under the Fourth Amendment," Appellant Br. 27.  Instead, she asserts

---

[5]  Alcorn erroneously asserts that under this statute, CPD should have "allowed
Tyler Lumar to post the $50 bond at the 11th District Police Station and go home."
Appellant Br. 27.  The statute did not require Lumar's immediate release.  It
provides the options of appearing before a judge in the county where the arrest was
made or, if the arrestee waives a hearing, allowing the arresting agency to
surrender the arrestee to a law enforcement agency of the county that issued the
warrant.  Neither of these alternatives mandate immediate release from custody.
Regardless, the GAO required the City to take him to bond court.

that the statute is relevant because in <u>Moore v. Marketplace Restaurant, Inc.</u>, 754
F.2d 1336 (7th Cir. 1985), this court said that "a state statute does not give rise to a
corresponding § 1983 violation, unless the right encompassed in the state statute is
guaranteed under the United States Constitution." <u>Id.</u> at 1349; <u>see also</u> Appellant
Br. 27. <u>Moore</u> does not support Alcorn's reliance on the statute. In <u>Moore</u>, this
court was "liberal[ly] reading" a section 1983 complaint that alleged various
violations of Illinois statutes to determine whether the underlying alleged conduct
independently violated any constitutional right. 754 F.2d at 1349. The fact that
Illinois statutes covered particular subjects did not impact this court's
constitutional analysis. Indeed, in the Fourth Amendment context, the Supreme
Court has clearly instructed that "whether state law authorized" certain conduct is
"irrelevant" to assessing constitutional claims because "when States go above the
Fourth Amendment minimum, the Constitution's protections . . . remain the same."
<u>Virginia</u>, 553 U.S. at 171, 173. Here, too, the question is whether the constitution
guarantees a particular right; whether state law provides for certain protections
cannot alter or enlarge the constitutional right actionable under section 1983. And
for the reasons discussed, Lumar's detention was reasonable and thus did not
violate his constitutional rights.

## II.     THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO THE CITY ON ALCORN'S WRONGFUL DEATH CLAIM.

Alcorn claims that the City is liable for Lumar's suicide under the Illinois
Wrongful Death Act, which permits a decedent's estate to sue a party whose alleged

"wrongful act, neglect or default" caused the decedent's death.  740 ILCS 180/1.  To succeed on a wrongful death claim under the statute, a plaintiff must establish that the defendant owed a duty to the decedent, that the defendant breached that duty, and that the breach proximately caused decedent's death.  Thompson v. City of Chicago, 472 F.3d 444, 457 (7th Cir. 2006) (quoting Leavitt v. Farwell Tower Ltd. Partnership, 625 N.E.2d 48, 52 (Ill. App. Ct. 1993)).  The proximate cause element includes both cause in fact and legal cause.  Turcios v. DeBruler Co., 32 N.E.3d 1117, 1124 (Ill. 2015).  Legal cause requires the injury to be "reasonably foreseeable" based on the defendant's conduct.  Id. at 1128.  Reasonable foreseeability is an "objective test" under Illinois law; courts ask "what a reasonable person would see [as] the likely result" of his or her conduct.  Stanphill v. Ortberg, 129 N.E.3d 1167, 1177 (Ill. 2018).[6]

"In wrongful death cases involving suicide, the general rule is that the injured party's voluntary act of suicide is an independent intervening act, which is unforeseeable as a matter of law and breaks the causal link between any alleged negligent conduct and the injury."  Stanphill, 129 N.E.3d at 1177.  Accordingly, "a plaintiff may not recover for a decedent's suicide" under Illinois law because the alleged "tortfeasor cannot be expected to foresee" suicide, except where "the

---

[6]  Proximate causation principles also apply to constitutional torts.  County of Los Angeles v. Mendez, 581 U.S. 420, 431 (2017) (plaintiffs may "generally recover damages that are proximately caused by any Fourth Amendment violation").  Alcorn's constitutional claim fails on the additional ground that, for the reasons we discuss in this section, no City policy proximately caused Lumar's suicide, which was unforeseeable.

defendant's conduct caused an injury, most often to the head, that made the decedent so 'bereft of reason' as to cause him to attempt suicide." <u>Johnson v. Wal-Mart Stores, Inc.</u>, 588 F.3d 439, 442 (7th Cir. 2009) (quoting <u>Crumpton v. Walgreen Co.</u>, 871 N.E.2d 905, 910-11 (Ill. App. Ct. 2007). Alcorn admits that there was no physical injury to Lumar, let alone to the head. Nor is there any evidence that Lumar was so bereft of reason that he would attempt suicide. As a matter of law, Lumar's suicide was not foreseeable.

