No. 22-2948

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| LISA ALCORN, as Independent Administrator of the Estate of TYLER LUMAR, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiff-Appellant | |
| v. | No. 17 C 5859 |
| THE CITY OF CHICAGO, *et al.*, | The Honorable Virginia M. Kendall, District Judge |

**REPLY BRIEF OF
PLAINTIFF-APPELLANT LISA ALCORN**

Bryan J. O'Connor, Sr.
O'Connor Law Group, LLC
221 N. LaSalle Street
Suite 1750
Chicago, IL 60601
(312) 236-1814
boc@oconnorlawgroup.com

Donald J. Pechous
The Khowaja Law Firm, LLC
8 South Michigan Avenue
Suite 2600
Chicago, IL 60603
(312) 388-1198
dpechous@khowajalaw.com

*Attorneys for Plaintiff-Appellant*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Authorities ................................................................................. iii

Argument ................................................................................................. 1

    I.    Purposeless Detention is Always Unreasonable, Violates The
        Fourth Amendment and The City Has No Defense to its
        Express Policy. ............................................................................. 1

        A.    The City Policy Was The Direct Cause of Lumar's Purposeless
                Detention ................................................................... 1

        B.    The City Disregard Federal and State Law When It Enacted
                and Enforced the Unconstitutional Policy ...................................... 3

        C.    A Municipality Has No Defense When It Enforces Its Own
                Express, Unconstitutional Policy ..................................... 6

    II.    Lumar's Illegal Detention Was Extended Because of Wlodarski's
        False Reports and Was Not Based on Probable Cause ......................... 8

        A.    Officer Wlodarski Was The Sole Eyewitness and His Reporting
                Was False ................................................................... 9

        B.    Qualified Immunity Protects Against Reasonable Mistakes,
                It Does Not Immunize Material Falsehoods ................................ 14

    III.    Lumar's Self-Harm Was Foreseeable Based on the Circumstances.... 16

        A.    The Defendants' Wrongful Conduct Combined to Produce a
                Single Injury ............................................................... 16

        B.    The Defendants' Wrongful Conduct Caused Lumar Mental
                Anguish Resulting in Self-Harm ..................................... 18

        C.    Under § 1983 Plaintiff is Entitled to Recover for All Damages
                That Flowed From the Defendants' Constitutional
                Misconduct ................................................................... 20

        D.    Plaintiff Should Be Allowed to Pursue Damages Under the
                Illinois Wrongful Death Act. ......................................... 22

Conclusion ................................................................................................ 25

Certificate of Compliance with Rule 32(a) ............................................. 26

Certificate of Service ............................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Sangamon Cty., Ill.,* 705 F.3d 706 (7th Cir. 2013) ...................................... 15

*Carter v. Chicago Police Officers*, 165 F.3d 1071 (7th Cir. 1998) .............................. 22

*Deluna ex rel. Estate of Virydiana v. City of Rockford*, 447 F.3d 1008 (7th Cir. 2006) ................................................................................................... 22

*Beard v. Mitchell*, 604 F.2d 485 (7th Cir. 1979) ........................................................ 18

*Bradley v. Vill. of Univ. Park,* 929 F.3d 875 (7th Cir. 2019) ........................................ 4

*Bethesda Lutheran Homes & Services, Inc. v. Leean,* 154, F.3d 716, (7th Cir. 1998) ................................................................................................. 2-3

*Bd. of the County Comm'rs v. Brown,* 520 U.S. 397 (1997) ......................................... 2

*Chortek v. City of Milwaukee*, 356 F.3d 740 (7th Cir. 2004) ......................................... 1

*City of Oklahoma City v. Tuttle,* 471 U.S. 808 (1985) .................................................. 2

*Cleveland v. Rotman,* 297 F.3d 569 (7th Cir. 2002) ..................................................... 21

*Crumpton v. Walgreen Co.*, 375 Ill. App. 3d 73 (Ill. App. Ct. 2007) .......................... 22

*County of Riverside v. McLaughlin,* 500 U.S. 44 (1991) .............................................. 1

*Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539 (2017) .............................. 20-21

*Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008) ............................................ 14, 15

*Estate of Novack v. County of Wood*, 226 F.3d 525, (7th Cir. 2000) .......................... 1-2

*Eversole v. Steele,* 59 F.3d 710 (7th Cir. 1995) ........................................................... 11

*Fields v. Wharrie,* 740 F.3d 1107 (7th Cir. 2014) ....................................................... 15

*Florida v. Harris*, 568 U.S. 237 (2013) ........................................................................ 9

*Fox v. Hayes,* 600 F. 3d 819 (7th Cir. 2010) .............................................................. 11

*Franks v. Delaware*, 438 U.S. 154 (1978)..................................................9, 15

*Gutierrez v. Kermon,* 722 F.3d 1003 (7th Cir. 2013) ................................. 15

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ................................................ 14

*Hernandez v. Sheahan*, 455 F.3d 772 (7th Cir. 2006)............................... 6-7

*In re Marriage of Santa Cruz,* 179 Ill. App. 3d 611 (Ill. App. Ct. 1989)..................... 5

*In re R.R.,* 92 Ill.2d 423 (Ill. 1982) ........................................................... 5

*Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 1988) .............................. 17

*Hebron v. Touhy,* 18 F.3d 421 (7th Cir. 1994)............................................ 11

*Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010)......................... 17

*Kennedy v. City of Cincinnati,* 595 F.3d 327 (6th Cir. 2010) ....................... 5

*Kleen v. Homak Manufacturing Company,* 321 Ill. App. 3d 639 (Ill. App. Ct. 2001) ............................................................................................. 22

*Lacy v. Cook County*, 897 F.3d 847 (7th Cir. 2018).................................... 24

*Lapre v. City of Chicago*, 911 F.3d 424 (7th Cir. 2018)............................... 18

*Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011)........................................ 15

*Lewis v. City of Chi.*, 914 F.3d 472 (7th Cir. 2019) .................................... 15