Alcorn asserts that her claim is within the exception because the City's alleged violation of Lumar's constitutional rights caused Lumar "psychic harm" that left him "bereft of reason." Appellant Br. 46. She even goes so far as to rely on the proposition that suicide is foreseeable when a person's "*insanity* prevents him from realizing the nature of his act or controlling his conduct." <u>Id.</u> (citing <u>Little v. Chicago Hoist & Body Co.</u>, 203 N.E.2d 902, 903 (Ill. 1965)) (emphasis added). These assertions have no merit. As we explain above, there was no constitutional violation at all, so by Alcorn's theory the wrongful death claim necessarily fails as well.[7] Nor is there any evidence that the City caused Lumar to be insane, let alone by reason of any injury the City purportedly inflicted.

Indeed, except for the transport to bond court pursuant to the GAO, Alcorn alleges nothing amiss about Lumar's arrest or detention in the City's custody. But detaining a person arrested on a valid warrant for the purpose of attending bond

---

[7] Alcorn also does not explain how the suicide, which occurred after Lumar returned to the police station for processing for the drug-related charge – a separate, valid basis for his detention – was caused by the alleged original arrest on his outstanding warrant.

court is not so inherently harmful to one's psyche that suicide is reasonably foreseeable. That leap is too great. Nor does Alcorn cite any authority that supports any remotely similar claim, which would significantly expand liability for suicide under Illinois law.[8]

In addition, there was no evidence that Lumar's suicide was foreseeable as a result of his required trip to bond court. CPD screened Lumar for medical and mental health problems during his intake, and Lumar denied any mental health issues or any prior attempts at suicide or serious self-harm. R. 351-26 at 29:18-30:6, 31:13-7; R. 351-2 at 4. Trained detention aides observed Lumar's demeanor as "cool" and "pretty normal" with "normal" body language. R. 351-28 at 32:2-12, 72:20-73:12; R. 351-26 at 28:18-29:13. The officer who escorted Lumar to the hospital for his asthma treatment, who was trained in crisis intervention, did not observe any indicators of suicidal ideation. R. 351-16 at 17:1-3, 62:5-24, 63:5-19. To the contrary, the officer explained that Lumar talked about wanting to go home to see his daughter, which is inconsistent with typical suicidal behavior; suicidal

---

[8] <u>Little</u>, which involved a suicide after a head injury, is inapposite. Alcorn cites that case by way of contrast, noting that in <u>Little</u> there was a five-year gap between the injury and the suicide, whereas here, "no lapse in time occurred." Appellant's Br. 46. This is irrelevant. Alcorn's claim is deficient not due to a lapse in time, but because she has no evidence that Lumar's overnight detention left him insane. Indeed, <u>Little</u> explained that an "act of suicide is a new and independent agency breaking the chain of causation," and that a head injury is directly liable only when the injury caused "insanity" that "prevents him from realizing the nature of his act," and not when the injured person voluntarily decides that "his life has become unendurable to him." 203 N.E.2d at 903-04. There is simply no evidentiary basis here to support a claim based on <u>Little</u>.

individuals usually "distanc[e] themselves from people, so him saying he wanted to see someone would have been the opposite of that." R. 351-16 at 62:10-24. At the hospital, the emergency room physician also reported no signs of suicidal ideation in Lumar's behavior; she testified that Lumar would not have been released back into CPD custody if he exhibited any such signs. R. 351-19 at 21:5-23:1. Last, upon Lumar's return to the police station from CCDOC, the detention aid who interacted with Lumar testified that there was no indication that Lumar was despondent, irrational, suicidal, or otherwise suffering from any serious mental problem. R. 351-17 at 76:22-77:22, 130:3-131:10. Alcorn asserts that Lumar was "angry, upset, ranting and raving and repeatedly saying 'this is bullshit,'" Appellant Br. 47, but nothing about that suggests Lumar was suicidal. Thus, there is no evidence from which a reasonable person could foresee that Lumar would attempt suicide because of his hours-long detention. Without such evidence, knowledge of a suicide risk may not be imputed to the City. See Estate of Novack ex rel. Turbin v. County of Wood, 226 F.3d 525, 530 (7th Cir. 2000) (behavior must indicate a "substantial likelihood of taking a suicidal turn").

Alcorn asserts that inmates generally attempt suicide more frequently than non-incarcerated persons, and she references the report of Dr. John Fabian – a psychologist hired by Alcorn's counsel – which opines that the circumstances of Lumar's detention were a cause of his suicide. Appellant Br. 43-44; see also R. 362 at 224-25. As for the propensity of suicide while in detention, Alcorn cherry-picks quotes from two cases, Jutzi-Johnson v. United States, 263 F.3d 753 (7th Cir. 2001),

and La Bombarbe v. Phillips Swager Associates Inc., 474 N.E.2d 942 (Ill. App. Ct. 1985), which state merely that suicide by detainees is more common than by the general population.  Appellant Br. 43.  In both cases, however, the courts decided that the defendants were not liable for the decedents' suicides, with the court in Jutzi-Johnson holding that "suicide was not a foreseeable consequence of [the inmate's] behavior," 263 F.3d at 757, and the court in La Bombarbe explaining that "the foreseeability among inmates in general is much less than that among those inmates . . . who threaten to commit suicide," 474 N.E.2d at 944.  Critically, no case supports the argument that the mere state of incarceration makes every inmate's suicide reasonably foreseeable.