*Manuel v. City of Joliet*, 137 S. Ct. 911 (2017) ......................................9, 10

*Maxwell v. City of Indianapolis,* 998 F.2d 431 (7th Cir. 1993)................. 8-9

*Memphis Community School Dist. v. Stachura*, 477 U.S. 299 (1986) ....................... 21

*Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S. Ct. 2018 (1978) ................................................................................ 2

*Monroe v. Pape*, 365 U.S. 167...............................................................4, 17

*Minix v. Canarecci*, 597 F.3d 824 (7th Cir. 2010) ...................................... 1

*People v. Ocampo,* 879 N.E.2d 353 (Ill. App. Ct. 2007)................................................ 10

*O'Rourke v. Hayes*, 378 F.3d 1201 (11th Cir. 2004)...................................................... 5

*Owen v. City of Independence,* 445 U.S. 622 (1980)................................................ 6, 8

*Pasadena City Board of Education v. Spangler,* 427 U.S. 424 (1976)........................ 6

*Pearson v. Callahan,* 555 U.S. 223 (2009) ................................................................. 14

*People v. Creagh,* 574 N.E.2d 96 (Ill. App. Ct. 1991) ................................................ 10

*People v. Gersch,* 135 Ill. 2d 384, 399 (Ill. 1990). ..................................................... 5

*People v. Ocampo,* 879 N.E.2d 353 (Ill. App. Ct. 2007)................................................ 10

*People v. Speight,* 72 Ill. App. 3d 203 (Ill. App. Ct. 1979)........................................... 7

*Portis v. City of Chicago*, 613 F.3d 702 (7th Cir. 2010) ............................................... 1

*Potts v. City of Lafayette,* 121 F.3d 1106 (7th Cir. 1997) ........................................... 11

*Richman v. Sheahan,* 512 F.3d 876 (7th Cir. 2008).................................................... 21

*Russ v. Watts,* 414 F.3d 783 (7th Cir. 2005)............................................................... 22

*Sanders v. Melvin,* 873 F.3d 957 (7th Cir. 2017) ....................................................... 21

*Saunders-El v. Rohde,* 778 F.3d 556 (7th Cir. 2015) ................................................. 15

*Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605 (7th Cir. 2002) ............................. 19

*Smith v. City of Chicago,* 913 F.2d 469 (7th Cir. 1990) ............................................. 15

*Snyder v. King,* 745 F.3d 242 (7th Cir. 2014) ........................................................... 2-3

*Staub v. Proctor Hosp.,* 562 U.S. 411 (2011) ............................................................. 17

*Surplus Store Exchange, Inc. v. City of Delphi*, 928 F.2d 788 (7th Cir. 1991) ............ 3

*Taliferro v. Augle,* 757 F.2d 157 (7th Cir. 1985) ....................................................... 16

*Thompson v. Clark*, 142 S. Ct. 1332 (2022) ............................................................... 10

*Tumminello v. Father Ryan High School, Inc.,* 678 Fed. App'x 281 (6th Cir. 2017) ................................................................................................. 21

*Turcios v. DeBruler Co.,* 32 N.E.3d 1117 (Ill. 2015) ............................................ 23-24

*Watts v. Laurent,* 774 F.2d 168 (7th Cir. 1985) ........................................................ 17

*Whitlock v. Brueggemann,* 682 F.3d 567 (7th Cir. 2012) ........................................... 16

*Williams v. Dart,* 967 F.3d 625 (7th Cir. 2020) ............................................................ 1

<u>Statutes, Rules and Constitutional Provisions</u>

42 U.S.C. § 1983 ..............................................................................*passim*

725 ILCS 5/109-2(b) ................................................................................ 7

740 ILCS 180/2 .................................................................................... 22

Illinois Supreme Court Rule 528(a) ........................................................ 18

U.S. Constitution Amendment IV ....................................................passim

# ARGUMENT

I.   Purposeless Detention is Always Unreasonable, Violates The Fourth
     Amendment and The City Has No Defense to its Express Policy.

"It is axiomatic that seizures have purposes. When those purposes are spent,

further seizure is unreasonable." *Williams v. Dart*, 967 F.3d 625, 634 (7th Cir. 2020).

Within three hours of Lumar's initial arrest on the warrant, all administrative

processing was completed. At that time, no prospect of pretrial detention or

burdensome pretrial release conditions should have existed. *Id.*, *citing Portis v. City

of Chicago*, 613 F.3d 702, 703–05 (7th Cir. 2010).[1] After processing, Lumar's

detention had no purpose but for the police to collect the $50 bail and release him.

Any detention after that was unreasonable under the Fourth Amendment.

   A.   The City Policy Was The Direct Cause of Lumar's Purposeless
        Detention.

The record below shows that the City's policy was the "direct cause" or

"moving force" behind the constitutional violation because it demonstrates that the

policy is itself unconstitutional. *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir.

2010), *citing Estate of Novack v. County of Wood*, 226 F.3d 525, 530-31 (7th Cir.

2000). "[I]t is when execution of a government's policy or custom . . . inflicts the

injury that the government as an entity is responsible under § 1983." *Novack*, 226

---

[1]    For this reason, the District Court's reliance on the 48-hour burden shifting
approach from *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) was
erroneous. Indeed, while the City urges this Court to apply the 48-hour approach
from *McLaughlin* here, City's Response at pp. 13-16, the City never comes to grips
with Plaintiff's argument that the 48-hour burden-shifting approach does not apply
when a probable cause hearing before a magistrate is not contemplated. *See Chortek
v. City of Milwaukee*, 356 F.3d 740, 746-747 (7th Cir. 2004).

F.3d at 531, *quoting Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The City's policy violated the Fourth Amendment because it required that Chicago police deny Tyler Lumar the right to post the predetermined bail and therefore endure a purposeless detention to attend a needless court hearing.

"Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving [the] issues of fault and causation is straightforward." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404-05 (1997). To establish a constitutional violation, no evidence is needed other than a statement of the municipal policy and its exercise. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822-28, (1985) (plurality opinion). Plaintiff has identified the express policy that violated Lumar's constitutional rights when it was enforced against Lumar.

The City responds that "when the only local government 'policy' at issue is general compliance with the dictates of state law[,]…the state law is the proximate cause of the plaintiff's injury." City's Response at p. 10, *quoting Snyder v. King*, 745 F.3d 242, 247 (7th Cir. 2014). This is certainly not Plaintiff's claim. Plaintiff does not challenge the City for a "general policy" of following state law. Rather, Plaintiff challenges the BOP Order, an express unconstitutional policy of the City that the City's Police Department formulated and executed.[2] The other cases that the City relies on, *Bethesda Lutheran Homes & Services, Inc. v. Leean*, 154, F.3d 716, (7th

---

[2]      In its Answer to Plaintiff's Third Amended Complaint, the City admitted that BOP 15-074 was an express policy of the Chicago Police Department. Dkt. 286, p 25, ¶ 104.

Cir. 1998) and *Surplus Store & Exchange, Inc. v. City of Delphi*, 928 F.2d 788 (7th Cir. 1991), are unavailing because they likewise address an unwritten "policy" of generally following state law. "Surplus not only fails to point to a specific Delphi policy or custom directly and causally linked to the alleged deprivation, but fails altogether to refer to any sort of Delphi policy or custom linked in any way to the alleged deprivation." *Id. at* 790. Similarly, the Court in *Bethesda* wrote that, "[T]he plaintiff who wants a judgment against the municipality under [§ 1983] must be able to trace the action of the employees who actually injured him to a policy or other action of the municipality itself." *Bethesda*, at 718. Unlike the plaintiffs in *Snyder*, *Surplus,* or *Bethesda*, Plaintiff here has pointed to a specific, express City policy, BOP 15-074, that directly caused the Fourth Amendment violation to Lumar when enforced.

Moreover, the evidence in the record demonstrates that the City's policy was the direct cause of the constitutional violation because the BOP Order dictated the actions of the desk sergeant who denied Lumar the ability to post bail. The BOP Order was not discretionary, and Chicago Police Officers in the Bureau of Patrol were expected to follow the BOP Order or face discipline. Dkt. 365, p. 9-10, ¶ 37.

B.    The City Disregard Federal and State Law When It Enacted and Enforced the Unconstitutional Policy.

The City claims that it was bound to implement the GAO, through the BOP Order, because the GAO had the force of law and is therefore not liable here. This is simply not the case. Plaintiff submits that all she needs to show here is that the City maintained and enforced an express policy that violates the Fourth

Amendment. Plaintiff further submits that the analysis should end there. Additionally, however, Plaintiff has also demonstrated that both Illinois statutory and long-standing case law unequivocally mandated that Lumar had the right to post the $50 bail at the police station and be released.

The City policy violates Federal and State law because it requires purposeless detention after administrative processing is completed. The GAO similarly, and plainly, also conflicts with Federal and State law. In this regard, the City violated the Fourth Amendment because it chose to ignore well-established Federal and State law, in favor of an improvidently entered administrative order, when it devised and enforced its unconstitutional, express policy. "§ 1983 was designed to provide a remedy 'against those who representing a State in some capacity were *unable* or *unwilling* to enforce a state law.'" *Bradley v. Vill. of Univ. Park*, 929 F.3d 875, 884 (7th Cir. 2019) (emphasis in original), *quoting Monroe v. Pape*, 365 U.S. 167, 176 (1961) (overruled on other grounds).

The City could have addressed the facially illegal GAO, either informally with the chief judge, formally through declaratory action, or even a "friendly contempt" hearing. The City, however, chose to promulgate the BOP order that violated Lumar's constitutional rights. In any event, the City was never at risk of a contempt judgment being sustained as the City had multiple winning defenses. As Plaintiff has previously discussed, in addition to violating the Fourth Amendment, the GAO improperly modified state law and was void *ab initio*. *See* Plaintiff's Brief pp. 31-33. A contempt judgment based on a void order cannot be sustained. *In re*

*Marriage of Santa Cruz*, 179 Ill. App. 3d 611, 620 (Ill. App. Ct. 1989), *citing In re R.R.*, 92 Ill.2d 423, 430 (Ill. 1982). To the extent that the GAO was a law, "[A]n invalid law is no law at all. An unconstitutional law confers no right, imposes no duty and affords no protection. It is as though no such law had ever been passed." *People v. Gersch*, 135 Ill. 2d 384, 399 (Ill. 1990) (internal citations omitted).

Suppose a state judge ordered the City to administer a severe beating to every accused shoplifter after their arrest, and the City dutifully complied making no attempt to challenge the order. Suppose further that the City went so far as to promulgate a written police department policy restating the judge's order and ensuring police compliance through the threat of disciplinary action. Surely, this Court would not allow the City to advance a "Nuremberg defense" that it was "just following a court order." This Court should not countenance the City's attempt to advance such a defense here.

"[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010), *quoting O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n. 5 (11th Cir. 2004) (internal citation omitted). The City here did not just implement the GAO -- it formulated its own express policy, enforced it, and did so without question despite it being plainly contrary to well-established Federal and State law.

However, the reasonableness of the City's course of action is not an issue here. As the Supreme Court has explained, "[W]hen a court passes judgment on the municipality's conduct in a § 1983 action, it does not seek to second-guess the 'reasonableness' of the city's decision nor to interfere with the local government's resolution of competing policy considerations. Rather, it looks only to whether the municipality has conformed to the requirements of the Federal Constitution and statutes." *Owen v. City of Independence*, 445 U.S. 622, 649 (1980). What the City is really doing here, and will be discussed below, is attempting to assert an immunity defense that it surely does not enjoy.