Fabian's report does not support the conclusion that Lumar's death was reasonably foreseeable, either.  As an initial matter, the district court did not abuse its discretion when it decided that it need not consider Fabian's report because Alcorn "placed no factual assertions related to the findings by the doctor in the Rule 56.1 Statement."  A. 9, 22; see Cichon v. Exelon Generation Co., 401 F.3d 803, 809 (7th Cir. 2005) ("We review a district court's decision concerning whether a litigant complied with a local rule, such as Local Rule 56.1, for an abuse of discretion.").  This court has consistently explained that a district court is "entitled to expect strict compliance with Local Rule 56.1," Raymond v. Ameritech Corp., 442 F.3d 600, 604 (7th Cir. 2006), and may "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement," Bordelon v. Chicago School Reform Board of Trustees, 233 F.3d 524,

529 (7th Cir. 2000). Despite the district court's determination that Alcorn failed to comply with Rule 56.1, Alcorn neither addresses this delinquency in her opening brief nor explains why this court should consider the contents of Fabian's report on appeal. Her failure to present any such argument forfeits the argument, and she may not raise it for the first time in her reply brief. See Greenbank v. Great American Assurance Co., 47 F.4th 618, 629 (7th Cir. 2022); see also Fed. R. App. P. 28(a)(8).

As the district court further explained, Fabian's opinion also is not evidence that anything about the factual circumstances of Lumar's detention should have made the City "aware that Lumar was at a heightened risk of suicide while he was in custody." A. 22. By Fabian's own admission, his "evaluation and opinion are somewhat speculative," in part because he could not actually evaluate Lumar. R. 362 at 213. And even if Fabian's conclusion that Lumar might have had some "other specified depressive disorder with antisocial and borderline traits" could be credited, R. 362 at 215-16, that diagnosis would not demonstrate that anyone at CPD was aware, or should have been aware, that Lumar was experiencing any such mental illness at the time of his detention, let alone suicidal thoughts or behavior. Not only did Lumar deny any mental illness, R. 351-26 at 31:13-32:11; R. 351-2 at 4, but even Fabian admitted that Lumar never put anyone at the police station on notice that he was suicidal, R. 373-2 at 193:24-194:13; 199:19-200:14. Fabian also stated that Lumar's family – including his mother, grandmother, and uncle – also did not believe that Lumar suffered from mental illness or had suicidal ideations.

R. 362 at 192, 199, 207.  And Fabian observed that "most if not all individuals I talked to were shocked at learning that Mr. Lumar attempted suicide at that 11th District Jail."  R. 362 at 178.  Ultimately, while Fabian believed that it was "within the realm of possibility" that Lumar might commit suicide after reviewing an extensive record that contained nearly eighty sources of information, including information about Lumar's education, employment history, and his medical and mental health records, R. 362 at 173-74, 224, he conceded that CPD "officers did not have all this material to review and did not know everything about his background," R. 373-2 at 206:17-22.  Fabian's report, therefore, is not evidence that Lumar's suicide was objectively foreseeable to a reasonable person in the position of CPD staff.  Because Alcorn provides no evidence that Lumar's suicide was foreseeable, summary judgment for the City was proper on her wrongful death claim.

## CONCLUSION

———

For the foregoing reasons, the district court's order granting summary judgment for the City should be affirmed.

Respectfully submitted,

Corporation Counsel
  of the City of Chicago

s/ Ethan Merel
BY:    ETHAN MEREL
       Assistant Corporation Counsel
       2 N. LaSalle Street, Suite 580
       Chicago, Illinois 60602
       (312) 744-2497
       Ethan.Merel@cityofchicago.org

## CERTIFICATE OF COMPLIANCE

_____

In accordance with Fed. R. App. P. 32(g)(1), I certify that the foregoing brief complies with the type-volume limitation provided by Fed. R. App. P. 32(a)(7)(B)(i) and Circuit Rule 32(c).  This brief contains 6,616 words, beginning with the words "Jurisdictional Statement" and ending with the words "Respectfully submitted" in the Conclusion section, as recorded by the word count of the Microsoft Word word processing system used to prepare the brief.

s/ Ethan Merel
ETHAN MEREL, Attorney

## CERTIFICATE OF FILING/SERVICE

_____

I certify that on May 10, 2023, I electronically filed the attached Brief of Defendant-Appellee City of Chicago with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

s/ Ethan Merel
ETHAN MEREL, Attorney