C.    A Municipality Has No Defense When It Enforces Its Own Express, Unconstitutional Policy.

As Plaintiff discussed in her opening brief, the City cannot assert any immunity defense in regards to Plaintiff's *Monell* claim. Plaintiff's Brief pp. 33-34. Notably, the City, in its response, failed to address Plaintiff's reliance on *Hernandez v. Sheahan*, 455 F.3d 772 (7th Cir. 2006). (No immunities available for county Sheriff, sued on a *Monell* claim, where Sheriff's Office claimed it was merely following a judge's order when detaining the Hernandez plaintiff).

The City's failure to latch on to *Hernandez* "like a dog to a bone" is surprising given the *Hernandez* panel's observation that, "[T]he collateral-bar doctrine, which provides that injunctions must be obeyed (even if constitutionally infirm) until stayed or reversed by a higher court, *see Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 439 (1976), would block an award of damages against a

public official who carried out a direct command of a judge, made in a case over which the court had jurisdiction." *Hernandez*, 455 F.3d at 776.

Plaintiff, however, can dispatch the collateral-bar doctrine without difficulty. In *Hernandez*, unlike with Lumar, Hernandez appeared before a judge and the judge's command was "to hold [Hernandez], in particular." *Id.* at 777. Here, no Cook County court gave a direct judicial command to hold "Tyler Lumar."[3] The Cook County court certainly did not have jurisdiction over Tyler Lumar when the GAO was issued a year before his arrest, and never obtained jurisdiction. Jurisdiction over a defendant in criminal matters requires both personal and subject matter jurisdiction. *People v. Speight*, 72 Ill. App. 3d 203, 208 (Ill. App. Ct. 1979). Personal jurisdiction is obtained through a defendant's appearance before the court. *Id.* Here, personal jurisdiction over Lumar could only be obtained if Lumar agreed to see a Cook County judge. Recall that Lumar had the right to waive an appearance before a Cook County judge, avoiding a court appearance and the Cook County court's jurisdiction altogether. 725 ILCS 5/109-2(b). The faulty GAO attempted to gain personal jurisdiction when Lumar had the clear right to avoid it and just post the $50 bail. Lee County had the beef with Lumar and had jurisdiction--Cook County did not. As such, even if the City had raised the collateral-bar doctrine as a defense, it would be inapplicable here because the Cook County court never made a direct command regarding the detention of Tyler Lumar and never had jurisdiction.

---

[3]     The Lee County arrest warrant commanded all peace officers of the State of Illinois to arrest Tyler Lumar and bring him, "without unnecessary delay," to the Lee County courthouse in Dixon, Illinois.

The Supreme Court, in *Owen v. City of Independence,* made it clear that "a municipality has no 'discretion' to violate the Federal Constitution; its dictates are absolute and imperative. And when a court passes judgment on the municipality's conduct in a § 1983 action, it does not seek to second-guess the 'reasonableness' of the city's decision nor to interfere with the local government's resolution of competing policy considerations. Rather, it looks only to whether the municipality has conformed to the requirements of the Federal Constitution and statutes." *Owen*, 445 U.S. *at* 649.

*Owen* further stated that "the threat that damages might be levied against the city may encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights. Such procedures are particularly beneficial in preventing those 'systemic' injuries that result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith." *Id*. at 652. The City has no defense to its unconstitutional, express policy that mandates purposeless detention to attend a legally superfluous bond hearing.

II.    Lumar's Illegal Detention Was Extended Because of Wlodarski's False Reports and Was Not Based on Probable Cause.

In a suit for damages, it is a proper issue for the jury "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). A conclusion that probable cause exists as a matter of law is appropriate only when no

reasonable jury could find that the officer did not have probable cause. *Id*. Probable cause is a "practical and common-sensical standard" which uses the "totality of the circumstances" to determine whether a person of reasonable caution would believe that the individual had committed the crime for which he is being arrested. *Florida v. Harris*, 568 U.S. 237, 243-44 (2013).

A.    Officer Wlodarski Was The Sole Eyewitness and His Reporting Was False.

Lumar's continued, wrongful detention and return to the police station was based entirely on the reporting of the sole eyewitness--Officer Wlodarski. In his incident report, Wlodarski wrote that; 1) he saw Lumar reaching behind the bullpen bench, 2) that he took Lumar's hand from the back of bench and saw Lumar drop a plastic package, and 3) that Wlodarski recovered the package which contained 12 individually packaged small white rocks of suspect crack cocaine.

Wlodarski subsequently conceded that he did not take Lumar's hand and see Lumar drop a plastic package. Wlodarski has admitted that it never happened, and a reasonable jury could conclude that Wlodarski's false statement was necessary to a finding of probable cause. *See Manuel*, 137 S.Ct. at 917; *see also Franks*, 438 U.S. 154, 156 (1978). Stripping out Wlodarski's false statement in the incident report leaves us with the following: (1) Wlodarski saw Lumar reaching behind the bullpen bench, and (2) Wlodarski recovered a package of suspect crack cocaine. *See Franks*, 438 U.S. at 156. Such a report could not give rise to a finding of probable cause that Plaintiff possessed cocaine. Wlodarski made similar false statements that he recovered contraband from Lumar to his supervisors, and other officers, including

9

the Chicago officers who transported Lumar back to the police station lockup. As the sole eyewitness, Wlodarski's false incident report and oral statements are what caused Lumar to be pulled out of the bullpen and returned to the District 11 police station instead of proceeding to bond court. A rational factfinder could conclude that Wlodarski violated the Fourth Amendment when he, through his false statements, caused the initiation of charges without probable cause. *Thompson v. Clark*, 142 S. Ct. 1332, 1337-38 (2022); *Manuel*, 137 S. Ct. at 917. Plaintiff submits that when the admittedly false, and material, information is stripped out, a reasonable jury could not find that Wlodarski had probable cause.

As we know, Wlodarski, on the day of his deposition in this case, watched a video of the incident for the first time. Wlodarski then proceeded to testify to facts that were materially different from his original reporting. Wlodarski testified that he was looking at Lumar when he saw Lumar pick something up, necessarily implying that Wlodarski saw the object on the floor of the crowded bullpen before he ever saw Lumar touch it. Within seconds, Wlodarski took Lumar's hand and discovered that Lumar's hand was empty. Wlodarski then recovered a plastic bag containing suspected cocaine from the ground next to Lumar in a room crowded with other detainees.

Even if Wlodarski saw Lumar acting suspiciously, furtive movements alone do not establish probable cause, *People v. Ocampo*, 879 N.E.2d 353, 365 (Ill. App. Ct. 2007); *See also People v. Creagh*, 574 N.E.2d 96, 98 (Ill. App. Ct. 1991). Moreover, a police officer's actions are based on objective reasonableness rather than subjective

beliefs. *Potts v. City of Lafayette*, 121 F.3d 1106, 1113 (7th Cir. 1997) ("An officer's subjective belief as to the legal basis for an arrest is irrelevant."). In any event, the claim that Wlodarski saw Lumar acting "suspiciously" is a red herring since immediately thereafter, Wlodarski saw the baggie on the ground before he saw Lumar touch it. Moreover, if furtive movements gave rise to some suspicion, Wlodarski should have reviewed the video, as he has admittedly done in the past, to establish necessary probable cause. Since the "reasonableness" standard of the Fourth Amendment links the constitutional obligation to prudent conduct, when information an officer receives warrants further investigation a prudent officer must do more to determine probable cause. *Hebron v. Touhy*, 18 F.3d 421, 422-23 (7th Cir. 1994).

Plaintiff acknowledges that "once police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *Eversole v. Steele*, 59 F.3d 710, 718 (7th Cir. 1995). However, probable cause must rest on reasonable belief and the police cannot close their eyes to information that undercuts probable cause. *Fox v. Hayes*, 600 F. 3d 819, 834 (7th Cir. 2010). If Wlodarski had reviewed the bullpen video, he would have seen multiple detainees engaging in questionable behavior and his suspicions about Lumar would have been redirected.

Wlodarski never had probable cause. Even viewing the evidence in the light most favorable to Wlodarski, he may have had an articulable suspicion of criminal

11

activity, but he certainly never had probable cause. After seeing the baggie on the floor, before he saw Lumar touch it, he had two legal options: (1) Wlodarski could have confiscated the baggie without more, or (2) Wlodarski could have acted as a reasonable officer and questioned the detainees and/or viewed the video to gain the probable cause he plainly lacked. Instead, Wlodarski fabricated a false narrative claiming he took Lumar's hand and saw Lumar drop the baggie even though, as he subsequently admitted, that never happened. Further, Wlodarski failed to report seeing the baggie on the floor before he saw Lumar touch it. This material omission is as significant as a false affirmative statement.

A review of the Bullpen 23 video beginning at the 1:45 mark, the first detainee on the left (Detainee #1) can be seen acting suspiciously, reaching towards his waistband and begins looking behind the bench. Dkt. 339, at 1:45. At 5:58, an officer begins a pat down search of the detainees on the left wall. including Lumar. Dkt. 339, at 5:58. At 7:14, Detainee #1 leans back and looks over his left shoulder and downward in an apparent view of something on the floor Dkt. 339, at 7:14. At the 7:59 mark, the second detainee on the left (Detainee #2) leans back and looks over his left shoulder and downward toward the floor Dkt. 339, at 7:59. At 8:18, the fourth detainee on the left (Detainee #4) looks over his left shoulder and down to the ground. Dkt. 339, at 8:18. At 8:44, the third detainee on the left (Detainee #3) looks over his left shoulder and down toward the bench and performs very suspicious "stretching" movements his arms and hands swinging his left arm down behind him and then his right down behind him. Dkt. 339, at 8:44. At the 8:45 mark, the fifth

detainee on the left, who is Lumar, leans back and looks over his right shoulder and down toward the ground. Dkt. 339, at 8:45. At 8:47, Wlodarski is standing directly in front of Lumar and picks up Lumar's shoes for an inspection Dkt. 339, at 8:47. At the 8:54 mark, Lumar looks to his left and down toward the ground. Dkt. 339, at 8:54. At the 9:03 mark, Wlodarski proceeds to the right of Lumar, looks over the bench and toward the floor Dkt. 339, at 9:03. At the 9:08 mark, Wlodarski bends over toward the floor; straightens back up, grabs onto Lumar's arm and escorts Lumar from Bullpen #23. Dkt. 339, at 9:08.

If Wlodarski's had acted reasonably here, since he saw the baggie on the floor before he saw Lumar ever touch it, he would have reviewed the video to establish probable cause instead of fabricating evidence. Wlodarski would have seen the detainees sitting shoulder to shoulder on the bench. Wlodarski would have seen Detainee #1 reaching for his waistband. Wlodarski would have seen Detainee #1 repeatedly looking behind the bench. Wlodarski would have seen the other detainees making odd movements behind the bench including Detainee #3, and his unusual "cartwheel" movements with his arms. Wlodarski would have seen Detainees #4 and #6, sitting on either side of Lumar, and observed their strange movements. Notably, Wlodarski, when asked if he saw any of the other detainees looking behind the bench, testified: "No. That's why his actions were strange. He was the only one acting the way he was." R. 360, ⁋ 2, citing, Wlodarski Deposition, Dkt. 332-30, p. 73, ll. 13-16. Wlodarski's testimony is plainly contrary to the video.

The video shows that Detainee #1 dropped the drugs, and the other detainees were pushing it down the line. Those detainees knew that whoever had the baggie behind them, whether it was true or not, would be accused of possessing the drugs. Somehow the detainees knew that Wlodarski, or perhaps another officer, would act unreasonably and pin the drugs on the detainee who happened to be sitting where the baggie ended up. The detainees were remarkably prescient.

B.    Qualified Immunity Protects Against Reasonable Mistakes, It Does Not Immunize Material Falsehoods.

Wlodarski attempts to invoke qualified immunity but his falsehoods bar that defense. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), *quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This requires the Court to make a two-step inquiry: (1) whether the facts make out a violation of a constitutional right; and (2) whether the right was clearly established at the time of the alleged misconduct. *Pearson,* 555 U.S. at 232.

As this Court has explained, "qualified immunity is a doctrine designed to respond to legal uncertainty." *Dominguez v. Hendley,* 545 F.3d 585, 589 (7th Cir. 2008). Legal uncertainty, however, is not the issue here. The issue is whether Wlodarski "provide[d] truthful information to subsequent decisionmakers." *Id.* at 590. Qualified immunity in the context of a false arrest claim "provides shelter for officers who have 'arguable probable cause' to arrest—*i.e.*, those officers that

reasonably but mistakenly believe they have probable cause." *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013), *citing Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714-15 (7th Cir. 2013). Qualified immunity does not extend where an officer knowingly or recklessly made false statements and "no accurate information sufficient to constitute probable cause attended the false statements." *Lawson v. Veruchi*, 637 F.3d 699, 705 (7th Cir. 2011).

Arresting an individual without probable cause, including fabricating evidence that is then used as probable cause to arrest, is a Fourth Amendment violation. *Smith v. City of Chicago*, 913 F.2d 469, 473 (7th Cir. 1990). Moreover, "[T]here was and is no disputing that [fabricating evidence] violates clearly established constitutional rights." *Dominguez v. Hendley*, at 589. This right has been clearly established since 1978. *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019) ("It has been clear since at least *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, (1978), that falsifying the factual basis for a judicial probable-cause determination violates the Fourth Amendment."). It is "clear that fabricating evidence, including witness testimony, violates a clearly established constitutional right, such that qualified immunity does not shield the manufacturers of such evidence from liability." *Saunders-El v. Rohde*, 778 F.3d 556, 560 (7th Cir. 2015*), citing Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014).

The allegations directed at Wlodarski regard material falsehoods, not mistakes. Wlodarski's report that he took Lumar's hand and saw him drop the baggie, when that never happened, is a falsehood and not a mistake. Wlodarski's

failure to report that he saw the baggie on the floor, before he saw Lumar touch it, is a material omission and not a mistake. Wlodarski was the sole eyewitness, and his falsehoods and material omissions negate probable cause, as well as arguable probable cause. Wlodarski did not make mere mistakes, so he has no immunity. Reasonable officers do not alter the facts and they do not make material omissions. Not only is Wlodarski not entitled to summary judgment, but Plaintiff has demonstrated that she is entitled to summary judgment on this claim.

III.    Lumar's Self-Harm Was Foreseeable Based on the Circumstances.

Plaintiff has pointed to substantial evidence, that shows the illegal detention, and false accusations, caused Lumar to undergo mental anguish at the very time of his suicide attempt. The Defendants' unconstitutional acts were a cause in fact and a proximate cause of Lumar's mental anguish, Lumar's self-harm, and the damages that flowed from that. *See Taliferro v. Augle*, 757 F.2d 157, 161-162 (7th Cir. 1985) (noting that Section 1983 was "enacted against a background of common law tort principles governing causation and damages.")

A. The Defendants' Wrongful Conduct Combined to Produce a Single Injury.

Among Wlodarski's defenses, is that "Lumar was in CPD custody and control when he did hang himself." County Response, p. 30. However, "[M]ultiple proximate causes are often present" and "an actor's tortious conduct need not be close in space or time to the plaintiff's harm to be a proximate cause." *Whitlock v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012)*, citing* Rest.3d Torts § 29 cmt. b. Here, the constitutional violations were ongoing and combined to produce a single injury to

Lumar. "It is axiomatic that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury." *Watts v. Laurent,* 774 F.2d 168, 179 (7th Cir. 1985).

The City, for their part, claims that it was merely detaining Lumar and did nothing wrong. "[D]etaining a person arrested on a valid warrant for the purpose of attending a bond court is not so inherently harmful to one's psyche that suicide is reasonably foreseeable." City's Response, pp. 19-20.

The Defendants' finger-pointing and deflections are futile. The City's unconstitutional policy caused Lumar to be wrongfully detained and sent to the Cook County Jail where he was subjected to Wlodarski's unlawful conduct. The Defendants' unconstitutional misconduct goes hand-in-hand. But for the unlawful City policy, Lumar never would have been exposed to Wlodarski, and but for Wlodarski, Lumar would not have continued to be unconstitutionally detained and returned to the City.

"In constitutional-tort cases as in other cases, 'a man [is] responsible for the natural consequences of his actions.'" *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988), *quoting Monroe v. Pape,* 365 U.S. at 187. "Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'" *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011), *quoting Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010). And in Section 1983 actions, different

conduct from multiple defendants could constitute more than one proximate cause of a plaintiff's injury. *Beard v. Mitchell*, 604 F.2d 485, 497 (7th Cir. 1979).

### B. The Defendants' Wrongful Conduct Caused Lumar Mental Anguish Resulting in Self-Harm.

Once again to be clear, the issue in the case at bar is not one where the defendants were acting as mere jailers and the plaintiff is claiming that the jailers failed to prevent suicide. *See, e.g., Lapre v. City of Chi*cago, 911 F.3d 424 (7th Cir. 2018) (Plaintiff alleged that City was deliberately indifferent to the risk of suicide for detainees held in City lockups). The Defendants expend many pages engaged in a straw man fallacy setting up and then knocking down an argument that Plaintiff does not make, *i.e.*, the jailers should have prevented Lumar's suicide. That is certainly not Plaintiff's contention.

Indeed, Plaintiff is not claiming the Defendants should have prevented the self-harm, rather, Plaintiff is alleging that the Defendants' wrongful conduct caused Lumar severe mental anguish resulting in Lumar's self-harm. Importantly, the Defendants' wrongs were being inflicted on Lumar at the very time Lumar engaged in the self-harm. Lumar wanted to post bail on the minor charge he was originally arrested for pursuant to the warrant and go home,[4] as the City acknowledges, to see his daughter. City Response, p. 20. Instead, a snowball turned into an avalanche of tumult for the twenty-two-year-old Lumar beginning on August 18, 2016, when:

(1)    Lumar is arrested for not paying a fine that he thought he paid.

---

[4]    The trivial nature of the original arrest warrant is obvious in that the Lee County judge only required Lumar to post $50 bail while, by rule, the Illinois Supreme Court has set bond for fine-only offenses at $100. Ill. S. Ct. R. 528(a).

(2)     Lumar is denied the ability to post the predetermined $50 bail
        even though he has $130 in his pocket.

(3)     Lumar suffers from shortness of breath and is taken to a
        hospital in the very early morning hours of August 19, 2016.

(4)     Lumar is returned to the police station and subsequently placed
        on a transport to bond court that morning.

(5)     Once at the Cook County Jail, on his way to bond court and
        release, Lumar is falsely accused of possessing cocaine -- a
        felony offense.

(6)     Lumar is then returned to the same police station he originally
        came from and is angry and protesting his innocence.

(7)     Lumar is told that he will be going back to the Cook County Jail
        the next day, to the very same place where he had just been
        wrongly accused of a felony he did not commit.

(8)     Lumar is "angry, upset, ranting and raving" upon his return to
        the police station.

(9)     Lumar, although screened for suicidal ideation the day before,
        received no suicide screening upon his return to the police
        station despite his outbursts and now being wrongfully accused
        of a felony.

(10)    Lumar is then placed into a cell, alone and unsupervised,
        where he hung himself when he tied his shirt around his neck
        and then to the cell bars within 11 minutes of being placed into
        the cell, leading to his death twenty months later.

The Defendants are quick to dissect the events of Lumar's wrongful
detention, claiming for example, that "there is no evidence that Lumar's suicide was
foreseeable as a result of his required trip to bond court." City's Response, p. 20. The
events over those two days should be viewed in their totality and not in isolation as
the City would apparently prefer. A jury should be allowed to determine proximate

cause. *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 615 (7th Cir. 2002) ("[G]enerally the issue of proximate cause is a jury question.").

The City's response explains it well -- Lumar was calm and rational until he was returned to the police station after Wlodarski's false report. City Response pp. 20-21. Plaintiff does not proceed here on mere assertions as the City suggests in its response, City Response, p. 21, but instead from the record.

The evidence comes directly from the testimony of City employees. In this regard, the following facts are not disputed: Lumar said, "that wasn't mine," was angry and claimed the drugs weren't his. Dkt. 368, p. 9, ¶ 57. Officer Alexander told Lumar that he would be returned to the Jail for bond court the next day. Dkt. 360. p. 11, ¶ 44; Dkt. 368, p. 9, ¶ 61. Lumar was acting upset while he was in the van. Dkt. 360, p. 11, ¶ 45; Dkt. 368, p. 10, ¶ 62. Upon his arrival back at the 11th District Police station, Lumar was "ranting and raving," kept saying "this is bullshit" and was agitated and upset. Dkt. 360, p. 11, ¶ 46; Dkt. 368, p. 10, ¶ 63. Lumar was escorted to a cell at 11:04 a.m., and 11 minutes later, at 11;15 a.m. Lumar was found hanging. Dkt. 365, p. 17 ¶ 73.

Plaintiff here, pursues two avenues of damages in connection with Lumar's suicide, *i.e.*, § 1983 damages arising from his Fourth Amendment claims against the City and Wlodarski, and damages pursuant to the Illinois Wrongful Death Act.

C.    Under § 1983 Plaintiff is Entitled to Recover for All Damages That Flowed From the Defendants' Constitutional Misconduct.

A § 1983 plaintiff may recover damages that any constitutional violation proximately causes. *See County of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539,

1548 (2017). "The tortfeasor takes his victim as he finds him. That is the 'eggshell skull' rule, which like most principles of the common law of torts is applicable to a constitutional tort case brought under 42 U.S.C. § 1983." *Richman v. Sheahan*, 512 F.3d 876, 884 (7th Cir. 2008) (internal citations omitted). Mental anguish and suffering are compensable damages under § 1983. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307 (1986).

This Court has implicitly recognized, albeit in the context of a prisoner's *in forma pauperis* application, that self-harm by a prisoner could foreseeably be caused by alleged Eighth Amendment conditions of confinement violations. *Sanders v. Melvin*, 873 F.3d 957, 961 (7th Cir. 2017) ("[T]he potential self-harm that [plaintiff] alleges may well be caused by the complained-of conduct."); *see also, Tumminello v. Father Ryan High School, Inc.*, 678 Fed. App'x 281, 288 (6th Cir. 2017) (Suicide is a foreseeable consequence of bullying.); *compare, Cleveland v. Rotman*, 297 F.3d 569, 573 (7th Cir. 2002) (Suicide after receiving allegedly bad legal advice was unforeseeable.) Lumar's mental anguish and self-harm were a result of the constitutional violations that the Defendants committed and were foreseeable under the circumstances here.

Lumar's potential for self-harm was foreseeable enough that the City performed a suicide screening when Lumar was initially arrested on the trivial $50 warrant before any constitutional violations occurred. Now the Defendants argue that Lumar's self-harm was unforeseeable after being wrongly accused of a felony, after Lumar was placed into a cell alone, with no suicide screening, while "ranting

and raving" and plainly suffering severe mental anguish.

    D.    Plaintiff Should Be Allowed to Pursue Damages Under the Illinois Wrongful Death Act.

The second, and more contentious issue, is Plaintiff's claim under the Illinois Wrongful Death Act. The Illinois Wrongful Death Act allows surviving spouses and next of kin to recover for injuries they incurred because of the death. 740 Ill. Comp. Stat. 180/2. This type of claim is available under Illinois state law but is barred under § 1983, because under § 1983, claims are personal to the injured party. *See Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005).

A proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause. *See Kleen v. Homak Manufacturing Company,* 321 Ill. App. 3d 639, 641 (Ill. App. Ct. 2001). Proximate cause is composed of two elements: legal cause and cause in fact. Legal cause exists where the injury was of a type that a reasonable person would foresee as a likely result of his or her conduct. *Id.*, 321 Ill. App. 3d at 642.

Plaintiff acknowledges that the general rule under Illinois law is that a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent intervening event that the tortfeasor cannot be expected to foresee. *Crumpton v. Walgreen Co.*, 375 Ill. App. 3d 73, 78 (Ill. App. Ct. 2007). Plaintiff further acknowledges that wrongful conduct that is compensable under § 1983 may not be compensable under state law. *Deluna ex rel. Estate of Virydiana v. City of Rockford*, 447 F.3d 1008, 1013 (7th Cir. 2006), *citing Carter v. Chicago Police Officers,* 165 F.3d 1071, 1081 (7th Cir. 1998) (Recognizing that a court may find

conduct to be unreasonable for Fourth Amendment purposes, but not willful and wanton so as to violate Illinois law).

No Illinois case law holds that a plaintiff may never recover for wrongful death where the decedent's death was the result of a suicide. The Illinois Supreme Court's most recent decision tackling the issue is *Turcios v. DeBruler Co.*, 32 N.E.3d 1117 (Ill. 2015). In *Turcios*, the decedent was embroiled in a dispute over an apartment he had rented and the landlord's unilateral cancellation of the lease. *Id*. at 1120-1121. The decedent was offered $2,000 from the property manager to move out but felt discriminated [against] and harassed. *Id*. at 1121. The decedent reported to a third party that he and his wife felt "fatigue due to lack of sleep over [the]matter," and they were "depressed, anxious and angry" because the management company was not willing to work with them. *Id*. The decedent allegedly told his wife that he could not tolerate the situation any longer, but did not know what to do, and committed suicide the following day. *Id*.

In dismissing the wrongful death action, *Turcios* found that the plaintiff did not identify any injury to decedent that caused his death and did not identify on what legal theory defendant's conduct was "wrongful." *Id*. at 1123. "[A] suicide may result from a complex combination of psychological, psychiatric, chemical, emotional, and environmental factors." *Id*. at 1128. As a result, "it is the rare case in which the decedent's suicide would not break the chain of causation and bar a cause of action for wrongful death, even where the plaintiff alleges the defendant inflicted severe emotional distress." *Id*. But as a district court has observed, "rare is

23

not the same as impossible." *Hankins v. Alpha Kappa Alpha Sorority, Inc.*, 447 F. Supp. 3d 672, 682 (N.D. Ill. 2020) (Chang, J.). Based on the record, this is one of those rare cases.

In *Turcios*, "the Illinois Supreme Court did not hold that suicide is always unforeseeable as a matter of law. Rather, *Turcios* only set forth a general presumption—albeit a strong one—that can still be overcome if a plaintiff is able to 'plead facts demonstrating that the suicide was foreseeable.'" *Hankins*, 447 F. Supp. 3d at 681-82 (emphasis in original), *citing Turcios*, 2015 IL 117962 at ¶41. In distinguishing *Turcios*, *Hankins* found that the plaintiff had sufficiently plead foreseeability where the complaint set out specific examples of physical and mental abuse that exacerbated the decedent's mental condition. *Id.*, 447 F. Supp. 3d at 682. Notably, *Turcios* was decided at the pleading stage on a motion to dismiss without a developed record. *Turcios* at 1120. As discussed above, the record contains considerable and sufficient evidence to allow a jury to determine proximate cause.

Absent a party's waiver of his or her right to a jury trial, a district court deciding a motion for summary judgment cannot decide disputed issues of material fact for the jury. *See Lacy v. Cook County*, 897 F.3d 847, 860-861 (7th Cir. 2018). In other words, the district court should have let the jury decide questions within the jury's province, including the issue of proximate cause.

The Plaintiff respectfully submits that this Court should reverse the decision below and remand this case to the district court so that a jury may decide whether the Defendants' violations of the Fourth Amendment and the Illinois Wrongful

Death Act proximately caused Lumar's suicide.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that this Court should reverse the decision of the District Court granting Defendants' motions for summary judgment, enter summary judgment in favor of Plaintiff on her motions for summary judgment, and remand this case for further proceedings for a jury to ascertain damages.

Respectfully submitted,


/S/ *Donald J. Pechous*
Donald J. Pechous



Attorneys for Plaintiff-Appellant:

Donald J. Pechous *Counsel of Record*
The Khowaja Law Firm, LLC
8 S. Michigan Ave., Suite 2600
Chicago, IL 60603
312-388-1198
Email: dpechous@khowajalaw.com

Bryan J. O'Connor, Sr.
O'Connor Law Group, LLC
221 N. LaSalle St., Suite 1750
Chicago, IL 60601
312-236-1814
Email: boc@oconnorlawgroup.com

**CERTIFICATE OF COMPLIANCE WITH**
**FEDERAL RULE OF APPELLATE PROCEDURE 32(a)**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,984 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12 point Century Schoolbook font and footnotes in 12 point Century Schoolbook font.

/s/ *Donald J Pechous*
Donald J. Pechous

*Attorney for Plaintiff-Appellant*

Dated:   May 31, 2023

## CERTIFICATE OF SERVICE

I, the undersigned, counsel for the Plaintiff-Appellant, hereby certify that on May 31, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ *Donald J Pechous*
Donald J. Pechous
THE KHOWAJA LAW FIRM, LLC
8 South Michigan Avenue
Suite 2600
Chicago, Illinois 60603
(312) 388-1198
dpechous@khowajalaw.com

Dated:    May 31, 2023